UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------X    Civil Number: 02-CV-656 (GLG)

TIMOTHY P. DOYLE,                                        :
                                                         :
       Plaintiff                                         :
                                                         :
    v.                                                   :
                                                         :
TOWN OF LITCHFIELD;                                      :
                                                         :
       Defendant                                         :
-------------------------------------------------------X    December 20, 2004

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Timothy P. Doyle, through undersigned counsel, submits the within memorandum of law in opposition to defendant Town of Litchfield's (the "Town") motion for summary judgment (the "Town's Motion").[1]

### PRELIMINARY STATEMENT

The focus of the present action is the recovery of Plaintiffs' response costs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 et seq., incurred by Plaintiff responding to the undisputed release of hazardous substances from the Town's Landfill. Plaintiff also seeks injunctive relief under the citizen suit provisions of the Resource Conservation & Recovery Act ("RCRA"), 42 U.S.C. § 6972 et seq.

The Town's Motion proffers an "apples to oranges" legal argument in attempt to blur distinct legal theories and thereby escape liability under federal law. The Town

---

[1] Also submitted herewith is the Declaration of John T. Shaban ("Shaban Decl.") and Plaintiff's Local Rule 56(a)2 Statement. The terms and abbreviations used in the Second Amended Complaint (the "Complaint") and /or the Town's Answer and Affirmative Defenses (the "Answer") are used herein.

argues that Plaintiff's federal claims are precluded by virtue of a previous action brought by Plaintiff in Connecticut Superior Court (the "State Court Action") which resulted in a January 2001 decision by Judge Franzzini (the "State Court Decision"). This argument is unavailing because the State Court Action and Decision focused on whether Plaintiff's former Litchfield property (the "Property") was actually polluted. Contrarily, in the present CERCLA and RCRA actions, the focus in on whether Plaintiff incurred response costs and/or the Town mishandled hazardous waste, *regardless* of whether the Property became polluted.

In fact, the State Court Decision works in Plaintiff's favor by establishing the essential elements of Plaintiff's CERCLA and RCRA claims. Moreover, the Town has been forced to admit in its Answer that contaminated leachate was released from the Landfill and that hazardous substances have entered and will continue to enter surrounding ground waters. See Answer at ¶¶19-24.

Plaintiff has pleaded prima facie CERCLA and RCRA claims, and the State Court Decision supports, not negates, these essential elements. Accordingly, the Towns' Motion should be denied.

## FACTS

Significantly, the majority of the facts alleged in the Complaint have been admitted by the Town in its Answer, and/or are *res judicata* by virtue of the State Court Decision. (The State Court Decision ("SCD") as printed from Westlaw is attached hereto; a Lexis version is attached to the Town's Motion as Ex. F.) Thus, most of the salient facts are undisputed and/or indisputable.

2

**The Doyle Property**

It is undisputed that on or about March 11, 1996, the Plaintiff and his fiancé purchased the Property which consists of 3.58 acres located at 521 South Plains Road, at the intersection of South Plains Road and Little Pitch Road, in the town of Litchfield.[2] The Property contained a colonial-style farmhouse built in 1802, a small pond, and gently sloping land. Plaintiff and his fiancé planned on building and running a horse breeding operation on the Property. See Answer at ¶ 10; SCD at *1.

It is undisputed that Plaintiff soon became concerned about the condition of the water in the pond. All parties agree that, in the spring of 1996, Plaintiff saw floating dead fish and pollywogs and an orange haze or sheen on top of the pond. See Answer at ¶11; SCD at * 1. Plaintiff thereafter undertook an investigation wherein he tested samples of surface water from the pond, talked to neighbors, and engaged an environmental testing company. It is undisputed that Doyle contacted the Connecticut Department of Environmental Protection ("DEP") about the neighboring Landfill and learned that the leachate from the Landfill had been the subject of previous litigation and orders from the DEP. Id. As a result of his investigation, Plaintiff formed the opinion that Landfill leachate had also contaminated the Property. It is undisputed that, following his investigation, Plaintiff contacted the local authorities, and through them the United States Environmental Protection Agency (the "EPA"), about the conditions in and around the Landfill and the resulting impact on the Property. Id.

It is undisputed that, in connection with his purchase of the Property, Doyle obtained zoning and conservation permits from the Town and undertook a series of

---

[2] The Town's only dispute with this factual statement is a technical one -- Plaintiff's fiancé purchased the property first only late to transfer it to Plaintiff -- and irrelevant for purposes of this action.

3

improvements on the Property to ready it for horse breeding such as removing trees, clearing land, installing a riding ring and a horse barn. See Answer at ¶12; SCD at *1. It is also undisputed that Plaintiff spent significant sums of time and money conducting environmental testing, blasting and excavating the land, moving dirt, capping an existing well, removing old drain pipes and installing new ones to direct surface water flow on the Property to and from the pond. See Answer at ¶13; SCD *1.

It is undisputed that in August 1996, Plaintiff and his fiancé married, moved onto the Property, and thereafter continued working toward their plan to raise a family and run a horse farm on the Property. See Answer at ¶14. The Town denies Plaintiff's claim that, after moving onto the Property, Plaintiff continued to spend time and money responding to the leachate problem and contamination on the Property, and that Plaintiff was unable to correct or otherwise cease the continuing flow of leachate from the Landfill.

**The Litchfield Landfill**

It is undisputed that the Landfill lies approximately one-quarter mile to the southeast of the Property, and that the Landfill was for fifty years the town dump for solid waste disposal, accepting a variety of residential, commercial, and industrial waste, including hazardous substances. The Landfill is still owned and operated by the Town as a waste recycling facility. See Answer at ¶17; SCD at *2.

It is undisputed that the Landfill is located in a steep valley between two bedrock ridges, and grew over the years to occupy 7.4 acres of land rising to a height of 45 feet at its center. See Answer at ¶18; SCD at *2. Significantly, it is undisputed that the water table in the center of the Landfill is more than 20 feet higher than the base of the refuse,

4

and that the historical use of the site and its hydro-geology resulted in leachate from the Landfill entering the bedrock system underneath the Landfill and into local groundwater and surface water systems. See Answer at ¶19; SCD at *2.

It is undisputed that the DEP entered a pollution abatement order against the Town and the Landfill in 1982. See Answer at ¶20; SCD *2. See also Shaban Decl. at Exhibit A (also Ex A to the Complaint). In compliance with the DEP's abatement order, the Town hired the engineering firm of Fuss & O'Neill to conduct a hydrogeological study. Id. It is undisputed that the study documented the presence of leachate contamination in the fractured bedrock adjacent to the Landfill and nearby ground and surface waters. Answer at ¶20; SCD *2. The Fuss & O'Neill hydrogeological study also reported that the principal pathways for leachate migration from the Landfill were to the north and south along the fracture trend in the bedrock, and that leachate also flowed toward the northwest in the general direction of the Property. Id.

It is undisputed that, in 1984, the Town submitted to the DEP a map depicting an area of approximately 350 acres surrounding the Landfill depicting the areas where the DEP either had to pre-approve well drilling or otherwise designate the area as a "No Soil Development Zone." See Answer at ¶21. See also Shaban Decl. at Ex B (also Ex B. to the Complaint). It is undisputed that the Property is located within the "No Soil Development Zone." See Shaban Decl. Ex B; SCD at *4 (Town's map places Property within area of potential leachate impact).

It is undisputed that, in response to the DEP order, the Town developed, adopted and implemented a landfill closure plan. See Answer at ¶22; SCD at *2. It is undisputed that, as part of this plan, the Town installed water monitoring wells, began monitoring

5

water quality at various private wells, and extended water mains to properties near the Landfill -- i.e. Plaintiff's neighbors -- to monitor and/or abate the problems caused by the flow of leachate from the Landfill. See Answer at ¶22; SCD at *2. Plaintiff alleges that was not aware of the measures taken by the Town until well after his purchase of the Property.

It is undisputed that, since leachate contamination from the Landfill was and is carried into the bedrock by water, part of the Town's closure plan involved placing a covering material composed of soil and ash derived from incinerated sludge on the top on the landfill to reduce the amount of rain and surface water entering the Landfill. See Answer at ¶23; SCD at * 2. Plaintiff has alleged that hazardous substances are contained within this covering material and have been and are being released from the Landfill.

Significantly, it is undisputed that the Landfill sits in a wetland area in a bedrock valley partially above the water table, and because of the topography, the Landfill base remains saturated despite the closing of the Landfill and the ash sludge cap covering. As a result, it is undisputed that the Landfill has and will continue to leach hazardous substances through ground water entering bedrock at the base and sides of the Landfill for many years. See Answer at ¶24; SCD at *2.

It is undisputed that the Town has continued to collect and analyze water samples obtained from the various monitoring wells quarterly to detect the presence of leachate constituents at the various locations. See Answer at ¶25; SCD at *2.

## Crompton's Illegal Handling of Hazardous Waste

While the related entities of Crompton Manufacturing Company Inc. ("Crompton"), Uniroyal Chemical Company, Inc. ("Uniroyal") and the Naugatuck

6

Treatment Company ("NTC") (collectively and in the singular, "Crompton.") are not presently a party to this action (discussed below), Crompton's activities are still central to the present action.

It is a matter of public record that, starting in or about 1984, NTC began operating an "over the road program" in which truck tankers of waste were hauled to NTC. NTC accepted massive amounts of industrial waste despite Crompton not having the proper permits to accept commercial and/or industrial waste, sludge or hazardous waste at NTC. The levels of hazardous substances in the waste accepted at NTC exceeded the acceptable safety levels permitted at NTC under applicable state and federal law.

It is a matter of public record that, in November 1998, the Connecticut State Attorney General's Office instituted a lawsuit against Uniroyal and NTC based on the aforementioned violations (the "AG's lawsuit"). In August of 1999, Uniroyal agreed to pay $1.2 million to settle the AG's lawsuit. One million dollars of the settlement was earmarked for a special agency to restore the Naugatuck River (which was severely polluted by Crompton' illegal activities), and $200,000.00 of the settlement payment constituted a fine that was paid to the Connecticut State Treasury.

### The Town's Acceptance of Crompton's Sludge Ash

It is undisputed that, in or about 1991, Crompton disposed of approximately 10,000 cubic yards of incinerated sludge ash from NTC in the Landfill. This sludge ash was used as part of the cover for the Landfill as described above. See Answer at ¶31. See Shaban Decl at Ex C (also Ex. C to the Complaint).

It is undisputed that the DEP granted permission to Uniroyal and/or NTC to dispose of the 10,000 cubic yards of incinerated ash based on, among other things,

7

representations from NTC and Uniroyal at the time that the sludge ash did not contain excessively high levels of hazardous substances and that the ash was otherwise appropriate for land disposal. Shaban Decl at Ex C. See also Answer at ¶32. It is undisputed that the Town also authorized the disposal of NTC sludge ash at the Landfill. See Answer at ¶33. Plaintiff believes that Uniroyal and/or NTC failed to notify the Town, and/or the Town purposefully, recklessly and/or negligently failed to monitor and recognize that the sludge ash was subject to certain EPA "land ban" provisions which prevented disposal of the sludge ash at the Landfill.

## Previous State Action

In the previous State Court Action, Doyle sued the former owners of the Property, the real estate agents who brokered the sale of the Property, and the Town arguing that those defendants had concealed and/or failed to disclose the pollution at the neighboring Landfill before Doyle and his fiancé purchased the Property. The State Court Decision found that Doyle had failed to establish a direct leachate pathway between the polluted Landfill and the Property. Based on Doyle's failure to establish that the Landfill was the direct causal source of contamination on the Property, the State Court rejected Doyle's claims. See SCD at *3 (encapsulating issue before the court as whether toxic Landfill constituents polluted the Property), 13, 15 fn 24, and 16 (finding that Doyle failed to prove that the Property was contaminated by the Landfill).

## Present Action

Plaintiff, acting *pro se*, initiated this action against the Town by Complaint dated April 8, 2002. Plaintiff alleged that the Town's actions violated his rights under the Fourth, Fifth and Fourteenth Amendments on the Federal Constitution. In May 2002,

8

Plaintiff (still acting *pro se*) filed an Amended Complaint wherein he added Crompton as a defendant based on his discovery that Uniroyal had supplied the toxic incinerated sludge ash that was used to cap the Landfill. Plaintiff's Amended Complaint pleaded causes of action based on (i) violations of the Fourteenth Amendment; (ii) a violation of 42 U.S.C. § 9607(a); (iii) Private Nuisance; (iv) Trespass Class Action; and (v) Toxic Tort Class Action. On September 9, 2002, Crompton moved to dismiss the Amended Complaint. Because Plaintiff, still acting *pro se*, failed to oppose the motion, the Court granted Crompton's motion on October 8, 2002 based on the "absence of opposition."

In January 2003, the Court granted Plaintiff's application for appointment of pro bono counsel, and appointed the undersigned as counsel for Plaintiff. The undersigned thereafter switched firms, and Plaintiff was required to file a new a Motion for Order Authorizing Payment of Fees and Litigation Expenses. Said motion was granted on April 21, 2003. Through appointed counsel, Plaintiff filed a motion to amend the complaint to restate claims against the Town and to replead its claims against Crompton. Crompton opposed the motion; the Town filed an answer. By ruling dated October 22, 2003, Judge Goettel denied Plaintiff's motion to amend as against Crompton as futile, reasoning that the State Court Decision would preclude Plaintiff's claims against Crompton. Plaintiff's appeal of Judge Goettel's ruling was withdrawn as premature, and will be refiled at the appropriate time (assuming that this Court does not reconsider that ruling in light of the within arguments). By this Court's directive, Plaintiff filed a Second Amended Complaint (not naming Crompton) to enable the Town to file its Answer and the present Motion.

## ARGUMENT

### I.    PLAINTIFF'S CERCLA AND RCRA CLAIMS ARE NOT PRECLUDED

The principle of res judicata bars relitigation of claims which were brought or
could have been brought in a previous action. See Dontigney v. Roberts, 73 Conn. App.
709, 711 (2002). See also Wades' Dairy, Inc. v. Town of Fairfield, 181 Conn. 556, 559
(1980)("The doctrine of res judicata requires that a final judgment on the merits, rendered
. . . by a court of competent jurisdiction, is conclusive, of those causes of action and of
such issues or facts thereby litigated as to the parties and their privies, in all other actions
in any judicial tribunal of concurrent jurisdiction").

Separately, "to invoke collateral estoppel [a.k.a. issue preclusion] the issues
sought to be litigated in the new proceeding must be identical to those considered in the
prior proceeding." R&R Pool & Patio v. Zoning Board, 60 Conn. App. 82, 91-92
(2000)(emphasis added). The party seeking preclusion "must establish that the issue
sought to be foreclosed actually was litigated and determined in the prior action" and that
the determination "was essential to the decision in the prior case." Delahunty v.
Massachusetts Mutual Life Insurance Company, 236 Conn. 582, 601 (1996) (rejecting
defendant's collateral estoppel argument in a fraud case; although some evidence had
been presented in the previous action related to alleged fraudulent conduct, the previous
court did not make any findings of fraud).

Here, the Town ignores that the facts and issues presented in Plaintiff's CERCLA and RCRA claims were not, and could not have been, litigated in the previous State Court Action. Accordingly, neither claim preclusion nor issue preclusion apply.[3]

A.    **Plaintiff's CERCLA and RCRA claims are not precluded because they are and were subject to this Court's exclusive original jurisdiction.**

It is black-letter law that, if state preclusion law includes a requirement of prior jurisdictional competency, a state judgment will not have a claim preclusive effect on a later cause of action within exclusive jurisdiction of the federal courts. Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 382 (1985). See e.g. Kelley v. John A. Biewer Co. of Schoolcraft, Inc., 1993 WL 186557, *5 (W.D.MI 1993)(holding that *res judicata* cannot apply to bar subsequent CERCLA action in federal court by virtue of prior Michigan state action because District Court had exclusive original jurisdiction over CERCLA claims); Nordberg v. Lord, Day & Lord, 107 F.R.D. 692, 701 (S.D.N.Y. 1985)("Because the federal courts have exclusive jurisdiction over RICO actions, plaintiffs could not have asserted their RICO claims in the state court action. Thus, under New York's law of claim preclusion or *res judicata*, plaintiffs' RICO action is not barred by the prior state court judgment").

Connecticut law requires jurisdictional competency for the application of *res judicata*. See Wades' Dairy, 181 Conn. at 559 ("The doctrine of res judicata requires that

---

[3]    Similarly, the Town's Rooker-Feldman argument fails. The Rooker-Feldman doctrine holds that a federal district court does not have jurisdiction to review a final adjudication of a state court. See Rooker v. Fidelity Trust Co., 263 U.S. 413 (1023); FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir. 1996) (the existence of a state court judgment will only bar the federal proceeding under Rooker-Feldman where, in entertaining the plaintiff's claim, the federal court would be required to determine that the state court judgment was erroneously entered, or to take action that would render the state court judgment ineffectual). Rooker-Feldman does not apply here because Plaintiff is not asking this Court to review the State Court Decision -- in fact, Plaintiff looks to the State Court Decision to establish most of the essential elements of his CERCLA and RCRA claims.

a final judgment on the merits, rendered . . . by a court of competent jurisdiction, is conclusive . . . in all other actions in any judicial tribunal of concurrent jurisdiction"). Here, it is indisputable that Plaintiff's CERCLA and RCRA claims are subject to this Court's exclusive original jurisdiction. See 42 U.S.C. § 9613(b)(CERCLA); 42 U.S.C. § 7002(a)(RCRA). Accordingly, the State Court Action and/or Decision does not preclude Plaintiff's CERCLA and RCRA claims because they could not have been brought in state court.[4]

**B.    Plaintiff is not collaterally estopped from asserting his CERCLA and RCRA claims because different issues are presented in this case.**

   1. Plaintiff's CERCLA Claim is not precluded by the State Court Decision.

   CERCLA is a broad remedial statute enacted to assure "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." Prisco v A&D Carting, 168 F.3d 593, 602 (2d Cir. 1999), quoting B.F. Goodrich v. Betkoski, 99 F.3d 505, 514 (2d Cir. 1996). "As a remedial statute, CERCLA should be construed liberally to give effect to its purposes." Prisco, 168 F.3d at 602. CERCLA addresses in particular the costs of responding to the release or threatened release of "hazardous substances," as that term is defined by CERCLA § 101(14) (42 U.S.C. § 9601 (14)). Accordingly, section 107 of CERCLA provides a private right of action for the recovery of such costs. "In determining liability under § 107, the quantity

---

[4] Notably, none of the authorities cited by the Town in support of its claim preclusion argument deal with the situation where -- as in Kelley and the present case -- a prior state court decision is trying to be leveraged to preclude an subsequent action in federal court where the court has exclusive original jurisdiction. Further, the Town's 56(a)1 Statement erroneously states that Plaintiff alleged violations of CERCLA and RCRA in its Second Amended Complaint. Not only is this allegation irrelevant – the State Court Action was based on a Third Amended Complaint – it is inaccurate. Compare Town's 56(a)1 Statement at ¶6 (citing to the Second Amended Complaint at ¶22e) to Second Amended Complaint at ¶22e, attached as Town Ex D.

or concentration of the hazardous substance is not a factor." Id., citing United States v.

Alcan Aluminum Corp., 990 F.2d 711 (2d Cir. 1993).

In order to make out a *prima facie* case under CERCLA § 107, a plaintiff must

establish five elements:

1. The defendant falls within one of the four categories of potentially responsible parties ("PRPs") set forth in § 107(a);[5]

2. The facility is a "facility" as defined by § 101(9) of CERCLA (42 U.S.C. § 9601(9)); [6]

3 There has been a release or a threatened release of hazardous substances at the facility;

4. The plaintiff incurred costs in responding to the release or threatened release;

5. The costs incurred conform to the National Contingency Plan ("NCP").[7]

Prisco, 168 F.3d at 602-03.

"Once the plaintiff establishes these elements, the defendant is strictly liable for the presence of the hazardous substances [at the facility] unless it succeeds in invoking one of the statutory defenses set forth in § 107(b). It is not a defense that the particular hazardous substance attributable to a specific defendant is not linked to the plaintiff's response costs."

---

[5] PRPs can be (i) the owner and operator of a facility, (ii) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (iii) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and (iv) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such persons.

[6] "The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." Id.

[7] The term 'national contingency plan' means the national contingency plan published under section 1321(c) of Title 33 or revised pursuant to section 9605 of Title 42. 42 U.S.C. § 9601 (31)

Id. at 603 (emphasis added), citing Betkowski, 99 F.3d at 514. See also United States v. Alcan Aluminum Corp., 990 F.2d 711, 721 (2d Cir.1993) ("What is not required is that . . . a specific defendant's waste caused incurrence of clean-up costs"); New York v. Shore Realty Corp., 759 F.2d 1032, 1042 (2d Cir.1985)(where the Court refused to read a causation requirement into CERCLA section 107); accord Bedford Affiliates v. Sills, et. al, 156 F.3rd 416, 423-424 (1998).

Significantly, even if a plaintiff's property does not actually become polluted, the PRP is still strictly liable under CERCLA for plaintiff's response costs. Contrary to the Town's (and Crompton's previous) argument, Plaintiff here is not required to plead or prove that his Property was actually polluted by the undeniable release of hazardous waste from the Landfill, only that he incurred response costs addressing a release or threatened release. The law is clear, even if there was only a threatened release, and/or the Property never became polluted, Plaintiff is still entitled to recover response costs.

Indeed, the Eight Circuit in Johnson v. James Langley Operating Co., Inc., 226 F.3d 957 (8th Cir. 2000), confronted a similar situation. In Johnson, the district court granted the defendants' motion for summary judgment against CERCLA plaintiffs because plaintiffs failed to show contamination on their property in excess of applicable pollution standards or that the conditions at the property otherwise threatened the public. Id. at 960-61. In reversing the lower court, the Eight Circuit reasoned (citations from original maintained):

> We disagree with [two cases opining that actual pollution need be shown] to the extent that they saddle a landowner with the costs of testing and sampling in response to a release or threat of a release of hazardous substances. CERCLA plainly contemplates liability for site assessment. The statute defines "response" to include removal actions. See 42 U.S.C. § 9601(25). Removal, in turn, includes "such actions as may be necessary to

*monitor, assess, and evaluate the release or threat of release* of hazardous substances." 42 U.S.C. § 9601(23) (emphasis added). Moreover, CERCLA's plain language does not incorporate any quantitative threshold into its definition of hazardous substances. See United States v. Alcan Aluminum Corp., 964 F.2d 252, 260- 61 (3d Cir. 1992) (collecting cases); [Amoco Oil Co. v. Borden, Inc., 889 F. 2d 664, 669 (5th Cir. 1989).

To fashion a quantitative minimum threshold for CERCLA liability under the guise of a non-statutory "justification" theory is to undo the policy decision Congress has already made: that the threat posed by hazardous substances does not depend upon a minimum concentration or quantity. See Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 78 n. 9 (1st Cir. 1999) (Amoco) " 'reads much too much into the word "causes" in section 9607(a)(4)' " (quoting A & W Smelter & Refiners, Inc. v. Clinton, 146 F.3d 1107, 1110 (9th Cir. 1998)); Stewman v. Mid-South Wood Products of Mena, Inc., 993 F.2d 646, 649 (8th Cir. 1993) ("[T]here is no minimum quantitative requirement to establish a release or threat of a release of a hazardous substance under CERCLA.").

CERCLA allocates to the generator of hazardous substances the cost of ascertaining the danger posed by an actual or threatened release of hazardous substances, even if such testing determines that levels do not warrant cleanup action. The statute contains its own limitations to ensure that response costs are justified and that private cost recovery actions for expenses incurred in site evaluation do not become a vehicle for wholly speculative testing.

Johnson, 226 F.3d at 962-63 (emphasis added). See also, Lansford-Coaldale Joint Water

Authority v. Tonolli Corp., 4 F.3d 1209, 1219 (3rd Cir. 1993)("It is well-established that

under [CERCLA] a plaintiff can recover its monitoring and evaluation costs from a

release or threatened release without proving that its property was actually contaminated

by the defendant"), citing Artesian Water Co. v. Government of New Castle County, 851

F.2d 643, 651 (3d Cir. 1988), Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889

F.2d 1146, 1153-54 (1st Cir. 1989), Wickland Oil Terminals v. Asarco, Inc., 792 F.2d

887, 892 (9th Cir.1986).

The Second Circuit's decision in New York v. Shore Realty Corp., 759 F.2d 1032

(2d Cir 1985) follows this same rationale. In Shore Realty, the Second Circuit held that

15

expenses incurred responding to a threatened release -- i.e. where no actual release polluted the plaintiffs' property -- where recoverable where defendants owned corroding storage tanks and pipelines, and defendants displayed a historical inability to properly handle hazardous waste (i.e. earlier releases):

> In addition, Shore's suggestion that CERCLA does not impose liability for threatened releases is simply frivolous. Section 9607(a)(4)(A) imposes liability for "all costs of removal or remedial action." The definitions of "removal" and "remedial" explicitly refer to actions "taken in the event of the threat of release of hazardous substances."

Id. at 1045 (citing CERCLA Legislative History).

Here, Plaintiff has pleaded, and at trial will be able to prove, that: (1) the Town falls into at least one of the four categories PRPs; (2) the Landfill is a "facility;" (3) there was a release of hazardous waste from the Landfill, and the threat of continuing releases is real; (4) Plaintiff incurred response costs in connection that release and/or threatened release; and (5) these costs were in conformity with the NCP. Once Plaintiff proves these requisite elements, the Town will be strictly liable to pay for Plaintiff's response costs, without regard to causation and, as in Johnson and Shore Realty, *regardless* of whether the Property was or was not polluted.[8]

Thus, in stark contrast to the Town's position, the State Court Decision actually works to establish these essential elements of Plaintiff's CERCLA claim. Indeed, it is

---

[8] The Town also notes that Plaintiff sought recovery for his testing expenses in the State Court Action through Conn. Gen. Stat §22a-452. This fact is irrelevant as it relates to Plaintiff's CERCLA claim. Conn. Gen. Stat §22a-452 requires a showing of fault and causation to recover these costs; as described above, CERCLA creates a strict liability rubric and does not require a showing of fault and causation. See CRRA v. Refuse Gardens, Inc., 9 Conn. L. Rptr. 77, 89-90 (Sup Ct. Hartford 1993). These differing standards of proof cut the legs out from under the Town's preclusion argument regarding response costs. "For collateral estoppel to apply, the issues in each action must be identical, and issues are not identical when the legal standards governing their resolution are significantly different." Computer Associates Intern., Inc. v. Altai, Inc., 126 F.3d 365, 371 (2d Cir 1997), citing 18 Charles A. Wright, et al., 18 Federal Practice & Procedure § 4417, at 165 (2d ed. 1981).

both undisputed and *res judicata* that there was a release and threat of future releases of

hazardous waste from the Landfill, and that Plaintiff incurred response costs as a result.

See Answer at ¶¶19-24; SCD at *1-2. Whether the Property was or was not polluted is

irrelevant to Plaintiff's CERCLA claims.[9]

2.    Plaintiff's RCRA Claims are not Precluded by the State Court Action

As with Plaintiff's CERCLA claim, the State Court Decision does not collaterally

estop Plaintiff from asserting his RCRA claims. In fact, the State Court decision and the

Town's Answer work together to establish Plaintiff's RCRA claim.

To establish a violation of RCRA §6972(a)(1)(A), a plaintiff must establish that

the defendant is currently in violation of a "permit, standard, regulation, condition,

requirement, prohibition, or order which has become effective pursuant to this chapter."

To establish a violation of §6972(a)(1)(B), a plaintiff must establish that the defendant

"has contributed or ... is contributing to the past or present handling, storage, treatment,

---

[9] Notably, Judge Goettel's Ruling was based on his finding that the State Court Decision establishes that the Property was not polluted. Plaintiff respectfully disagrees with his Honor both in the application of CERCLA and with the proposition that the Property was found to be unpolluted. To the extent that the Town argues that Judge Goettel's ruling must be mimicked here as "law of the case," Plaintiff obviously disagrees, and will ask this Court to reconsider Judge Goettel's ruling at an appropriate time. See e.g. Breen v. Phelps, 186 Conn. 86, 99 (1982)(the law of the case is a flexible principle which expresses the practice of judges generally to refuse to reopen what has been decided, but is not a limitation on their power to do so when warranted); Miller v. Kirschner, 225 Conn. 185, 220 (1993) ("A judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings, and if the same point is again raised he has the same right to reconsider the question as if he had himself made the original decision").

Further, while not relevant to Plaintiff's CERCLA and RCRA case, Plaintiffs disagrees with the Town's argument that the State Court Decision establishes that the Property "was not and could not" be polluted. Town's Memo at 7. Indeed, while the state court judge found that Doyle (and more specifically, his expert) failed to establish a direct leachate pathway between the polluted Landfill and the Property, the State Court Judge opined, on multiple occasions, that the Property contained notable levels of heavy metals and pollutants. Judge Frazzini, however, rejected Doyle's expert's methodology and interpretation of these readings. See e.g. SCD *6 (rejecting various pollutant standards because there had not been a formal "discharge" under state and federal statutes); Id. ("It is undisputed that the total mass of each metal in each of these samples and the quotient resulting from [the expert's formula] exceed the number established by the [DEP's pollutant mobility criteria]," but then rejecting expert's formula); SCD at * 15, fn 24 (judge personally observing orange tinted stream water between the Landfill and the Property).

17

transportation, or disposal of any ... hazardous waste which may present an imminent and substantial endangerment to health or the environment." See ABB Indus. Systems, Inc. v. Prime Technology, Inc., 120 F.3d 351, 359 (2nd Cir. 1997).

Plaintiff has pleaded and intends to prove these requisite elements of his citizen's suit under sections 6972(a)(1)(A) and (B). The State Court Decision -- holding that Plaintiff failed to establish a direct leachate pathway to the Property -- is irrelevant to Plaintiff's RCRA claims. In fact, because of the State Court Decision, the Town will be collaterally estopped from disputing any of the elements of Plaintiff's RCRA claim. [10] Accordingly, the Town's preclusion argument must be rejected.

## II.    PLAINTIFF HAS STANDING

The Town's standing argument is baseless. Article III standing requires injury-in-fact, causation and redressability. Interfaith Community Organization v. Honeywell, 215 F. Supp. 2d 482 (D.N.J. 2002), citing Steel Co. v. Citizens for a Better Env't., 523 U.S. 83, 103-04 (1998). In addition to Article III standing, standing in federal court may also be limited by "prudential limitations" restricting access, among other ways, to plaintiffs enforcing their personal rights as opposed to the rights of the public in general. See DMJ Associates, L.L.C. v. Capasso, 288 F. Supp. 2d 262, 267 (E.D.N.Y. 2003), citing Bennett v. Spear, 520 U.S. 154 (1997). Legal challenges to a plaintiff's standing require the court to accept the allegations in the complaint as true, and to construe the complaint in favor of the plaintiff. Warth v. Selden, 422 U.S. 490, 501 (1975).

---

[10] Indeed, as with Plaintiff's CERCLA claims, the State Court Decision and the Town's Answer establish, at a minimum, that the Town "has contributed or ... is contributing to the past or present handling, storage, treatment, transportation, or disposal of any ... hazardous waste which may present an imminent and substantial endangerment to health or the environment." See ABB, 120 F.3d at 359. Thus, not only are Plaintiff's RCRA (and CERCLA) claims not precluded, the Town's Answer appears to have established liability as a matter of law. Plaintiff will explore the filing of a motion for judgment on the pleadings following the resolution of the present motion.

18

As described herein, Plaintiff has pleaded and intends to prove that he incurred significant response costs as defined by CERCLA responding to a release and/or threatened release from the Landfill. Thus, Plaintiff has suffered an injury in fact, traceable to the Town, for which this Court has exclusive jurisdiction to award relief under CERCLA. Plaintiff has clear standing under CERCLA.

Plaintiff also had clear standing under RCRA. RCRA §6972 (Citizen Suits) states that: "any person" may commence a civil action on his own behalf against a municipality for current violations of RCRA (§(a)(1)(A)), and/or past mishandling of hazardous waste (§(a)(1)(B)). Indeed, Congress intended to grant citizens a broad right to enforce RCRA's terms, broader than what might otherwise be typical in federal court. See e.g. DMJ, 288 F. Supp. 2d at 267 (holding that purchaser of security interest in property near a landfill gave purchaser standing: "through the use of the terms 'any person' it is clear that Congress intended to confer standing to full extent permitted by Article III [citations omitted], [and in so doing so] abrogated the prudential standing requirements under RCRA and CERCLA . . ."). Citing this broad form of standing, the Interfaith court noted that RCRA provides standing "even when a non-owner can assert an 'identifiable trifle' of an injury." 215 F. Supp. 2d at 495. See also Friends of the Earth v. Consolidated Rail Corp., 768 F.2d 57, 61 (2d Cir. 1985) (holding that an affidavit stating that an environmental group member had driven over a polluted body of water and was offended at its appearance was a sufficient injury- in-fact to justify standing under the Clean Water Act).

This is, at a minimum, the posture in which Plaintiff stands. Indeed, the Town does not dispute that landowners near the Landfill have standing under RCRA. See e.g.

19

Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81 (E.D.N.Y. 2001)(holding that environmental and health interests of individuals residing in immediate vicinity of former landfill were sufficient to give them standing to bring citizen suit under RCRA). The fact that Plaintiff's injuries were so severe as to force him to move away can not be used to strip Plaintiff of standing.

Moreover, Plaintiff's entire investment in the Property has been lost, his marriage has been destroyed, and his bank account has been emptied by virtue of the actions of, among others, the Town. These injuries arise well above an "identifiable trifle." Under the Second Circuits decision in Friends of the Earth, 768 F.2d at 61, Plaintiff need only be offended by the conditions at and around the Landfill, let alone robbed of his home and livelihood. Significantly, the Town has since been forced to bring city water to all of the properties surrounding the Landfill, including the Property formally owned by Plaintiff. Thus, any argument that Plaintiff has not suffered "injury in fact," traceable to the Town, and capable of redressed under RCRA is patently ridiculous.

### III.    PLAINTIFF'S RCRA CLAIMS ARE SOUND

#### A. The Town's Notice Argument is flawed.

The Town's legal argument regarding Plaintiff's alleged failure to follow RCRA's notice requirements is fatally flawed. Plaintiff has pleaded that he complied RCRA's notice requirements with respect to both state and local agencies starting in 1996. See Complaint at ¶11. Moreover, the Town as admitted that Plaintiff provided notice to the EPA and the Connecticut Department of Environmental Protection ("DEP") in its Answer. See Answer at ¶11. It is also undisputed that Doyle gave notice to the Town about the problems at the Landfill, both informally (see Complaint at ¶¶10-13) and via

the State Court Action. Accordingly there are no issues of fact regarding notice to the EPA, DEP and the Town

Further, while the "flexible approach" standard and "actual notice exception"[11] to RCRA's notice requirements have been watered down by the reasoning of Hallstrom v.Tillamook, 493 U.S. 20 (1989), it bears noting that the EPA, DEP and the Town had actual notice of the problems at the Landfill long before Plaintiff moved down the street. Here, Plaintiff has pleaded at length about: the 1982 pollution abatement order from the DEP; the 1984 DEP landfill closure plan imposed upon the Town; the Town seeking and thereafter obtaining permission from the DEP to take NTC's sludge ash for use as a cover at the Landfill; and the 1998 Connecticut Attorney General Suit against the NTC and resulting $1.2 million fine regarding that same sludge ash deposited at the Landfill. See Complaint at ¶¶ 17-40.

## B. The parallel Connecticut program does not preclude Plaintiff's RCRA claims.

The Town contends that Plaintiff is "limited to pursuing any claim of improper handling of hazardous waste under Connecticut statutes and regulations." (Town's Motion, Memo at 29.) The legal landscape on this issue is not as cut and dry as the Town suggests. Indeed, federal courts are split as to whether federal actions under RCRA §6972(a)(1)(A) are precluded when the EPA has authorized a parallel state RCRA program. The "better reasoned position" is that federal actions should be permitted even where a state has an authorized program. Sierra Club v. Chem. Handling Corp., 778 F. Supp. 25, 26 (D. Colo. 1991).

---

[11] See e.g. Proffitt v. Commissioners, 754 F.2d 504 (3rd Cir 1985)(reversing dismissal of pro se plaintiff's RCRA claim for failure to conform precisely with RCRA's notice requirements because, *inter alia*, the EPA state and violators had actual notice of the violations before the suit was filed.)

21

Indeed, in <u>Murray v. Bath Iron Works Corp.</u>,(cited by the Town) the court noted that "[a]ccording to the two courts that have squarely addressed the issue, a citizen suit under section 6972(a)(1)(A) is still available for violations of a state authorized program, since the state program in having received EPA authorization under RCRA, 'has become effective' pursuant to RCRA, as required by section 6972(a)(1)(A)." 867 F. Supp. 33, 43 (D. Md. 1994). <u>See also</u> <u>Ashoff v. City of Ukiah</u>, 130 F.3d 409, 411 (9th Cir. 1997)(a RCRA action should be permitted in federal court because "[t]he federal criteria give the state standards legal effect under federal law").[12]

More importantly, while the courts are split on section 6972(a)(1)(A), "[e]very court that has addressed the effect of state-run hazardous waste programs on imminent hazard suits under section 6972(a)(1)(B) has concluded that such suits are 'not superseded by [the] state program." <u>Stewart-Sterling One, LLC v. Tricon Global Restaurants, Inc.</u>, 2002 WL 1837844, at *2 (E.D. La. 2002) (quoting and citing cases).

Notably, Plaintiff's claims are based both on sections (a)(1)(A) and (a)(1)(B). Accordingly, this Court should make the "better reasoned decision" to permit Plaintiff's federal RCRA action, under both sections (A) and (B), to proceed despite the existence of the Connecticut program.

---

[12] Many courts have since cited <u>Murray</u> with approval when finding that federal actions should be permitted even where the state has been so authorized. <u>See</u> <u>Eastman v. Brunswick Coal & Lumber Co.</u>, No. CIV. 95-255-P.C., 1996 WL911200, at *7 (D. Me. April 19, 1996). Moreover, other courts have independently found that federal actions remain available where the state has a RCRA authorized program. <u>See</u> <u>Long Island Soundkeepers Fund, Inc. v. N. Y. Athletic Club</u>, No. 94 Civ. 0436 (RPP), 1996 WL 131863, at *8 (S.D.N.Y. March 22, 1996); <u>Sierra Club</u>, 778 F. Supp. at 26; <u>Lutz v. Chromatex, Inc.</u>, 725 F. Supp. 258, 261-262 (M.D. Pa. 1989).

## IV. PLAINTIFF'S SUPPLEMENTAL STATE CLAIMS ARE NOT RIPE FOR SUMMARY JUDGMENT

### A. Plaintiff's Current state law claims are based on facts and issues not "actually litigated" in the State Court Action and thus are not precluded.

Plaintiff's current state law claims under strict liability, negligence per se and Conn. Gen Stat §22a-452 focus solely on the Town's improper acceptance of, and supervision over, Crompton's hazardous sludge ash at the Landfill. The strict liability and negligence claims are viable causes of action, even if the Property did not become polluted, because Plaintiff was injured in other ways (e.g. Plaintiff' response costs and the diminution in value of the Property). Further, new evidence establishes that hazardous components of the sludge ash actually made it to the Property and caused Plaintiff injury, thereby supporting his §22a-452 and other state claims. These new theories, and the new test results, were not considered in the State Court Action.

Indeed, it is Plaintiff's focus on Crompton's illegal activities (and the Town's participation therein) that saves the current state law claims from preclusion.

> Under Connecticut law, [c]ollateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action. For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment. The doctrine of collateral estoppel is based on the public policy that a party should not be able to relitigate a matter which is already has had an opportunity to litigate.
>
> . . .
>
> An issue is actually litigated if it is properly raised in the pleadings, submitted for determination, and in fact determined. An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. If an issue has been determined, but the judgment is not dependant upon the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta.

Putnam Resources v. Frenkel & Co., Inc., 1995 WL 416194, *4 (1995)(internal punctuation omitted); quoting Commissioner of Motor Vehicles v. DeMilo & Co., 233 Conn. 254, 267 (1995), Carol Management Corp. v. Board of Tax Review, 228 Conn. 23, 32-33 (1993).

Crompton was not a party to the State Court action because, quite simply, Plaintiff only learned of Crompton's illegal dumping of toxic sludge ash (and the resulting 1999 $1.2 million fine) at about the time the State Court Action was being concluded.[13] Indeed, the April 2000 laboratory reports, which were not reviewed by the state court, establish a ground water pathway to the Property containing hazardous materials that correspond to the materials found in the Crompton sludge ash. See Shaban Decl. at ¶5 and Ex D (a true and complete copy of the April 2000 laboratory results, using a new "Ground Water Matrix"). Tellingly, the Town has been forced to admit in its Answer that hazardous substances have been and are being released from the Landfill into surrounding ground and surface waters. See Answer at ¶¶19-24.

Thus, Plaintiff's current state law claims based on the Town's acceptance of and failure to supervise Crompton's sludge ash should be allowed to proceed because these issues were not actually litigated in the State Court Action.

---

[13]   As alleged in the Complaint, it took the DEP almost 15 years to discover Crompton's/the Town's illegal activities which thereafter prompted the State to refer the case to the Attorney General's office. Mr. Doyle should not be penalized for his inability to garner this evidence in time to be used in the State Court Action -- especially when the Court considers that the pollution at/from the Landfill was the cause of his financial hardships.

**B. The Town's remaining challenges to Plaintiff's state law claims are flawed, and raise issues of fact.**

Finally, the Town's attempt to achieve summary judgment on Plaintiff's §22a-452 and strict liability claims must fail.

First, Section 22a-452 does not preclude private parties from suing municipalities. While the Accashian case cited by the Town does pull the statute apart to stand the legislators' intent on its head, the majority of Connecticut decisions recognize (albeit tacitly) a plaintiffs' right to sue a municipality under §22a-452. Indeed, in Jewett City Savings Bank v. Town of Canterbury, 23 Conn. L. Rptr. 332 (1998) plaintiff sued town for, among other things, nuisance, trespass and clean up costs under §22a-452 arising from town's operation of a landfill. The court granted plaintiff's motion to strike the town's special defense, and rejected the town's argument that §22a-452 could not be applied retroactively to expose town to liability for clean up costs that predated the passage of §22a-452: "Section 22a-452 is remedial and, therefore, ought to be liberally construed to effect its purpose to ameliorate environmental corruption" Id. See also Regional Refuse Disposal Dist. One v. Town of Colebrook, 10 Conn. L. Rptr. 184 (1993)(plaintiff commenced action against the town seeking relief under §22a-452; court denied town's motion to dismiss based on prior pending action doctrine). C.f. Albahary v. City and Town of Bristol, Conn., 963 F. Supp. 150, 156 (D. Conn. 1997)(suit based on Bristol's operation of a municipal landfill -- "By its terms, §22a-452 allows reimbursement of remediation costs only if a plaintiff has "contain[ed] or remove[d] or

otherwise mitigate[d]" contamination" -- court nevertheless dismissed the §22a-452 claim because plaintiff's failed to allege that they actually incurred response costs).[14]

Next, the Town's argument that the risk from the Landfill was not "obvious" or otherwise "ultahazardous" raises obvious questions of material fact that can not be decided on summary judgment. Indeed, the cases cited by the Town where all resolved by a careful and complete examination of the facts at hand. Further, the plaintiffs in Accashian (Town's Motion pg. 32, and Town Ex. L) argued that the mere acceptance of alleged hazardous waste was ultrahazardous. More importantly, the substances at issue in Accashian were simple construction debris, which the court concluded were not ultrahazardous. Accashian at *19. Contrarily, in the present case, it is undisputed that hazardous waste leached from the Landfill into the surrounding ground and surface waters. See Answer at ¶¶19-24. Further, Plaintiff pleads and intends to prove that the Town failed to abide by the DEP's landfill closure plan, failed to properly monitor the Landfill, and more importantly, turned a blind eye to Crompton's efforts to dump its banned hazardous waste at the Landfill.

## CONCLUSION

For the foregoing reasons, the Town's Motion must be denied.

---

[14] Ironically, the Town's argument based on Accashian cuts against its main argument that Plaintiff is somehow precluded from pursuing his CERCLA claims. Indeed, according to the Town, Plaintiff is precluded from recovering his response costs under CERCLA in the present action because he essentially did so in the prior State Court Action under state law. At the same time, however, the Town argues that Plaintiff is unable to recover response cost under state law. The Town's "sword and shield" approach to collateral estoppel can not be adopted by this Court.

THE PLAINTIFF
TIMOTHY P. DOYLE

BY /s/ John T. Shaban
 John T. Shaban (ct14075)
 Whitman Breed Abbott & Morgan LLC
 100 Field Point Rd.
 Greenwich, CT 06830
 203-869-3800
 203-869-1951 (facsimile)
 jshaban@wbamct.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2004, a copy of foregoing Memorandum in Opposition to Defendant's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.

/s/ John T. Shaban
John T. Shaban (ct14075)
Whitman Breed Abbott & Morgan LLC
100 Field Point Rd.
Greenwich, CT 06830
203-869-3800
203-869-1951 (facsimile)
jshaban@wbamct.com

Westlaw.

Not Reported in A.2d
2001 WL 58018 (Conn.Super.)
**(Cite as: 2001 WL 58018 (Conn.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.

Timothy DOYLE, et al.,
v.
Arthur WEBSTER, et al.

**No. CV990079961.**

Jan. 8, 2001.

MEMORANDUM OF DECISION

FRAZZINI.

*1 This memorandum of decision addresses an
action in which Timothy Doyle and his former wife,
Lisa Dijon, claim that property they purchased on
Little Pitch Road in Litchfield is contaminated by
leachate from the former landfill once operated by
the town of Litchfield approximately one-quarter
mile to the southeast. The plaintiffs (hereafter
referred to as Doyle) have sued the former owners
who sold them this property (Arthur, Timothy, and
Hugh Webster, hereafter referred to as the sellers),
the real estate agents who acted on the Websters'
behalf (Ted Murphy and Diane Patemo, referred to
hereafter as the brokers), and the town of Litchfield
(hereafter, the town). For the reasons stated below,
the court enters judgment for all defendants on all
counts.

Part I of this opinion summarizes the legal
proceedings and issues presented here, Part II
contains the court's preliminary findings of fact
necessary for discussing the ultimate factual
questions of contamination and source, Part III
discusses the court's analysis of the expert opinion
testimony and the other evidence and its conclusions
on the key factual issues, and Part IV states the
court's resolution of the parties' claims for damages
and other relief.

I-NATURE OF PROCEEDINGS

The gravamen of the plaintiffs' various causes of
action against the town is their allegation that testing
of soil, surface water, and ground water on their
property [FN1] shows the presence of leachate
containing toxic and hazardous substances emanating
from the former landfill. Against the sellers and
brokers the plaintiffs claim in numerous counts that
these defendants knew or should have known that the
presence of landfill leachate contaminants on the
property made it unsuitable for the Doyles' intended
uses. After a bench trial held before this court on
numerous days in May, June and July 2000, the
parties agreed at closing argument that the court
would first decide the plaintiff's factual claims that
leachate flowing from the former Litchfield landfill
had contaminated their property. The parties have
since agreed that the court, in addressing this
question, must determine whether the plaintiffs met
their burden of proving that their property is
contaminated (referred to in this decision as the
"contamination issue") and that leachate flowing
from the former landfill caused any such
contamination (referred to here as the "source issue").
Resolving those questions of fact depends in large
part, though not exclusively, on the opinion
testimony of the parties' expert witnesses.

> FN1. Evidence offered at trial established
> that title to the Doyle property has passed by
> foreclosure to a third party. The court need
> not consider the significance of that transfer
> of title, however in light of its decision here.
> For purposes of convenience, the court will
> refer in this decision to the premises as the
> Doyle property.

II-PRELIMINARY FINDINGS OF FACT [FN2]

> FN2. Additional facts necessary for
> discussing and analyzing the opinion
> testimony and resolving the ultimate factual
> questions at issue are discussed in later
> sections.

A. The Doyle Property

On March 11, 1996, the plaintiff Lisa Dijon
purchased the property in question, a parcel of land
on 3.58 acres located at 521 South Plains Road, at the
intersection of South Plains Road and Little Pitch

Not Reported in A.2d
2001 WL 58018 (Conn.Super.)
(Cite as: 2001 WL 58018 (Conn.Super.))

Road in the town of Litchfield. [FN3] The property contained a colonial-style farmhouse built in 1802, a small pond, and gently sloping land. After a summer wedding she and co-plaintiff Timothy Doyle planned to raise a family and run a horse-breeding farm on the property. In the months immediately before and after the plaintiffs moved into the subject property in September 1996, Doyle obtained zoning and conservation permits from the town and undertook a series of improvements on the land to ready it for their horse breeding plans. This work included removing trees, clearing land, some blasting and excavating on the land, moving dirt, removing old drain pipes and installing new ones to direct water flow on the property to and from the pond, and installing a riding ring and a leased horse barn.

> FN3. The evidence established that Ms. Dijon later transferred a portion of her ownership interest in the property to co-plaintiff Timothy Doyle. In view of its decision here, the court need not address any legal significance of the chain of ownership.

Even before moving in that September, however, Doyle became concerned about the condition of the water in the pond. In the early spring of 1996, he saw floating dead fish and pollywogs and an orange haze or sheen on top of the pond. After taking samples of water from the pond and having them tested, seeing orange stains at other locations on his property, talking to neighbors, engaging an environmental testing company to do additional testing, finding a groundwater spring in a shed on the property that had been locked until the closing, and learning that the leachate from the landfill had been the subject of previous litigation and orders from the state department of environmental protection, he came to believe that landfill leachate had also contaminated his own property. The present litigation ensued.

### B. The Litchfield Landfill

*2 Approximately one-quarter miles to the southeast of the Doyle property, the former Litchfield landfill, now a waste recycling facility for the town of Litchfield, was for fifty years the town dump for solid waste disposal. It accepted a variety of residential, commercial, and industrial waste. Located in "a steep ... valley that is estimated to have been twenty-five feet deep and one hundred feet wide" (Pl.'s Ex. 33, "Litchfield Landfill Closing Plan," 3) between two bedrock ridges, the landfill grew over the years to occupy 7.4 acres of land rising to a height of 45 feet at its center. The water table in the center of the landfill is more than 20 feet higher than the base of the refuse. The historical use of the site and its hydro-geology resulted in leachate from the landfill entering the bedrock system underneath the dump and flowing into local groundwater and surface water systems. In 1982 the state department of environmental protection (DEP) entered a pollution abatement order against the landfill. A hydrogeological study done that same year by the engineering firm of Fuss & O'Neill for the town documented the presence of leachate contamination in the fractured bedrock adjacent to the landfill and some nearby surface waters. The Fuss & O'Neill hydrogeological study reported that the principal pathways for leachate migration from the landfill were to the north and south along the fracture trend in the bedrock, but that leachate also flowed toward the northwest in the general direction of the Doyle property.

In response to the DEP order, the town of Litchfield thereafter developed, adopted, and implemented a landfill closure plan, installed ground and surface water monitoring wells, began monitoring water quality at various private wells, and extended water mains to properties near the landfill potentially affected by the landfill's flow of leachate. Since leachate contamination from the landfill is carried into the bedrock by water, part of the town's closure plan involved placing a covering material composed of soil and ash derived from incinerated sludge on the top on the landfill to reduce the amount of rain and surface water entering the landfill. Because the landfill sits in a wetland area in a bedrock valley partially above the water table, however, the landfill base remains saturated despite the closing of the landfill and the ash cap covering; as a result, the landfill will continue to generate leachate through ground water entering bedrock at the base and sides of the landfill for many years. The town has continued to collect and analyze water samples obtained from the various monitoring wells quarterly to detect the presence of leachate constituents at the various locations.

### III-DISCUSSION

*3 The plaintiffs have advanced two different factual bases for recovery. In their complaint, the opinion testimony of their expert, and their post-trial memorandum, the plaintiffs have asserted that elevated levels of toxic landfill constituents hazardous to human health have flowed as leachate to surface and ground water on the Doyle property. There appears to be no dispute among the parties that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

such a finding would be a basis for liability, at least as to the town. In their memorandum and closing argument, the plaintiffs also allege that even one molecule of leachate from the landfill entering the Doyle property would sustain their burden of proof. Although the defendants dispute this second "one molecule" theory, the court here, by virtue of its ultimate factual conclusions, need not resolve that legal question.

To establish the presence of landfill leachate on their property, the plaintiffs called Michael Mahan, president and senior hydro-geologist for SMC Environmental Corporation, as an expert witness. The heart of Mahan's opinion testimony that landfill leachate has reached and contaminated the Doyle property rested on two premises: his conclusions (a) that the samples from the Doyle property contained elevated levels, or exceedances, [FN4] of hazardous landfill constituents and (b) that leachate could, by a combination route of surface water and ground water, migrate from the landfill to the plaintiffs' property. [FN5] In their post-trial memorandum, the plaintiffs also advance a leachate plume theory: that "the presence of one species of landfill contaminant ... at every point on the map around the Doyle property and the presence of another species of landfill contaminant ... on the Doyle property" establishes that landfill leachate transported those constituents to the Doyle property. (Pls.' Post-trial Memorandum at 12.)

> FN4. Mahan testified that the term exceedance is used in the engineering industry "[t]o indicate that ... a level of contamination is found above ... the applicable criteria." (Mahan Test. of 5/16/2000 at 34.)

> FN5. Mahan testified that samples from the pond sediment and water, soil, and surface water on the Doyle property contained "elevated levels" of certain constituents that are hazardous to human health. Based on those elevated concentrations at the Doyle property and his conclusions as to the pathway for the flow of ground water and surface water from the landfill to the Doyle property, Mahan testified that "it is [my] opinion that the landfill has contributed to those levels." (Mahan Test. of 5/16/2000 at 28.) Mahan also cited a documented history of leachate outbreaks and exceedances elsewhere and his own conclusion that orange-stained water the court observed on a

site visit at the edge of the Landfill was a leachate outbreak to support his opinion of that pathway.

To refute these claims, the defendant town called Jeffrey Heidtman, a hydro-geologist and chief executive officer of Fuss & O'Neill, the engineering firm that has done extensive work for the town regarding the town's former landfill, as an expert witness. Heidtman testified that Mahan's opinions about the presence of elevated levels on the Doyle property--and the methodology Mahan used to derive them--were not scientifically valid or reasonable. He also disputed Mahan's conclusion about a leachate pathway from the landfill. In deciding whether the plaintiffs met their burden of proof, the court must, as the trier of fact, therefore consider the conflicting opinion testimony of the two experts on these two factual questions. [FN6]

> FN6. The plaintiffs argue that the court should discredit Heidtman's testimony because of interest or bias. Their argument is that since Heidtman is an officer of Fuss & O'Neill, which designed the landfill closure and monitoring plan, any liability on the town's part might subject Fuss & O'Neill to liability. Hence, they assert, Heidtman has an interest in a verdict favorable to the town. While the court has not discounted the possibility of interest, motive or bias on the part of Heidtman, or either of the other two experts who testified at trial, much of Heidtman's testimony about the various regulatory criteria or surface water flow could be and was corroborated by independent evidence, such as DEP regulations or a topographical map. The court found Heidtman's testimony to be credible and convincing.

### A. The plaintiffs' claim of a water pathway between the landfill and their property

One premise of Mahan's opinion that landfill leachate has contaminated the plaintiffs' property was his conclusion that there was a route by which landfill leachate could migrate via surface water and ground water from the former landfill to the plaintiffs' property. He testified that he based this opinion on prior geological studies conducted for the town by Fuss & O'Neill and Anderson Nichols and on his own observations of surface water flow and bedrock outcroppings between the landfill and their

property. He maintained that leachate from the landfill follows a surface water pathway from the landfill to an area near a culvert on Little Pitch Road approximately 600 feet southeast of the Doyle property (hereafter, culvert number two [FN7]), from whence the surface water enters one of two wetland areas, and that the leachate then migrates via ground water to the Doyle property. He also testified that seasonally surface water could flow all the way from the landfill to the plaintiffs' property--from culvert number two westerly to culvert number one, which Mahan testified would direct the water under Little Pitch Road and onto the plaintiffs' property. Heidtman agreed with Mahan's conclusion that surface water influenced by landfill leachate could, "[a]t times of higher flow," (Heidtman Test. of 6/1/2000 at 94) reach culvert number two. [FN8] He maintained that it was highly unlikely, however, that water would flow from that location to the plaintiffs' property. To support their conflicting opinions as to the flow of ground water and surface water from culvert number two, the two experts cited aspects of the earlier Fuss & O'Neill geological studies, the strike and dip of the bedrock planar features in the area, and topographic and piezometric information.

> FN7. The parties offered evidence establishing the existence of three culverts running under Little Pitch Road. For ease of reference, the court will refer to them as culvert number one (the most westerly culvert on Little Pitch Road, running between the Krhla property directly south of the plaintiffs' property under Little Pitch Road to the Doyle property and located approximately 450 feet down Little Pitch Road from its intersection with Route 63, South Plains Road); culvert number two (located approximately 425 feet southeast of culvert number one; and culvert number three (located approximately 275 feet southeast of culvert number two and 600 feet northwest of the toe slope of the former landfill).

> FN8. Heidtman testified that "the landfill impacts radially in all directions," (Heidtman Test. of 5/31/2000 at 19) that one of the drainage basins of ground water leaving the landfill flows in a general northwesterly direction, and that such ground water "very soon after leaving the edge of the landfill [finds its] way to the surface water environment" (*id.*, 25, 650 A.2d 172), and could then follow the

topography of the land to culvert number one. (Heidtman Test. of 6/1/2000 at 93-94.)

Heidtman's testimony raised enough questions about the topographical features of the area to cast serious doubt on Mahan's testimony of an entirely surface water pathway from the landfill to the plaintiffs' property. It is a matter of common sense that surface water flows from higher elevation to lower. Heidtman testified credibly that for surface water to flow directly from culvert number two northwest to culvert number one, as Mahan claimed, the water would have to flow uphill in that direction toward culvert number one rather than downhill to the north. Using a topographical map with photogrammetric details and a cross-elevation chart (Def's Exhs. 2, 2A, 54) for illustration, Heidtman showed that surface water could not flow from culvert number two northwest all the way to culvert number one; before surface water can reach culvert number one, the topography of the region directs the water north, even if it overflows culvert number two, first over Little Pitch Road and then toward the same wetlands north of Little Pitch Road that culvert number two itself directs water toward. Nothing in Mahan's testimony or the evidence as a whole credibly refuted Heidtman's testimony on this point. The court therefore concludes that Mahan's claim of an entirely surface water pathway from the landfill to the plaintiffs' property is not, on the evidence offered at trial, credible.

\*4 On the question of whether ground water could flow, in seasons when Mahan would concede that surface water flow is not sufficient to carry landfill leachate all the way to the Doyle property, via wetlands and bedrock from culvert number two to the plaintiffs' property, the question is closer. Mahan testified that surface water from the landfill would, after leaving culvert number two, reach one of two wetland areas, the one directly north of Little Pitch Road or another on the Krhla property directly south of the Doyle property across Little Pitch Road. He testified that after surface water containing landfill leachate reaches either of these wetland areas, the leachate migrates in ground water above and below bedrock to the Doyle property. He testified that he believed this was a unique geological area where the surface water leaving the landfill fills in the wetlands on the Krlha property or the wetlands north of Little Pitch Road, recharges the bedrock and an overburden aquifer and ends up in the Doyle pond.

Heidtman testified, on the other hand, that he believed that all surface water from the landfill

Case 3:02-cv-00656-WIG    Document 68    Filed 12/20/2004    Page 33 of 44

Page 5

Not Reported in A.2d
2001 WL 58018 (Conn.Super.)
(Cite as: 2001 WL 58018 (Conn.Super.))

reaching culvert number two would eventually flow, by virtue of the topography of the area, into the wetlands north of that culvert, from where it would recharge the ground water and follow the topographical slope in a northerly direction toward the Bantam River, rather than westerly to the Doyle property. He testified that he believed the primary source for water on the Doyle property is the wetlands area on the Krhla property, and that this is probably fed by water from the south. He acknowledged, however, that Mahan's inability to obtain ground water at a depth of four to five feet at location SS-03, just south of the pond, means that in that location, at least, ground water is migrating toward the south. He also acknowledged that he had once prepared a map for the town that included the Doyle property in an area of potential leachate impact, and said that he had done so because in the absence of precise geological studies one could not preclude that possibility.

Ground water in the bedrock must obviously follow the same Newtonian principles of physics and gravity as surface water. Mahan explained, for example, that ground water tends to flow from areas of higher hydraulic pressure to lower. Yet, unlike the typographical features of the earth's surface, which are visible to the human eye and were presented on maps as exhibits for the court to examine and use in comparing and analyzing the experts' opinions about surface water flow, the subsurface features of bedrock and groundwater flow between the landfill and the plaintiffs' property are concealed from direct human observation. Although the court heard opinions from both experts about such geological features as the bedrock, likely flow of water into and out of wetlands, overburden aquifers, bedrock aquifers, and fractures, strike, and dip of the bedrock, none of the parties offered any independent, objective information to assist the court in evaluating the credibility of the experts' views as to the direction of ground water migration. The opinion of each seemed plausible. Both also admitted that they had no actual geological studies of bedrock and ground water flow for the entire region between the landfill and the plaintiffs' property (the earlier Fuss & O'Neill geological survey had only studied the landfill and its immediate environs). Neither expert's opinion had the ring of authority or conclusiveness on this issue.

*5 After hearing their testimony, observing and considering their demeanor, and re-reading the transcripts of their testimony on this subject numerous times, the court concludes that the evidence as to a possible groundwater pathway from culvert number two to the Doyle property was in equipoise. Thus, the court can only conclude that the plaintiffs, in the absence of independent geological data or other objective evidence to confirm Mahan's opinion testimony or without evidence of constituents on their property whose mere presence or quantity there would establish the landfill as their source (see next section), failed to meet their burden of proof to establish the existence of a pathway for leachate to migrate from the landfill to the plaintiffs' property.

B. The plaintiffs' claim of elevated levels

The other premise of Mahan's opinion testimony that landfill leachate has reached and contaminated the Doyle property was his conclusion that the Doyle property contains elevated levels of hazardous landfill constituents. Mahan testified that he took sediment, soil and water samples at various locations on the Doyle property:

Pond sediment (at location SS-01) and pond water one foot above (at location SW-01) near the southern edge of the pond near the plastic inlet pipe that Doyle had installed;

Pond sediment (at location SS-02) and pond water six inches below the surface of the pond ((at SW-02) in the north-middle of the pond;

Ground soil (at location SS-03) from near the southwest edge of the pond at a depth of approximately five feet;

Ground soil (at location SS-04) collected around three feet deep from a location just north of Little Pitch Road and approximately 60 feet west of the first culvert under Little Pitch Road off South Plains Road (culvert number one), and equidistant between culvert number one and GW-01;

Ground soil (at location SS-05) collected to 15 feet south of culvert number one from a depth of approximately one to two feet.

*6 In addition, he also relied on data from samples of surface water taken by Arthur Boehm of Environmental Health and Safety Services of New England from the bottom of the Doyle pond and of ground water that discharges into the pond from a plastic pipe.

Both Mahan and Boehm directed laboratories they engaged to test these various samples for the presence of various typical landfill constituents: volatile organic compounds (VOCs), total petroleum hydrocarbons (TPHs), various metals commonly associated with landfills, and other constituents. None of the defendants disputed the validity of the sampling techniques or the accuracy of any of the laboratory findings on which Mahan relied. Instead,

Not Reported in A.2d
2001 WL 58018 (Conn.Super.)
(Cite as: 2001 WL 58018 (Conn.Super.))

they focused on the conclusions that Mahan derived from those findings.

Mahan testified that:

Samples of pond sediment at SS-01 and SS-02 and the ground soil at SS-03 and SS-04 all contained elevated levels of barium, chromium, and lead; and Samples of pond water contained elevated levels of cyanide, nickel, copper, lead, benzene and zinc that constituted a hazard to human health (Tr. of 5/17/2000 at 36-49). [FN9]

> FN9. The August 15, 1998 sample at SS-02, in the mid-pond sediment, did detect 120 mg/kg of total petroleum hydrocarbons by an infrared test. Although TPHs are a typical landfill constituent, Mahan did not claim this single finding bore any significance on the plaintiffs' legal or factual claims.

Acknowledging that none of the various standards established for these constituents by the state and federal governments are directly applicable to the Doyle property (because there have been no discharges of such constituents that would invoke such standards), Mahan testified that he instead used certain of those standards that he said were related to human health hazards "for comparison purposes." [FN10]

> FN10. Q You said that phrase "comparison purposes" several times in your testimony. What do you mean by "for comparison purposes?"
>
> A They're--in the case where there are no standards that can represent--I'm trying to think of the easiest way to say this--that would represent an actual exceedance that would be breaking the law, for discharges of a similar nature, you can use these standards as health-based exposure criteria for comparison. And that's merely what all of my work has been, is comparing these to health-based criteria.
>
> In a situation where you have a site that is subject to the remediation standards, you have levels that are for each parameter that are accurately spelled out to what you have to clean up to. So it gives you a threshold level that there is no deviance from. When you're dealing with sites that don't fall into the RSRs, or the remediation standards, or when you get involved with surface water, you can only look at these for comparison purposes.

(Tr. of 5/17/2000 at 84.)

1. The sediment and soil on the Doyle property

Although initially referring on direct examination to both the pollutant mobility criteria (PMC) and the residential direct exposure criteria (RDEC) as "two criteria that can be used ... for comparison purposes, the balance of Mahan's testimony about elevated levels or exceedances in soil or sediment on the plaintiffs' property relied exclusively on the pollutant mobility criteria. [FN11] Mahan identified the PMC as "a list of concentrations for each constituent, or each compound that is a relative health-based cleanup criteria ... used for constituents in soil ... as a mandatory cleanup standard." (Mahan Test. of 5/16/2000 at 22.) He testified that he used the PMC by applying what he referred to as a "factor of twenty" analysis, which he explained as dividing the total mass of the constituent found in the sample by twenty and comparing the resulting number with the PMC. [FN12] He justified this methodology by explaining that:

> FN11. Mahan testified that soil standards are broken down into two categories. (Tr. of 5/17/2000 at 99-100.) The PMC and RDEC are promulgated by the state department of environmental protection for the remediation of polluted soil and set forth in Appendices A and B to § § 22a-133k-1 through 22a-133k-3 of the Regulations of Connecticut State Agencies. Section 22a-133k-2 of the Regulations of Connecticut State Agencies provides as follows:
>
> Standards for soil remediation (a) General. Unless otherwise specified in sections 22a-133k-1 through 22a-133k-3, inclusive, of the Regulations of Connecticut State Agencies, polluted soil at a release area shall be remediated to a concentration which meets (1)(A) the direct exposure criteria set forth in subsection (b) of this section or alternative direct exposure criteria established in accordance with subdivision (2) or subdivision (7) of subsection (d) of this section; and (B) the pollutant mobility criteria set forth in subsection (c) of this section.
>
> Mahan testified that the "residential direct exposure criteria [are] applied to the total sample ... [T]he pollutant mobility criteria [are] compared to the leachate that is passed through that sample in a TCLP or SPLP test." (Tr. of 5/17/2000 at 92.)

FN12. "The pollutant mobility criteria was compared by using what the DEP recognizes as a factor of twenty, where you take your result, you divide it by twenty, and if it exceeds the pollutant mobility criteria, then it is considered to be elevated." (Mahan Test. of 5/16/2000 at 23.)

Elsie Patton at DEP in a seminar that she put on that myself and other people of my company were at, she specified that people could use the factor of twenty to determine if they exceed or are close to the pollutant mobility criteria, only for comparison purposes.

(Tr. of 05/17/2000 at 104.)

The specific results that Mahan claimed to violate the PMC were findings for the presence of barium, chromium, and lead in the pond sediment and soil samples taken from the Doyle property. It is undisputed that the total mass of each metal in each of these samples and the quotient resulting from the factor of twenty analysis exceed the number established by the PMC, as shown in Table 1 located later in the text. Through cross-examination, their own expert's testimony, and introduction of the actual DEP regulations into evidence, however, the defendants cast grave doubt on the reliability and validity of Mahan's use of the PMC or the factor of twenty analysis.

The purpose of the residential direct exposure criteria is, according to Mahan himself, "to characterize what ... quality of soil that people could come in ... contact with." (Tr. of 5/17/2000 at 99-100.) They have, he acknowledged, "a human health rationale"--"to be able to determine whether the content of the soil is going to pose a risk to those who come in direct contact with the soil ... either by ingestion or some other means of bringing it into contact with their body ..." (*Id.*, 100.) Explaining that the pollutant mobility criteria are "a measure of ... the leachability of contaminants out of the soil" (Mahan Test. of 5/16/2000 at 23), he said that the PMC are "set up to protect ground water. So they are concerned with what's leaching out of the sample that could potentially impact ground water." (Tr. of 5/17/2000 at 97.) Heidtman concurred with this analysis. [FN13]

FN13. "If you own a piece of property, and you have constituents on it, there are two pathways conceivably that you could be

exposed to those constituents.
One, you walk around the property, you use the property and you're exposed to the soil either by touching it or breathing the dust or playing in it, or ingesting it, so you need some criteria for direct exposure.
Secondly ... if you have soils that ... hold some of these constituents, whether they're contaminants or however they're there, just like the landfill, rain continues to fall on this property, seems [sic] down through the soil and enters the ground water.
If those constituents are in some soluble form, then that recharging precipitation passing down through the soil environment can dissolve some of these constituents and carry it down to the ground water. Thus, DEP said we need to establish some standards for the quality of soil that relates to how these soils may release their contaminants or these constituents to the underlying ground water.
But the ultimate goal is to protect the quality of the ground water. You take a look at the soil, the quality of the soil under a very specific testing protocol and the resultant extract is presumed to reach the ground water and cause some ground water impacts. That's the whole concept behind the pollutant mobility criteria." (Heidtman Test, of 5/31/2000 at 84-86.)

*7 On direct examination Mahan admitted that there are more accurate ways than the factor of twenty analysis to measure the potential for contaminants leaching out of soil and into ground water: "Laboratories can perform an analysis which is referred to as either the TCLP, or toxicity leachate precipitate ... procedure, or the SPLP which is synthetic precipitate leachate procedure." (Mahan Test. of 5/16/2000 at 41.) In each such procedure, an acidic solution dilutes the mass of the substance being tested to determine whether and to what extent the constituent is capable of leaching out to ground water. (Tr. of 5/27/2000 at 97.) Heidtman explained further that the TCLP test "attempts to simulate leaching in a very aggressive environment, i.e., like inside a landfill." He described the SPLP as "a more reasonable test, one that is more aggressive than mother nature, ... but not as aggressive as the TCLP test ..." (Heidtman Test of 5/31/2000 at 85.)

Mahan justified using the factor of twenty methodology because "the number of twenty comes from the actual volume of the dilution that they're

Not Reported in A.2d
2001 WL 58018 (Conn.Super.)
(Cite as: 2001 WL 58018 (Conn.Super.))

Page 8

using for the extraction fluid" in the TCLP and SPLP test. In other words, the sample being analyzed is dissolved in a solvent that is twenty times the mass of the original sample. Although acknowledging that the factor of twenty analysis assumes that "100 percent of the mass of [the] material would leach out if it were exposed to dilution," (Tr. of 5/17/2000 at 102) he also admitted that such an assumption is not accurate. On cross-examination, he conceded that, in most instances, one hundred percent of the mass does not leach out and that it is rare for metals to leach out at 100 percent of their mass value. Heidtman concurred that "[i]t doesn't happen very much." (Heidtman Test. of 5/31/2000 at 101.)

During a particularly effective portion of cross-examination, Mahan was questioned about the results of 1999 testing by Arthur Boehm of Environmental Health and Safety Services of New England on samples from the ash cover placed on the landfill. Boehm analyzed mixtures of soils taken from various locations on the landfill for total and extractable metals using the SPLP and TCLP tests. As Mahan conceded, the total mass of barium at one location, 194 mg/kg, divided by twenty equaled 9.7, whereas the SPLP test produced only .18 mg/L; at another location, the total mass of barium was 74.6 mg/kg; the quotient of that number divided by twenty was 3.73, but the extract yielded by the TCLP test was only . 46 mg/L. In Boehm's various barium findings at the landfill, the total mass found exceeded the leachate extract derived by the SPLP or TCLP methods by from 160 to 1300 percent.

Analysis of 1997 samples that Boehm took from the landfill yielded similar results: a sample of lead that was 1960 mg/kg yielded, when subjected to TCLP solution, 1.31 mg/L of leachate, a difference of almost 1,500 percent. When questioned whether "in order ... to give an opinion that the pollutant mobility criteria is exceeded in any of these Doyle property samples for 1998, wouldn't it actually be necessary to run a TCLP or SPLP test," (Tr. of 05/17/2000 at 112) Mahan acknowledged that "it would increase the accuracy of the data ... to add more data would only help, ..." but claimed that it "is not necessary." (*Id.*, 112-13.) Challenged to justify not doing an SPLP or TCLP extraction on the samples of metals he found at the Doyle property, as the pollutant mobility criteria regulations would require, Mahan could only answer that he did not believe it was necessary to do so since he had only used the PMC for comparison purposes. [FN14]

FN14. "[W]e felt that ... direct applicability

of the [PMC] didn't apply to this site ... It was used only for comparison purposes." (Mahan Test. of 5/16/2000 at 41.)

*8 Despite Mahan's claim that a factor of twenty analysis can be used to determine if soil contains elevated levels, Heidtman's explanation is much more credible: that a factor of twenty analysis is useful only for determining whether one could argue about the need for further testing; if the mass divided by twenty does not exceed the pollutant mobility criteria, then there is no possibility that such a leachate from such mass, when diluted twenty-fold in a solvent, will exceed the PMC even if one hundred percent of the mass leaches out.

Mahan never offered an adequate explanation, moreover, why the residential direct exposure criteria are not the appropriate governmental standards to consider when analyzing soils for possible harm to health through direct contact, ingestion and inhalation. Since they take into account such human health factors in assessing risk of human contact with soil as target cancer risk level, hazard index, cancer slope factor, ingestion rate, exposure frequency and duration, and body weight; § 22a-133k-2(4)(B) Regulations of Connecticut State Agencies; the direct exposure criteria would seem to be the appropriate standard for determining human health risk. When asked why he did not rely on the residential direct exposure criteria, Mahan gave the same response as to why he had not used the TCLP or SPLP tests--that the residential direct exposure criteria are not directly applicable to the Doyle property. A second reason he gave for using the PMC as his criteria for comparing the soil and sediment is that he initially claimed his soil samples were taken at or below the water table "so they had come into contact with the groundwater." (Mahan Test. of 5/16/2000 at 40.) Yet Heidtman's own testimony demolished that premise; and Mahan himself eventually admitted that all of his samples were taken above the groundwater level. None of Mahan's answers or reasons is credible, in light of the rest of the evidence. It seems far more likely that the RDEC, not the PMC, would be the relevant criterion to apply to ground soil on the plaintiffs' property.

The court thus concludes that plaintiffs failed to establish by a preponderance of the evidence that the soil or sediment on the Doyle property contained quantities of any of the constituents about which evidence was offered that exceeded any applicable standards. Mahan had admitted that the soils at the Doyle property don't "violate any legally applicable

standards." (Tr. of 5/17/2000 at 90.) He admitted that the residential direct exposure criteria are the appropriate standard for measuring whether direct human contact with soil, whether by ingestion or other means, will cause a risk to human health. (*Id.*, 100.) He admitted that the findings for barium, chromium and lead do not exceed the residential direct exposure criteria for direct contact with those substances. He admitted that the pollutant mobility criteria promulgated by the DEP require comparison of leachate extractions rather than total masses of the samples. He admitted that the factor of twenty analysis relies on an assumption of 100 percent leachate that is not always accurate. Finally, he admitted that neither the PMC nor the RDEC applied to sediment but only to soil. There is no reliable or credible evidence that the quantities of barium, chromium or lead found on the Doyle property exceed background levels, the amounts of these substances naturally appearing in soils of the region. The court thus concludes, after considering the testimony, documentary evidence, and exhibits and considering the relevant regulations and the briefs of the parties, that the plaintiffs did not sustain their burden of proof of establishing that there were elevated levels of contaminated substances in the soil of the Doyle property in comparison with applicable and appropriate standards.

2. Pond and ground water on the Doyle property

*9 The plaintiffs also claim that the pond and ground water on the Doyle property are contaminated by landfill constituents. Their expert Michael Mahan testified that elevated levels of constituents in the Doyle pond were a health hazard. In particular, he claimed that the levels in the pond water of copper, lead, zinc, cyanide and the volatile organic compound benzene all exceeded what he referred to as the surface water quality standards (hereafter, SWQS), [FN15] [FN16] which he said he used as a measure of human health for comparison purposes. (Tr. of 5/17/2000 at 84.) As with the soil and sediment samples, he acknowledged that there are no directly applicable standards to the pond water, but maintained that the surface water quality standards were an appropriate standard "for comparison purposes." (*Id.*)

FN15. In his testimony Mahan initially referred to the surface water protection criteria (SWPC) as his comparison reference for the pond and surface water on the Doyle property. He later conceded, however, that the SWPC are not applicable to surface

water bodies. (Tr. of 5/17/2000 at 85.)

FN16. Adopted by the state department of environmental protection and contained as Appendix D--Numerical Criteria for Toxic Pollutants to the DEP Water Quality Standards.

Acknowledging that there are several sets of water quality standards--four sets of aquatic life criteria (separate chronic and acute criteria for both freshwater and saltwater species) and two sets of human health criteria (for organisms only and for water and organisms), Mahan testified that he chose to compare the sample results found on the Doyle property to the surface water quality standards for chronic aquatic life criteria. As with Mahan's use of the PMC and the factor of 20 analysis, the defendants again challenged his selection criteria through vigorous cross-examination and opinion testimony from their own expert.

Mahan testified that there were no directly applicable standards for measuring the levels of any contaminants in the water on the Doyle property. "[W]hen you get involved with surface water, you can only look at these [RSRs, or remediation standards] for comparison purposes." *Id.*

*10 Q So in the absence of the directly applicable standard for the surface water on the Doyle property, you cite, as you say for comparison purposes, to the surface water quality standards. Do I understand that correctly?

A That's correct.

*Id.*, 86.

Mahan testified that the surface water quality standards are used to compare contaminants in actual surface water samples to determine the quality of that water for human contact. Mahan explained that he selected the chronic aquatic life criteria, as opposed to the acute criteria, because the chronic standards indicate levels at which longer-term sustained exposure to a constituent will impair the ability of aquatic species to reproduce or survive. The acute aquatic standards, on the other hand, only measure the survivability of organisms to a short-term exposure. [FN17] Mahan maintained that chronic aquatic criteria were an appropriate reference when determining questions of human health hazards because of the possibility that humans might drink the pond water: "I can't ... tell you that no one is going to drink the pond water, drink the pond water only once or live off the pond water." *Id.*, 87-88.

Case 3:02-cv-00656-WIG    Document 68    Filed 12/20/2004    Page 38 of 44

Page 10
Not Reported in A.2d
2001 WL 58018 (Conn.Super.)
(Cite as: 2001 WL 58018 (Conn.Super.))

FN17. Footnotes to the surface water quality standards define the differences between the acute and chronic criteria more precisely: the acute criteria mean that "[b]iological integrity is impaired by an exposure of one hour or longer to a concentration which exceeds the acute criteria more frequently than once every three years on average"; whereas the chronic criteria mean that "[b]iological integrity is impaired when the four-day average concentration exceeds the chronic criteria more frequently than once every three years on average." (Def.'s Ex. 74, "Appendix D. Numerical Water Quality Criteria for Chemical Constituents," Revised April 1997, Table Notes 3 and 4.)

That explanation, however, seems dubious. Mahan never adequately explained why criteria to protect the biological integrity of aquatic species would have any relevance at all to human health or safety, particularly when the SWQS themselves contain two other sets of standards specifically designated as human health criteria. Nor did he explain why chronic criteria, for which the SWQS require three-year average statistics involving the frequency by which four-day average concentrations are exceeded, (Def.'s Ex. 73 n. 3) could be applicable or meaningfully compared to individual samples taken from the Doyle Pond. Heidtman's testimony that the chronic aquatic criteria are not applicable to individual samples taken on the Doyle property also seems more credible than Mahan's contrary claims, since the chronic criteria are, by definition, applicable to average concentrations over a period of time.

The DEP water quality standards contain two numerical columns under the Human Health Criteria, one labeled "Organisms" and the other "Water and Organisms." Heidtman explained that the "Organisms" column provides the criteria for human consumption of an organism containing a particular constituent, while the "Water and Organisms" column relates to drinking water containing particular micro-organisms. Even were the water quality standards applicable here, which Heidtman disputed, the SWQS standards in these two columns labeled "human health criteria" would seem more likely to apply to human contact than criteria established for aquatic species. (Heidtman Test. of 6/1/2000 at 52.)

Heidtman testified, on the other hand, that the surface water quality standards do not have any application to the water samples taken from the

Doyle property and that using the water quality standards for the Doyle pond samples is not valid. He testified that the purpose of the SWQS is "to manage treated discharges to fresh water and salt water systems ..." (Heidtman Test. of 6/1/2000 at 38.) The water pollution control regulations adopted by DEP for the granting of treated water discharge permits refer repeatedly to the water quality standards as a guide to planning and designing treatment facilities or to reducing discharges under the National Pollution Discharge Elimination Program. See Regs., Conn. State Agencies § 22a-430; Def.'s Ex. 74. As Heidtman testified, the DEP ground water remediation standards use the chronic aquatic species water quality standards as cleanup criteria for remediating certain of those discharges. [FN18] The DEP has adopted surface water protection criteria (SWPC) as standards for remediating a groundwater plume [FN19] polluted by a release. [FN20] The purpose of these SWPC, as Mahan admitted, is to protect surface water from contaminated ground water by setting cleanup standards for ground water where there has been a discharge of a toxic substance. [FN21] The SWPC also use the water quality standards for aquatic life as the numerical criteria for remediating certain of those discharges. [FN22]

FN18. Section 22a-133k-3 of the Regulations of Connecticut State Agencies, captioned "Ground-water remediation standards," provides in relevant part as follows:
(2) If a ground-water plume (A) discharges to a wetland or an intermittent stream, or (B) the areal extent of such ground-water plume occupies more than 0.5%, or other percentage which is approved in writing by the Commissioner, of the upstream drainage basin of the stream to which such plume discharges measured from the intersection of stream and such ground-water plume, each substance therein shall be remediated to a concentration equal to or less than the applicable aquatic life criteria contained in Appendix D to the most recent Water Quality Standards, or equal to or less than an alternative water quality criterion adopted by the Commissioner in accordance with section 22a-426 of the General Statutes and paragraph 12b of the Water Quality Standards effective May 15, 1992.
(3) Alternative surface-water protection criteria. Alternative surface-water criteria may be calculated in accordance with

Not Reported in A.2d
2001 WL 58018 (Conn.Super.)
(Cite as: 2001 WL 58018 (Conn.Super.))

subparagraph (A) of this subdivision or may be approved in writing by the Commissioner in accordance with subparagraph (B) of this subdivision. (A) An alternative surface-water protection criterion may be calculated for a substance in Appendix D of the most recent Water Quality Standards by multiplying the lower of the human health or aquatic life criterion for such substance in said Appendix D by [ (0.25 x 7Q10)/Q[plume]] where Q[plume] is equal to the average daily discharge of polluted ground water from the subject ground-water plume.

FN19. 22a-133k-1. Definitions (24) "Ground-water plume" means ground water which has been polluted by a release and in which ground water one or more substances from such release is present at a concentration above the analytical detection limit.

FN20. 22a-133k-1. Definitions (50) "Release" means any discharge, spillage, uncontrolled loss, seepage, filtration, leakage, injection, escape, dumping, pumping, pouring, emitting, emptying, or disposal of a substance.

FN21. Although Mahan initially stated he was relying on the SWPC, he later disclaimed them and cited instead the SWQS, which he claimed were applicable to all ground water regardless of site use and hence more stringent.

FN22. Section 22a-133k-3 of the Regulations of Connecticut State Agencies, captioned "Ground-water remediation standards," provides in relevant part as follows:
(2) If a ground-water plume (A) discharges to a wetland or an intermittent stream, or (B) the areal extent of such ground-water plume occupies more than 0.5%, or other percentage which is approved in writing by the Commissioner, of the upstream drainage basin of the stream to which such plume discharges measured from the intersection of stream and such ground-water plume, each substance therein shall be remediated to a concentration equal to or less than the applicable aquatic life criteria contained in Appendix D to the most recent Water

Quality Standards, or equal to or less than an alternative water quality criterion adopted by the Commissioner in accordance with section 22a-426 of the General Statutes and paragraph 12b of the Water Quality Standards effective May 15, 1992.
(3) Alternative surface-water protection criteria. Alternative surface-water criteria may be calculated in accordance with subparagraph (A) of this subdivision or may be approved in writing by the Commissioner in accordance with subparagraph (B) of this subdivision. (A) An alternative surface-water protection criterion may be calculated for a substance in Appendix D of the most recent Water Quality Standards by multiplying the lower of the human health or aquatic life criterion for such substance in said Appendix D by [ (0.25 x 7Q10)/Q[plume]] where Q[plume] is equal to the average daily discharge of polluted ground water from the subject ground-water plume.

*11 As to Mahan's claim that he used the chronic aquatic criteria because of the possibility that people would drink the pond water, or possibly even live on it, he also admitted that the surface water quality standards are not used to determine the quality of surface water for drinking, but only for human contact. (Tr. 5/17/2000 at 79.) Heidtman testified that the state department of health services has adopted other "regulations that govern the use of a surface water supply for treatment for drinking, and it requires monitoring, it requires treatment, it requires certification." Those regulations may be found in the "Standards for quality of public drinking water" set forth in section 19-13-B102 of the Regulations of Connecticut State Agencies.

Moreover, the surface water protection criteria that designate the chronic aquatic criteria as cleanup goals are only one of two sets of ground water mediation standards adopted by the DEP. The DEP has also adopted ground water protection criteria (hereafter GWPC), which are for the most part, more stringent standards than the SWPC. Heidtman testified that the SWPC are more concerned with "flora and fauna" whereas the GWPC focus more on human health concerns, and that the GWPC are closely related to the drinking water standards, also known as maximum contaminant levels or MCLs. (Heidtman Test. of 6/1/2000 at 27-28.) He also stated that humans have a much greater tolerance than aquatic species to metals. Heidtman's explanation of the

differences between the SWPC and the GWPC is credible in light of the fact that SWPC use the aquatic SWQS as their cleanup criteria, whereas the DEP requires that cleanups from discharges in areas, such as the Doyle property, with a GA groundwater classification (which means that DEP has designated that the ground water must be fit for human consumption) use the more stringent GWPC as criteria for remediating the ground water.

Other flaws, or unanswered problems, in Mahan's testimony that the chronic aquatic SWQS are the applicable standard for comparing surface water on the Doyle property include the following:

*12 Heidtman testified that either the SWPC or the GWPC could conceivably be applicable to the water tested by Boehm at the end of the plastic pipe that contains ground water discharging into the pond. Either set of standards exceeds the levels of constituents found by Boehm, however.

The chronic aquatic water quality standards used by Mahan make no reference to either the Department of Health's drinking water standards or the maximum contaminant levels promulgated by the United States Department of Environmental Protection for contact with the constituents that Mahan claimed to be elevated on the Doyle property.

Mahan testified that the levels of lead, zinc and copper in the pond water and of barium, chromium and lead in the pond sediment and ground soil all constituted hazards to human health. He admitted that he was not an expert in toxicology and was relying on published standards for his opinion. Yet the plaintiffs did not sustain their burden of proving, by a preponderance of the evidence, that the standards on which he relied were the appropriate ones.

Early in Mahan's testimony, he stated that there are various criteria that "you can choose to compare" the findings for constituents on the plaintiff's property. (Mahan Test. of 5/16/2000 at 21.) He similarly explained, in the context of surface water samples that "[t]here are different levels you can compare these to. You can decide to compare it to a number of different ... regulatory standards. I think you need to decide which applies to this site and which don't ..." (Tr. of 5/17/2000 at 24.) He also acknowledged that none of these standards were "more appropriate for use on this property" than another. (Mahan Test. of 5/16/2000 at 21.) Mahan maintained that he selected the pollutant mobility criteria for soils and sediment and the chronic aquatic water quality standards for surface water because the capacity of the soil and

water for contact and ingestion made it appropriate to select the most stringent standard available.

Very little in the evidence, outside Mahan's own testimony, however, supports his selection of these criteria. Instead, the court finds his testimony that these are appropriate and valid standards for comparison not to be credible, for the reasons stated above. As the text of the various regulations and the stated purposes of the various standards confirm, Heidtman's testimony that the PMC and chronic aquatic SWQS standards are not scientifically valid for comparing the samples from the Doyle property is much more plausible. It would appear that Mahan's principal selection criterion was to choose for comparison whichever standard was most stringent, rather than most relevant to human health factors, as the following charts show. Both tables list data in milligrams per kilogram, or parts per million.

Table one, drawn from testimony and exhibits introduced into evidence at trial, depicts the pollutant mobility criteria and residential direct exposure criteria for barium, chromium and lead, the totals (T) of each metal found at the identified locations, and the numerical result of Mahan's factor of twenty analysis ("20"):

## TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

*13 Table Two below, also drawn from testimony and exhibits at trial, as well as relevant state and federal regulations, compares the levels of various constituents found in pond or surface water that Mahan claimed to be a health hazard with the various standards:

## TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

Jeffrey Heidtman on 6/1/2000, p. 57; and confirmed from data published in 40 C.F.R. Part 141, National Primary Drinking Water Regulations. The table omits an M.C.L. for nickel, as none of the experts testified about such a level and the court was unable to determine from a specific standard set forth in the federal regulations.

"nd"-not detected. "FW"-freshwater aquatic species. "SW"-saltwater aquatic species

Thus, from all the evidence, the court concludes that Mahan's reliance on the chronic aquatic life criteria is misplaced, just as is his reliance on the pollutant

mobility criteria, or at least that the plaintiffs did not prove that such reliance is well-founded and credible. It instead is far more likely that the human health numerical criteria for water quality standards, the ground water protection criteria, the drinking water standards, the maximum contaminant levels, and the residential direct exposure criteria would all be more relevant standards to apply to constituents found in the soil, sediment, and water on the Doyle property. To the extent there is evidence as to the numerical criteria for each of these standards in the record, the samples found on the Doyle property are all under the critical threshold levels.

For all these reasons, the court concludes that the plaintiffs did not bear their burden of establishing, by a preponderance of proof, that the surface or ground water on the Doyle property contained elevated levels of constituents exceeding recognized and applicable standards. Since the evidence as to whether leachate could be transported to the plaintiffs' property via ground water after leaving culvert number two was equivocal, the presence of constituents whose presence could only have been explained by landfill contamination might have been sufficient to establish the credibility of Mahan's conclusions about such a groundwater pathway. Mahan's conclusion that landfill leachate contaminated the plaintiffs' property, however, rested in part on his opinion that the soil and water on their property contained elevated levels of landfill constituents. The failure to sustain the exceedance premise of his groundwater route conclusion renders that conclusion improbable and not credible.

### 3. Background or naturally occurring levels

Another reason for doubting that the levels of constituents on the plaintiffs' property originated at the landfill, in addition to the lack of evidence establishing a water pathway and the levels found on the Doyle property not exceeding any applicable standards, is that the levels themselves appear, from the testimony offered, to be in the range of what would occur naturally in the area. None of the constituents Mahan found on the plaintiffs' property are man-made, and he agreed that all occur naturally. Mahan initially testified that the background levels of the constituents he found do not usually exceed the pollutant mobility criteria and thus rejected that possibility as an explanation for their presence on the plaintiffs' property. (Mahan Test. of 5/16/2000 at 40.)

Heidtman, on the other hand, convincingly testified as to why the levels found probably are in the background range. He based his conclusion on two factors. First, he testified that the levels found in the soil samples at the Doyle property at SS-04 and SS-05 had not been in contact with the ground water, for, as Mahan eventually admitted, the water table was below the soil depth at which each of these samples was taken. Thus, the constituents could not have migrated to those locations via ground water. Secondly, Heidtman concluded that there was no surface water pathway from the landfill that could have been their source, a conclusion the court has already found credible. (Heidtman Test. of 6/1/2000 at 65-67.) Furthermore, Heidtman testified that even if Mahan's conclusion of a surface water pathway from culvert number two to culvert number one were correct, surface water leaving culvert number one would never reach the location of SS-04 because such water would first reach a deep hole "four to five feet deep and would then overflow and flow down to the pond." *Id.,* 65. Heidtman therefore concluded that the levels of metals found at SS-04 and SS-05, which were among the highest levels of any found on the Doyle property, indicated the naturally occurring background levels in the area.

*14 Both Mahan and Heidtman agreed that the levels of barium, chromium and lead found on the Doyle property were within the naturally occurring range of those metals in the eastern United States. (Mahan Test. of 5/23/2000 at 64; Heidtman Test. of 5/31/2000 at 59.) Mahan even admitted that he could not "say that the levels of the three metals that [he] found on the Doyle property are elevated with respect to background ..." (Mahan Test. of 5/23/2000 at 64.) Heidtman explained that it is common to find variations in the background levels of a constituent found in various locations because of the "tumultuous history of the rock and soil" in the region. (Heidtman Test. of 5/31/2000 at 58.) [FN23]

> FN23. On cross-examination, Heidtman admitted that the quantity of lead (.0024 mg/kg) found in the Doyle pond samples taken by Boehm could not be explained solely as the result of leaching out of the soil surrounding the pond. But neither he nor Mahan offered a convincing explanation as to the precise source of the lead. Heidtman testified it could result from a combination of background levels, soil or sediment in colloidal form within the liquid being analyzed, and anthropogenic sources (Heidtman Test. of 7/13/2000 at 7.) Thus neither Mahan nor Heidtman precluded the possibility of human sources of

contamination. This single unexplained test sample is not sufficient to establish the plaintiffs' case.

In the absence of accepted and verified scientific data as to background levels at the Doyle property, Heidtman's conclusions seem plausible. The plaintiffs' failure to preclude the possibility that the results found on the Doyle property were naturally occurring levels is another fatal flaw in their claim to have proven that the constituents found on their property resulted from landfill leachate contamination.

### C. The plaintiffs' claim of a leachate plume

At trial the plaintiffs produced evidence of leachate contamination at neighboring properties north, west and south of the plaintiffs' property:

South: Benzene and chlorobenzene, volatile organic compounds that are constituents of gasoline, were found once in a drinking well in 1990 at the Krlha property located directly across Little Pond Road and immediately south of the Doyle property.

West: The Bridgeport Hydraulic Company, the local supplier of public drinking water, has claimed that in 1989 it found benzene and related VOCs in the "Webster Well Field" directly west of the plaintiffs' property across Route 63.

North: MTBE, another VOC gasoline component, was recently found in wells on Camp Dutton Road.
*15 East: The parties referred several times to litigation during the 1980s concerning the presence of landfill leachate on the Dingwell property east of the plaintiffs' property. The evidence also revealed that monitoring well 3-D, located southeast of the Doyle property, has detecting findings of lead and gasoline constituents.

The plaintiffs argue that the above data establishes proof that an area of leachate plume includes and spreads beyond the plaintiffs's property: "the presence of one species of landfill contaminant ... at every point on the map around the Doyle property and the presence of another species of landfill contaminant .... on the Doyle property compels only one logical result: The metals on the Doyle property were transported there by landfill leachate." (Pl's Post-trial Mem. at 12.)

There are two serious problems with this argument. First, they never offered any expert testimony to support this claim. Mahan conceded that, since he had done no study on the question, he could not give an opinion as to the location of any leachate plume:

"I don't feel that the extent of the plume is accurately defined." (Tr. of 5/17/2000 at 151.) He even testified that determining the extent of the plume would require a hydrogeological study. Id., 151-52. Other expert testimony, however--about topographical features, piezometric lines, wetlands recharging and discharging ground water, bedrock fractures, strike and dip of the planar geological features--all make amply clear to the court that one cannot surmise a finding of landfill contamination at one location from contamination at another location. While the flow of surface water from high to low can be documented visually, testified about by either expert or lay person, and is a matter within the common understanding of most people, how particular geological features have affected the flow of ground water hidden from the human eye in a specific area is not something this court can conclude in the absence of credible expert testimony. [FN24]

FN24. The court does not find Mahan's conclusions about the presence of leachate at the northwest foot of the landfill, where the court took its site walk, of any credible value on the issues of groundwater flow, leachate plume, or single molecule contamination. At the suggestion of the plaintiff the court took a site walk during trial to view a small stream of water with an orange tint at a location the parties agreed was at the northwest foot of the landfill. Although conducting no formal sampling and laboratory analysis of that water at that time, Mahan opined that the orange-stained water was a leachate outbreak from the landfill. He based his opinion on a variety of other environmental samplings there and elsewhere. His conclusion is consistent with Heidtman's testimony that leachate from the landfill enters the ground water at the base and sides of the landfill but quickly makes its way to surface water, and Heidtman's opinion that surface water containing leachate could flow from the vicinity of the landfill in a northwestern direction (in the general direction of the plaintiffs' property). Heidtman concluded, however, that such leachate in such surface water would not migrate onto the Doyle property (see discussion above). When asked if the presence of leachate at the location of the site walk would "have anything to do with the presence of contaminants on the Doyle property," (Tr. of 5/17/2000 at 19.) Mahan said yes; asked to explain, he testified: "We

Case 3:02-cv-00656-WIG   Document 68   Filed 12/20/2004   Page 43 of 44

Not Reported in A.2d
2001 WL 58018 (Conn.Super.)
(Cite as: 2001 WL 58018 (Conn.Super.))

Page 15

observed leachate outbreak, which is known to contain the same constituents that are detected on the Doyle property. As I stated yesterday, after my review, and site walks that I've observed the groundwater flow, that it partially does enter the Doyle property. Groundwater soil--or surface water both enter the Doyle property." *Id.* The only conclusion the court can reach, from the presence of leachate at the location of the site walk, however, is that leachate does in fact, as both experts testified, enter the surface water to the northwest of the landfill. Since there is credible evidence neither of a water pathway for leachate to migrate from the landfill to the plaintiffs' property nor that the quantities of constituents found at the Doyle property exceeded background levels or applicable governmental remediation standards, the presence of leachate at the place of the site walk does not establish that any constituents found on the Doyle property were also contaminated by landfill leachate.

Second, the premises of the plaintiffs' leachate plume theory are themselves questionable. The claims of the Bridgeport Hydraulic Company were never established at trial to be valid or reliable proof of landfill contamination, rather than merely a claim made; Heidtman's explanation that the presence of benzene and VOCs in the Webster oil field suggested a recent, localized gasoline spill as the source was credible, particularly without persuasive expert opinion to the contrary. The lack of MTBE in samples taken at the landfill and its monitoring wells, at least without contrary persuasive expert opinion, supports Heidtman's conclusion that the MTBE found on Camp Dutton did not originate at the landfill and had an on-site origin. The inability to replicate the single finding of benzene at the Krlha property and Heidtman's testimony that poor driveway design probably allowed surface run-off of a local gasoline overflow would explain that finding. All of these explanations offered by Heidtman were credible and seemed plausible. Without persuasive evidence from the plaintiffs to establish that these findings mean what their brief claims, the court concludes that the plaintiffs did not establish, by a preponderance of evidence, the validity of their leachate plume theory.

### D. The mere iota theory

*16 The plaintiffs' last claim offering a possibility of relief is that if even a single molecule of landfill

leachate reached their property, the defendants, or at least the town, would be liable. Although Heidtman admitted that he could not preclude the possibility of a single molecule of landfill leachate migrating to the Doyle property, there is no persuasive evidence of such migration. Mahan's conclusion that landfill constituents had migrated to the plaintiffs' property was premised on the presence of elevated levels of those constituents, a factual burden the plaintiffs did not sustain. The evidence presented to the court did not establish, by a fair preponderance, that either one molecule or elevated levels of landfill constituents were on the plaintiff's property.

### IV-CONCLUSION

Determining whether the plaintiffs proved that leachate migrating from the landfill has contaminated their property depended, in the final analysis, on the court's evaluation of the different experts' opinions. It is axiomatic that " '[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.' *Kimberly-Clark Corp. v. Dubno,* 204 Conn. 137, 153, 527 A.2d 679 (1987)." *Jacques All Trades Corporation v. Brown,* 42 Conn.App. 124, 129, 679 A.2d 27 (1996), aff'd, 240 Conn. 654, 692 A.2d 809 (1997); see also *In re Hector L.,* 53 Conn.App. 359, 366, 730 A.2d 106 (1999). It is within the court's province, in such situations, to determine which expert testimony, if any, is more credible than other expert opinion evidence provided for review. *Keans v. Bocciarelli,* 35 Conn.App. 239, 241-42, 645 A.2d 1029, cert. denied, 231 Conn. 934, 650 A.2d 172 (1994).

The plaintiffs' expert Michael Mahan testified that elevated levels of constituents typical of landfill leachate and a surface water and groundwater pathway from the landfill to the Doyle property warranted a conclusion that the landfill had contaminated their property. The defendants' expert Jeffrey Heidtman testified that the levels of constituents found in sampling on the plaintiffs' property did not exceed applicable governmental standards of contamination, were consistent with naturally occurring background levels, and probably did not migrate to the subject property from the landfill. Having considered and weighed all the testimony, exhibits, briefs, and arguments of counsel, the court has concluded that Heidtman's testimony was more credible than that of Mahan on most points of factual dispute. His explanation of which contamination and remediation standards were applicable to the constituents found on the Doyle

property was more consistent with the text of those standards and the purpose of each standard as explained by the experts. His explanation of the surface water pathways in the area was more consistent with the topographical information introduced into evidence. His opinion as to the background levels in the area for the constituents found on the Doyle property was convincing. Moreover, Mahan admitted that he did not exclude all other possibilities for the sources of the constituents at the Doyle property. For these and all the other reasons stated above, the court therefore finds that the plaintiffs did not sustain their burden of proof to establish either contamination (that their property was contaminated by constituents) or source (that the former Litchfield landfill was the source of any such contamination). Accordingly, the court enters judgment for all defendants on all counts.

END OF DOCUMENT