UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TIMOTHY P. DOYLE,                          :
      Plaintiff                      :
                                    :
v.                                         :     CIVIL ACTION NO.
                                      :     3:02 CV 656 (JCH)
TOWN OF LITCHFIELD, et al.,                 :
      Defendants                     :
                                      :     MAY 31, 2005

**RULING RE: DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [DKT. NO. 59]**

Plaintiff Timothy Doyle ("Doyle") brings this suit against the Town of Litchfield

("Litchfield"), asserting various theories of recovery.  Each of the claims involves land

that Doyle previously owned, situated approximately one-quarter mile from Litchfield's

landfill.  The case has a lengthy history.  Currently, Doyle alleges that he is entitled to

relief under the Comprehensive Environmental Response, Compensation and Liability

Act ("CERCLA"), the Resource Conservation & Recovery Act ("RCRA"), Connecticut

General Statute § 22a-452, Strict Liability, and Negligence per se.

Litchfield has moved for Summary Judgment pursuant to Fed. R. Civ. P. 56.  For

the reasons to follow, Litchfield's motion is DENIED as to the CERCLA claim and

GRANTED as to the remaining claims.

I.      **BACKGROUND**

      **A.**     **Facts**[1]

      In March 1996, Doyle's then-fiancé, Lisa DiJon, bought a parcel of property

---

[1]  The undisputed facts set forth have been admitted in the parties' pleadings and Local
Rule 56(a) Statements.

("Property") at 521 South Plains Road, Litchfield, approximately a quarter-mile northwest of Litchfield's former municipal landfill.  The Property was 3.58 acres of gently sloping land with a small pond and a colonial-style farmhouse.  Doyle and his fiancé planned to run a horse breeding operation on the Property.  Doyle became concerned when he noticed dead fish and pollywogs floating in the pond, and an orange sheen on the surface of the water.  He tested the water, engaged an environmental testing company, and talked to neighbors and the Connecticut Department of Environmental Protection ("DEP").  From the DEP, he learned that landfill leachate had been the subject of previous litigation and DEP orders.  He contacted local authorities and the United States Environmental Protection Agency ("EPA") regarding conditions in the landfill and surrounding property.

Also in connection with the Property, Doyle obtained zoning and conservation permits from the Town of Litchfield.  He removed trees, cleared land, and installed a riding ring and horse barn.  He also procured further environmental testing, blasted and excavated the land, moved dirt, capped a well, and installed new drain pipes for the pond.  In August 1996, he and Lisa DiJon married and moved onto the Property.  They continued working toward their planned horse operation.

The Town's landfill, used for solid waste disposal for fifty years, accepted residential, commercial, and industrial waste.  Currently, it is a waste recycling facility and is located between two bedrock ridges in a steep valley.  The water table in the center of the landfill is over twenty feet higher than its base.  The use of this site,

2

combined with its hydrogeology, allowed leachate to flow from the landfill into the underlying bedrock system, and then into local ground and surface water systems.

In 1982, the DEP issued a pollution abatement order against Litchfield for the landfill, and Litchfield conducted a hydrogeological study. According to the study, there was leachate in the bedrock adjacent to the landfill and in nearby surface waters. Further, two primary migratory pathways for leachate were found to the north and south of the landfill, along a fracture in the bedrock. Leachate also flowed to the northwest.

In 1984, Litchfield submitted a map to the DEP and developed and implemented a landfill closure plan. It installed monitoring wells, began monitoring water quality, and extended water lines to some surrounding properties. It has continued to collect and analyze samples from those wells. As part of the closure plan, Litchfield placed a covering material on the landfill to reduce the amount of rain and surface water entering the landfill. The covering was a mixture of soil and ash derived from incinerated sludge. Around 1991, and with the DEP's and Litchfield's permission, Crompton Corporation[2] disposed of about 10,000 cubic yards of incinerated sludge ash at the Litchfield landfill. The ash was from Naugatuck Treatment Company and was used as part of the covering. Because the landfill is in a wetland area in a bedrock valley partially above the water table, its base remains saturated despite the covering.

_____

[2] Doyle alleges that Crompton is a Delaware corporation with headquarters in Connecticut; it globally markets chemicals, polymer products, and processing equipment. Second Am. Compl. ¶ 5. He alleges that Uniroyal Chemical Company, Inc. Naugatuck Treatment Company ("NTC") are wholly-owned subsidiaries of Crompton. NTC operated as a waste recycling center. Id. at ¶¶ 6, 7.

In February 1998, after the below-described state court litigation had begun, Lisa DiJon conveyed an interest in the Property to Doyle.  Doyle subsequently lost the property in unrelated foreclosure proceedings, before the state litigation reached trial. He has lived in Woodbury since "some time" before he filed the present action in April 2002.

### B.     Procedural History

In 1997, Doyle and his then-wife sued Litchfield on various grounds in the Connecticut Superior Court.  They alleged that their property was contaminated by leachate from Litchfield's landfill and asserted various common law and state statutory claims.  They amended their complaint several times.  The parties to that suit agreed that the court would decide the factual issues first.  After visiting the site twice and evaluating the testimony of two expert witnesses, one for each side, the state court found: 1) plaintiffs did not sustain their burden of establishing that their property was contaminated (contamination); and 2) plaintiffs did not sustain their burden of establishing that the Town's landfill was the source of any contamination on their property (connection to source).  Doyle v. Webster, No. CV990079961, 2001 WL 58018, at *16 (Conn. Super. Ct. Jan. 8, 2001).  The court therefore found for the defendant Town on all counts.  Id.  The plaintiffs' attempts pro se for rehearing and appeal were denied.

In April 2002, Doyle filed the instant lawsuit pro se.  He amended his complaint in May 2002, adding Crompton as a defendant.  The court granted Crompton's motion to

4

dismiss for failure to state a viable claim, absent opposition. (Dkt. No. 19.)  The court also granted Doyle's application for pro bono counsel.  (Dkt. No. 22.)  Doyle then filed a motion to amend his complaint and add defendants Uniroyal Chemical and Naugatuck Treatment; Judge Goettel conducted a hearing and denied that motion.  (Dkt. No. 34.) When Doyle's motion for reconsideration was denied (Dkt. No. 37), he appealed to the Second Circuit (Dkt. No. 39).  Before the motion was heard, Doyle withdrew his appeal by stipulation that the appeal was premature because some claims were still pending against Litchfield in the district court.  (Dkt. No. 50.)

In September 2004, Doyle filed his Second Amended Complaint against Litchfield alleging CERCLA, RCRA, and Connecticut statutory violations, strict liability, and negligence per se.  Pre-discovery, Litchfield moved for summary judgment. Litchfield contends that Doyle's claims are barred by preclusion and the *Rooker-Feldman* doctrine; that Doyle does not have standing to pursue his claims; that he failed to follow statutory RCRA requirements for suit; and, that he failed to state a strict liability claim.  In response, Doyle contends that the federal actions involve issues that were not decided by the state court and are not barred; that he has sufficient standing for his claims and adequately followed RCRA's notice requirements; that his state claims deserve reconsideration; and that Litchfield's understanding of a strict liability claim is faulty.  He lists twelve disputed issues of material fact, several of which involve disputed issues of law.

## II.    STANDARD

The burden is on a party moving for summary judgment to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000). When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present significant probative evidence to create a genuine issue of material fact.  See Liberty Lobby, 477 U.S. at 249-50.  A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . .'"  Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted).  A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide."  Aldrich, 963 F.2d at 523.  Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).  A party may not create a genuine issue of material fact by relying on the "'mere allegations or denials'" contained in his pleadings.  See Goenaga v. March of

Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citation omitted); see also

Ying Jing Gan v. City of New York, 996 F.2d 522, 532-33 (2d Cir. 1993).  Further, a

party may not rely "on mere speculation or conjecture as to the true nature of the facts

to overcome a motion for summary judgment."  Knight v. United States Fire Ins. Co.,

804 F.2d 9, 12 (2d Cir. 1986).

The Local Rules of this court also address the obligation of the parties with

regard to a motion for summary judgment:  "All material facts set forth in said Local

Rule 56(a) statement will be deemed admitted unless controverted by the statement

required to be filed and served by the opposing party in accordance with Local Rule

56(a)(2)."  Local Rule 56(a)(1) (D. Conn.).

## III.    DISCUSSION

### A.    Doyle's CERCLA Claim Is Not Barred

1.    Claim Preclusion

When considering whether a claim is barred by the doctrine of res judicata, a

federal court generally should apply the preclusion law of the state in which the original

judgment was rendered.  Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S.

373, 375 (1985) (citing 28 U.S.C. § 1738 ("Full Faith and Credit Statute")).  In Marrese,

two board-certified orthopaedic surgeons sued the American Academy of Orthopaedic

Surgeons in Illinois state courts when the Academy denied membership to them.  They

alleged violations of Illinois common law associational rights.  Both claims were

dismissed for failure to state a claim.  Id. at 375.  Subsequently, both surgeons

instituted a federal anti-trust claim in federal district court. The district court denied the defendant's motion to dismiss, holding that claim preclusion did not apply because the state court lacked jurisdiction over the federal antitrust suit. Id. at 376. The Seventh Circuit reversed, with a plurality finding that a state claim bars a subsequent federal antitrust claim if the plaintiff could have brought a "'materially identical'" claim in state court. Id. at 377. When the Supreme Court reversed and remanded for consideration under Illinois law, it looked to the Full Faith and Credit Statute, which "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." Id. at 380. If state law would *bar* the federal action, then the courts might look for an exception to the Full Faith and Credit rule. Id. at 383. However, if state law would *not bar* the action, then state preclusion law applies. Id.

The Marrese Court went on to discuss state preclusion law, stating that where "state preclusion law includes [a] requirement of prior jurisdictional competency . . . a state judgment will not have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts." Id. at 382. The Court noted that most state preclusion law requires prior jurisdictional competency for a judgment to have claim-preclusive effect. Id. at 382.

The Second Circuit has had opportunity to apply Marrese. For instance, when a plaintiff brought a Sherman Act suit in federal court subsequent to a state action, the District of Vermont held that, because the plaintiff originally filed in state court rather than federal court, his current federal action was barred. Valley Disposal, Inc. v. Cent.

Vt. Solid Waste Mgmt. Dist., 31 F.3d 89, 97 (2d Cir. 1994).  In reversing the district

court, the Second Circuit discussed Maresse at length and noted: "Whatever might be

said for the district court's approach as an initial proposition, it would seem to be

foreclosed by Supreme Court precedent."  Id. at 97.  The Circuit Court then held that,

because Vermont preclusion law requires a "proper forum" for res judicata to apply, the

plaintiff's federal antitrust claims were not barred.  Id. at 98-99;.  see also Cullen v.

Margiotta, 811 F.2d 698, 732 (2d Cir. 1987) (applying New York preclusion law, which

requires prior jurisdictional competency, to hold plaintiff's subsequent RICO claim not

barred by state court action), overruled on other grounds by Riverwoods Chappaqua

Corp. v. Marine Midland Bank, 30 F.3d 339, 347 (2d Cir. 1994); Titan Sports, Inc. v.

Hellwig, No. 3:98-CV-467, 1999 WL 301695, at *10 (D. Conn. 1999) ("[t]his Court must

determine what effect the . . . state courts would give to the prior proceedings between

the parties in that state.").

     Like Vermont law in Valley Disposal, Connecticut law requires "prior jurisdictional

competency" for res judicata to apply.  See Wade's Dairy, Inc. v. Town of Fairfield, 181

Conn. 556, 559 (1980).  "The doctrine of res judicata holds that an existing final

judgment rendered upon the merits without fraud or collusion, by a court of competent

jurisdiction, is conclusive of causes of action and of facts or issues thereby litigated as

to the parties and their privies in all other actions in the same or any other judicial

tribunal of concurrent jurisdiction."  Id.  Connecticut courts have not discussed the

meaning of "competent jurisdiction", but there is no reason to assume it has a different

meaning in Connecticut than it did in the Supreme Court's <u>Marese</u> decision, or in the

Second Circuit's interpretation of "proper forum" in <u>Valley Disposal</u>.  Additionally,

<u>Wade's Dairy</u> confines preclusion to "the <u>same</u> or any other judicial tribunal of

<u>concurrent jurisdiction</u>."  <u>Id.</u> at 559 (emphasis added).  State courts do not have

"competent jurisdiction" over, or "concurrent jurisdiction" with, claims within the

exclusive jurisdiction of the federal courts, and without that, <u>res judicata</u> does not apply.

<u>See</u> <u>Marrese</u>, 470 U.S. at 382.

　　　　The next relevant inquiry is whether CERCLA is within the exclusive jurisdiction

of the federal courts.  The statute provides:

> Except as provided in subsections (a) and (h) of this section, the United
> States district courts <u>shall have exclusive original jurisdiction</u> over all
> controversies arising under this chapter, without regard to the citizenship
> of the parties or the amount in controversy . . . .

42 U.S.C. § 9613(b) (2004) (emphasis added).[3]  In CERCLA, Congress has

"affirmatively divest[ed] state courts of their presumptively concurrent jurisdiction."  <u>See</u>

<u>Yellow Freight System, Inc. v. Donnelly</u>, 494 U.S. 820, 823, 826 (1990) (citation

omitted) (holding that, "[u]nlike a number of statutes in which Congress unequivocally

stated that the jurisdiction of the federal courts is exclusive", Title VII contained no such

provision and was not within the exclusive jurisdiction of the federal courts).  Thus,

because Connecticut law requires prior jurisdictional competency for claim preclusion to

---

[3] Subsections (a) and (h), inapplicable here, concern judicial review regulations and
challenges to or orders for remedial action.

apply, and because the Connecticut courts do not have jurisdiction to hear CERCLA claims, Doyle's CERCLA claim is not barred by the res judicata doctrine.

Litchfield points to another Connecticut case as indicative of Connecticut's claim preclusion law, DeMilo & Co., Inc. v. Comm'r of Motor Vehicles.  233 Conn. 281 (1995). In DeMilo, the court identified the principal Connecticut requirement for claim preclusion: a claim is precluded if it was made and litigated, or could have been made, in a previous action.  See id. at 293.  In that case, the plaintiff junkyard owner appealed an administrative penalty to the Connecticut Superior Court.  In two other related and basically simultaneous actions, the Commissioner brought injunction and enforcement actions against the junkyard owner, all in state court.  The Superior Court held that the plaintiff's claims were barred, since he could have raised relevant issues as special defenses in the enforcement action.  Id. at 293-94.  Because he did not, he could not then raise them as affirmative claims.  Id.

The court then focused its inquiry on whether the enforcement action and the present appeal actually involved the same claims.  Id. at 294.  It described the test that Connecticut uses for determining if two claims are actually the same, which is the transactional test.  Id.  To apply that test, Connecticut courts "compare the complaint in the second action with the pleadings and the judgment in the earlier action."  Id.  The DeMilo court found that the claims in question had "identical factual underpinnings" and that DeMilo's claims in the present appeal were "identical" to those it had raised in the enforcement proceeding.  Id. at 295.

DeMilo did not involve or address exclusive federal jurisdiction claims, nor did it discuss competent jurisdiction. Instead, it identified the principal Connecticut requirement for claim preclusion: a claim is precluded if it was made and litigated, or could have been made, in a previous action. In fact, the court stated that proposition three times. Id. at 292-95 ("We conclude that there is [nothing left to be litigated], because DeMilo either advanced, or could have advanced, every claim or defense to the merits"; "[t]he doctrine of res judicata, therefore, applies not only to claims actually made and litigated . . . but also to claims that party could have made in the initial action"; "[b]ecause the same claims raised by DeMilo in this administrative appeal could have been raised by DeMilo in that action . . . we conclude that the doctrine of res judicata applies . . . ."). Generally, a claim could have been made in a previous action if it arose from the same transaction. See id. at 294. However, under exclusive federal jurisdiction, a federal claim cannot be raised in state court, even if it arises from the same transaction. Thus, since Doyle's CERCLA claim could not have been raised in state court, it is not barred by either the Wade Dairy or the DeMilo transactional test.

　　　2.　　Issue Preclusion

　　　The Supreme Court also held in Maresse that a state court judgment could have issue preclusive effect in a "subsequent patent suit that could not have been brought in state court." Maresse, 470 U.S. at 381 (citing Becher v. Contoure Labs., Inc., 279 U.S. 388 (1929)). Thus, a state court judgment may have issue preclusive effect on a subsequent federal action, even if the subsequent action is within the exclusive

12

jurisdiction of the federal courts.  Further, the general requirement that a federal court apply state preclusion law extends to collateral estoppel as well as res judicata.  Id. at 381-82 (citing Kremer v. Chemical Constr. Corp., 456 U.S. 461, 466-67 (1982)) ("[A] federal court can apply state rules of issue preclusion to determine if a matter actually litigated in state court may be relitigated in a subsequent federal proceeding.").

The previously-quoted Connecticut preclusion doctrine outlined in Wade's Dairy applies to issue as well as claim preclusion.  181 Conn. at 559.  Further, issue preclusion in Connecticut requires that an issue be actually litigated and necessarily decided in a valid and final judgment.  See Corcoran v. Dep't of Soc. Servs., 271 Conn. 679, 689-90 (2004) (citing Cumberland Farms, Inc., v. Groton, 262 Conn. 45, 58 (2002)) (denying issue preclusion).  Thus, issue preclusion only applies where there is "'an identity of issues between the prior and subsequent proceedings.'"  Id. at 689 (quoting Crochiere v. Bd. of Ed., 227 Conn. 333, 345 (1993)).  "'[T]he prior litigation must have resolved the same legal or factual issue that is present in the second litigation.'"  Id. at 690 (quoting Conn. Nat'l Bank v. Rytman, 241 Conn. 24, 38 (1997)) (alteration in original).

Though the Connecticut court was not competent to hear a CERCLA claim, it was competent to hear the various state law claims that Doyle brought before it.[4]

---

[4]  They were: absolute public nuisance, absolute private nuisance, negligent public nuisance, negligent private nuisance, negligence per se, recklessness, actions under Connecticut General Statutes §§ 22a-16 & -452, strict liability, trespass, and inverse condemnation.  Pl's Third Am. Compl, Conn. Super Ct. (April 2000).

13

Accordingly, and in line with the previously-stated <u>Maresse</u> rule that a state action may have issue preclusive effect in a subsequent, exclusively-federal action, any identical issues actually litigated and necessarily decided in the plaintiff's state action will have preclusive effect in the instant action.

Neither of the state court findings, contamination or connection to source, are essential to or even elements of a CERCLA claim.[5] The elements of a private party CERCLA claim are: 1) the defendant is a responsible party as defined in § 9607(a); 2) the site is a "facility" as defined in § 9601(9); 3) "there is a release or threatened release of hazardous substances at the facility"; 4) the plaintiff incurred response costs as a result of the release or threatened release; and 5) the response costs were necessary and consistent with the national contingency plan (NCP). <u>See</u> <u>B.F. Goodrich Co. v. Murtha</u>, 958 F.2d 1192, 1198 (2d Cir. 1992); <u>see</u> <u>also</u> 42 U.S.C. § 9607(a).

Litchfield asserts that, because Doyle's property was not contaminated and because there was no pathway between Doyle's property and the landfill, the notion that he could still recover under CERCLA is "absurd." Def's Reply Mem. at 3. Essentially, Litchfield's argument is as follows: because Litchfield did not cause

---

[5] When Judge Goettel denied Doyle's motion to amend the complaint by adding Uniroyal and NTC as defendants, he did so because he found the amendment would be futile. Ruling on Mot. for Leave to Amend Compl. at 7. He noted that the state court's finding of no contamination was dispositive, presumably assuming that contamination is necessary to a CERCLA claim. <u>See</u> <u>id.</u> However, he did not discuss or necessarily decide that issue, except by implication. To the extent that the issue was decided, this court has discretion to revisit it under the law of the case doctrine. <u>See</u> <u>SCS Communications, Inc. v. Herrick Co.</u>, 360 F.3d 329, 336 (2d Cir. 2004).

contamination on Doyle's property, Litchfield could not have caused him to incur necessary response costs.  The court has not found, and the parties have not directed it to, a CERCLA case with facts exactly on point.  However, the relevant case law suggests that the state court findings do not preclude CERCLA liability, though they could limit Doyle's response cost recovery.

The most useful case is a 1988 Third Circuit case, Artesian Water Co. v. Gov't of New Castle County, 851 F.2d 643 (3d Cir. 1988).  There, the court of appeals affirmed the district court's holding that a private water utility was entitled to some response costs under section 9607.  Id. at 651.  The plaintiff, Artesian Water Co., provided water to residents of a county in Delaware.  It drew water primarily from the Llangollen Wellfield, which was 3,000 feet from New Castle county's landfill.  In 1972, the state had informed Artesian that "contamination" had been discovered in the vicinity of the Llangollen Wellfield.  Id. at 645.  When Artesian sued the county for response costs including monitoring, evaluation, and funds for additional water supplies, it was established that "the leachate [extended] no more than 300 feet from the county landfill and [did] not intrude into the area in which Artesian's wells [were] located."  Id. at 646.

The Artesian Water court began its discussion by noting that CERCLA was not "a paradigm of clarity or precision."  Id. at 648.  The court briefly discussed recovery under section 9607(a)(B), the section under which Doyle presently rests his claim.  See id.  Relevant to the instant case, the Third Circuit held that recovery for additional water sources was not "a remedial cost 'as may be necessary' in the statutory language."  Id.

15

at 651.  It was unnecessary because "'to replace an, as yet, uncontaminated source of drinking water' would be unjustified."  Id. (citing the district court, Artesian, 659 F. Supp. 1269, 1290 (D. Del. 1987)) (internal quotation marks omitted).  However, the court rejected the state's argument that Artesian's monitoring and evaluation costs were not recoverable because there were no other "compensable response costs."  Id.  Instead, it agreed with the district court that monitoring and evaluation costs "to ensure that the source of [Artesian's] supply . . . remained uncontaminated" were suitable response costs.  Id.  Obviously, then, the fact that Artesian's tests did not reveal contamination on its property did not preclude it from recovering private-party CERCLA response costs.

The underlying rationale of other circuit decisions also indicates that actual contamination is not necessary to recover at least some CERCLA response costs.  In a 1993 Third Circuit case, a municipal water authority sued the owner of a former smelting site for CERCLA response costs.  Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209 (3d Cir. 1993).  The Authority owned groundwater wells that were adjacent (3,100 feet from) to the site; and it conducted a study of its wells to determine whether there was or would be contamination there.  When it later brought suit to recover both monitoring/evaluation costs and costs to obtain an alternative water supply, the Authority alleged that discharges from the site posed a threat of future contamination to the Authority's water supply.  The district court found that there was no threat of future contamination because the site was hydrogeologically isolated from the Authority's wells, and no waste would migrate.  Id. at 1216.  Based on this finding, the

16

district court denied costs for obtaining an alternative water supply.  Id. at 1214.  It also

denied recovery of monitoring and evaluation costs (from the study), even though it

found the site's release "had induced the Authority to incur monitoring and evaluation

expenses."  Id.  It found that the study was neither necessary nor consistent with the

NCP.  Id.

The Third Circuit affirmed the district court's factual finding that there was no

threat of future contamination and thus could be no recovery for an alternative water

supply, but remanded for further proceedings regarding monitoring/evaluation costs.  Id.

at 1218, 1226.  It stated that it "must still address the Authority's doctrinally distinct

claim for recovery of its monitoring and evaluation costs," id. at 1218 (emphasis added):

> CERCLA authorizes recovery for the costs of "such actions as may be necessary
> to monitor, assess, and evaluate the release or threat of release of hazardous
> substances."  42 U.S.C. § 9601(23).  It is well-established that under this
> provision a plaintiff can recover its monitoring and evaluation costs from a
> release or threatened release without proving that its property was actually
> contaminated by the defendant.  Even though we uphold the district court's
> conclusion that the AGES study failed to establish that the Tonolli site poses any
> threat of future environmental harm, the authority may still recover for the costs
> of the AGES study if it establishes that it incurred these costs in response to a
> release or threatened release of hazardous material and establishes the other
> elements of such a CERCLA claim.

Id. at 1218-19 (citations omitted).  Similarly, here, even though the Superior Court of

Connecticut found that hazardous substances from Litchfield's landfill would not migrate

to Doyle's property, Doyle may recover monitoring and evaluation costs if he otherwise satisfies the elements of a CERCLA claim.[6]

The Lansford court was careful to note that, even though a plaintiff may recover when a defendant has not contaminated his property, there must still be limits to what a plaintiff may recover. See id. at 1219. There must have been "a reasonable risk (although one that may not materialize) that the defendant's release or threatened release of hazardous substances would contaminate the plaintiff's property," and the plaintiff must have incurred the monitoring/evaluation costs in a "reasonable manner." Id. Further, recovery of "needless and expensive" studies is limited by NCP requirements and proof that the defendant was actually responsible for a release or threatened release. Id.

Finally, the Lansford court affirmed the district court's finding that the site had "caused" the Authority to incur monitoring/evaluation costs. Id. Determinative factors were: the defendant had released hazardous substances into the soil at its facility; the EPA had conducted removal actions at the site; and, the defendant had applied for a hazardous waste permit. Id. at 1219-20. Additionally, the Authority knew about the permit application and had good reason to be concerned about its drinking water supply

_____

[6] The Lansford study revealed "slightly higher" levels of lead and VOCs in its wells after a pumping experiment, which one expert attributed to the site, and another attributed to other possible sources such as pre-existing background levels from an upgradient source. 4 F.3d at 1216-18. Thus, the property was arguably "contaminated" after the pumping experiment. However, unlike the Connecticut Superior Court in Doyle's case, the Lansford court made no analysis of whether any increase in hazardous substances had reached applicable standard levels to be deemed "contamination."

before conducting its study.  See id. at 1220.  Though this "causation" finding supports

Doyle's contention that his property need not be contaminated (the Authority conducted

the study to find out if its wells were contaminated), it does suggest that he must have

had good reason to conduct monitoring and evaluation initially (the Authority knew

about the facility and its hazardous waste potential).  However, this issue has not been

fully briefed.

    The First Circuit's reasoning in a 1989 CERCLA case further supports Doyle's

claim.  See Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146 (1st

Cir. 1989).  In Dedham, a public water utility sued Cumberland Farms under various

theories, including CERCLA.  The utility operated a well field about 1000 feet from the

defendant's truck maintenance facility.  Also nearby were a packaging company and a

sewer.  The plaintiff discovered that two of its wells were contaminated and took steps

to ensure that the other wells did not also become contaminated.  The district court

denied cost recovery to the plaintiff because, in "two-site" cases, the plaintiff must prove

that a defendant's waste has actually migrated to and contaminated the plaintiff's

property.  Id. at 1149.  When the Circuit Court framed the issue on appeal, it stated that

it must decide whether a plaintiff must prove that a defendant's waste migrated to the

plaintiff's property and contaminated it, or whether a plaintiff must prove "that there

were releases or threatened releases of a hazardous substance from defendant's

facility which caused the plaintiff reasonably to incur response costs, regardless of

whether physical migration actually occurred." Id. at 1150. It chose the latter, vacated the district court decision, and remanded. See id.

The important issues, taken literally from the statute itself, were 1) whether there was a release or threatened release 2) from the defendant's facility 3) that caused the plaintiff to incur response costs. See id. at 1152. Not at issue, and not in the statute, was actual contamination of the plaintiff's property by the defendant. Id. Though two of the plaintiff's wells had been contaminated, in making the point that it did not matter how they had become contaminated, the Dedham Water court re-emphasized the relevant inquiry: defendant's release or threatened release caused the plaintiff to incur response costs. See id. at 1153. For support, it cited to the previously-discussed Artesian case, noting that the neighbors of a hazardous waste site could recover response costs even though their property was not yet contaminated. Id. (citing Artesian Water Co. v. Gov't of New Castle County, 659 F. Supp. 1269, 1281-82 (D. Del. 1987), aff'd, 851 F.2d 643 (3d Cir. 1988). Thus, whether the plaintiff's property is actually contaminated is not relevant to some recovery under CERCLA. "Contamination" is more relevant to disputes regarding whether there was a release or threatened release of hazardous substances, or whether response costs were necessary and consistent with the NCP. See New York v. Shore Realty Corp., 759 F.2d 1032, 1039, 1045-48 (2d Cir. 1985) (upholding response cost recovery, including both monitoring and supervisory costs, for the state of New York under § 9607(a)(4)(A), where the costs were consistent with the NCP; also rejecting defendant's argument that

20

whether there was a release or threatened release was in dispute, since even if the site ("facility") had not been contaminated, the state would have incurred costs responding to a threatened release); see also Johnson v. James Langley Operating Co., Inc., 226 F.3d 957, 962-63 (8th Cir. 2000) (rejecting defendant's argument that, because plaintiffs' testing did not reveal contamination above a certain level on the site itself, they were not entitled to response costs under CERCLA).

Litchfield has cited a recent Tenth Circuit case in support of its proposition that a neighboring plaintiff's property must actually be contaminated in order for the plaintiff to recover under CERCLA. See Young v. United States, No. 02-7133, 2005 U.S. App. LEXIS 61, *5-16 (10th Cir. Jan. 4, 2005). There, the court affirmed summary judgment for the defendant, though on different grounds than the Eastern District of Oklahoma had granted it. Id. at *2. Rather than decide whether the plaintiffs were potentially responsible parties, the Young court held that their cost-recovery claim must fail because they had failed to incur response costs that were necessary and consistent with the NCP. Id. at *8, 13. The plaintiffs had bought property adjacent to a Superfund site and then hired two companies to do environmental testing. Though the testing revealed the presence of arsenic and lead on their property, the plaintiffs did not attempt to clean-up those hazardous substances. The court reasoned that the testing costs were not "necessary" because they were not closely tied to an "actual cleanup." Id. at *10, 13. For the same reason, the costs were not "consistent with" the NCP; they were not in "substantial compliance" with NCP requirements and did not result in a

21

CERCLA-quality cleanup.  Id. at *11, 13 (citing NCP regulations, 40 C.F.R. §
300.700(c)(3)(I)).

Contrary to the defendant's suggestion, the Young court did not hold that,
because the plaintiffs' property was not contaminated (which it was), the plaintiffs'
response costs were unnecessary and inconsistent with the NCP.  Rather, the issue
was whether investigative response costs must result in an actual cleanup in order to
be recoverable under CERCLA.[7]  Like the causation issue, the NCP issue has not been
briefed here.

    3.    CERCLA Conclusion

Based on the above conclusions of law, Doyle may pursue his CERCLA claim.
Because the elements of that claim have not been fully argued, the factual issues have
neither been supported nor denied with evidence adequate to show that there is no
genuine issue of material fact.  Many of the issues of material fact that Doyle claims are
disputed are actually elements of his CERCLA claim.  See Pl.'s Local Rule 56(a)2
Statement; 42 U.S.C. §§ 9601(9), 9607(a).  He should be allowed the opportunity to

---

[7] It bears noting that one of the cases cited by Young to support its conclusion that
there can be no recoverable monitoring costs without actual cleanup does not in fact support
that conclusion.  See Black Horse Lane Assoc. v. Dow Chemical Corp., 228 F.3d 275 (3d Cir.
2000).  In Black Horse, the defendant was actually pursuing remedial action on property it had
sold to one of the plaintiffs.  The court denied costs for the services of the plaintiffs'
environmental consultant  based on many factors: the consultant merely looked over reports
from the defendant's progress and reported to plaintiffs; the consultant never investigated nor
gathered data on the actual property; the costs seemed to be litigation costs only; the
consultant was basically an overseer, not a participant in bona fide cleanup efforts of the
property.  Id. at 294-99.

prove these elements.  Thus, the Town's motion for summary judgment as to the

CERCLA claim is denied.[8]

### B.    Doyle's State Claims Are Barred

_____The same Connecticut preclusion law that saved Doyle's CERCLA claim defeats

his current state claims.  In <u>Wade's Dairy</u> the Connecticut Supreme Court held that "an

existing final judgment rendered upon the merits without fraud or collusion . . . is

<u>conclusive of causes of action</u> and of facts or issues thereby litigated . . . ."  181 Conn.

at 559 (emphasis added).  <u>DeMilo</u> asserted:

> [The precluded claim] includes <u>all rights </u>of the plaintiff to remedies against the
> defendant with respect to <u>all or any part of the transaction, or series of
> connected transactions,</u> out of which the action arose.  What factual grouping
> constitutes a 'transaction,' and what groupings constitute a 'series,' are to be
> determined pragmatically, giving weight to such considerations as whether the
> facts are related in time, space, origin, or motivation, whether they form a
> convenient trial unit . . . .

233 Conn. at 294 (emphasis added) (citations omitted).  In his state court action, Doyle

brought and lost the three state claims that he again asserts here: violation of

Connecticut General Statute § 22a-452, strict liability, and negligence <u>per se</u>.

Therefore, under a plain reading of <u>Wade's Dairy</u> and <u>DeMilo</u>, his state claims seem

clearly barred.

---

[8]  As evidenced in the above discussion, Doyle did not have an opportunity to litigate his
CERCLA claim in the state court and the state court findings do not preclude his CERCLA
claim.  Therefore, the _Rooker-Feldman_ doctrine is inapplicable.  <u>See</u> <u>Kropelnicki v. Siegel</u>, 290
F.3d 118, 128 (2d Cir. 2002) (stating that the _Rooker-Feldman_ doctrine bars lower federal
courts from reviewing claims that were actually litigated in or "inextricably intertwined" with state
court proceedings, where a claim cannot be "inextricably intertwined" unless the plaintiff had an
opportunity to present it in the state court).

Doyle contends, however, that he has new evidence not considered by the state court and that he only learned of Crompton's alleged illegal dumping of sludge ash toward the end of the state court litigation.[9]  Litchfield correctly points out that the evidence Doyle refers to as "new" was in fact considered by the state court.  There, in April 2000, Doyle sought to introduce new laboratory reports to establish a groundwater pathway of hazardous materials between the landfill and his property.  After considering testimony and argument, Judge Frazzini granted the motion to preclude disclosure of that evidence.  Excerpt-Order, at Def.'s Reply, Ex. 2.

Because the state court did consider Doyle's proffered evidence, this court need not discuss whether it could otherwise come in as new evidence, although it would seem to be highly unlikely.  See Honan v. Dimyan, 63 Conn. App. 702, 706 (Conn. App. Ct. 2001) (stating that res judicata applied to not only "every matter which was offered to sustain the claim", but also to "any other admissible matter which might have been offered for that purpose" and that it applies "regardless of what additional or different evidence or legal theories might be advanced in support of it").  Apparently, Doyle would like this court to consider Crompton's alleged illegal dumping of sludge ash on new evidence grounds as well, for he states in a footnote that he should not be faulted for failing to discover the illegal activity on time.  Pl.'s Resp. at 24 n.13.  Even if this

---

[9]  Doyle states that the Connecticut Attorney General instituted a suit against Uniroyal and NTC, subsidiaries of Crompton, in November 1998 for accepting hazardous wastes above applicable safety levels, and that the suit was settled in August 1999.  Second Am. Compl. ¶¶ 6, 7, 27-30.  The hazardous material, Doyle alleges, found its way to the Litchfield landfill when Crompton dumped the 10,000 cubic yards of sludge ash there.  Second Am. Compl. ¶ 34.

court were to do so, Doyle's state claims would be barred.  Whether Crompton dumped

hazardous materials at the landfill is irrelevant to the state court findings that Doyle's

property was not contaminated and that there was no contaminant pathway between

Doyle's property and the landfill.  It was based on those factual findings that the state

court found for the defendants on all counts, including the counts Doyle raises here.

Thus, having already been heard, they are barred now.

### C.    Doyle Does Not Have Standing to Pursue His RCRA Claim

Five years ago, the Supreme Court addressed standing under environmental

statutes.  See Friends of the Earth, Inc., v. Laidlaw Envtl. Servs., 528 U.S. 167 (2000).

The constitutional requirements for standing require a plaintiff to show 1) a concrete,

particularized, and actual or imminent injury in fact; 2) that is fairly traceable to the

defendant's challenged action; and 3) that is likely to be redressed if given a favorable

decision.  Id. at 180-81 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61

(1992)).  In Friends of the Earth, the Supreme Court held that the environmental-group

plaintiffs had standing in a Clean Water Act[10] case where members averred variously

that a river looked and smelled polluted and that, because of concern about the

defendant's discharges, they no longer recreated in or near the river.  Id. at 181-83.

Diminished "'aesthetic and recreational values'" were, and are, sufficient to establish

---

[10]  The Clean Water Act confers citizen suit standing on "any citizen," which is "a person or persons having an interest which is or may be adversely affected."  33 U.S.C. § 1365(a), (g) (2004).

injury in fact in environmental cases. See id. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)).

The Court distinguished its earlier ruling in Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990), which held that the plaintiff could not survive a summary judgment motion where the injuries it alleged were "'general averments' and 'conclusory allegations.'" Id. at 184 (citing Nat'l Wildlife Fed'n, 497 U.S. at 888). It also distinguished its ruling in Defenders of Wildlife, where the plaintiffs' "'some day' intentions" to visit endangered species were insufficient to establish injury in fact. Id. (citing Defenders of Wildlife, 504 U.S. at 564). By contrast, in Friends of the Earth, the members' concerns about the polluted river directly affected their aesthetic, recreational, and economic interests. Id. at 183-84. Further, their injuries could be redressed by an order requiring the defendants to pay civil penalties. Id. at 185-86. Even though the penalty monies would go to the Government, and not to the plaintiffs, they addressed the plaintiffs' injuries because they acted as a deterrent for future violations in the affected waters. Id

Despite these broad environmental standing parameters, Doyle lacks standing to pursue his RCRA claim because none of the injuries he alleges can be redressed by a favorable RCRA decision. The statute authorizes a citizen suit by "any person":

(1)(A) against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or

> hazardous waste which may present an imminent and substantial endangerment
> to health or the environment . . . .

42 U.S.C. § 6972(a)(1) (2004).  A district court may enforce the permit or other

paragraph (1)(A) order, restrain or order any paragraph (1)(B) violator to take action,

and apply appropriate civil penalties.  Id. § 6972(a).  Because Doyle no longer has an

interest in the Property, unlike the plaintiffs in Friends of the Earth, neither an injunction

to abate pollution nor civil penalties to deter pollution will redress his injuries.

It is true, as Doyle contends, that RCRA's "any person" confers citizen suit

standing to the full extent allowed by the Constitution.  See DMJ. Assoc., L.L.C., v.

Capasso, 288 F. Supp. 2d 262, 264, 267 (E.D.N.Y. 2003) (granting plaintiff's motion for

summary judgment on standing issue).  However, that is not enough for Doyle.  Unlike

the plaintiff in DMJ, which had a defaulted mortgage interest in property next to a

landfill, it is uncontested that Doyle no longer has any ownership interest in the

Property.  Also unlike DMJ, where it was "uncontested that plaintiff's economic injury

[would] be redressed by a favorable decision requiring defendants to abate the

contamination of the property," id. at 272, Doyle's economic injury would not be

redressed by an abatement order because any increase in the Property's value would

no longer benefit him.

In further support of his argument that standing under RCRA is broad, Doyle

cites to a Second Circuit decision.  See Friends of the Earth v. Consol. Rail Corp., 768

F.2d 57 (2d Cir. 1985).  That case is also distinguishable.  There, the court held that a

non-profit organization had standing to sue under the Clean Water Act.  Id. at 61.  The

court noted that one member "passes the Hudson regularly and 'find[s] the pollution in the river offensive to [his] aesthetic value.'"  Id. (quoting member's affidavit).  Another member had a family who swam, fished, and/or picnicked on the river.  In contrast, Doyle has made no allegation that he currently relies on the landfill or his old property for either aesthetic value or recreation; he alleges no physical contact at all.  His alleged injuries (costs responding to the release and destruction of financial investments, business, and marriage) are past, and though they are regrettable, they are not redressable under RCRA.  RCRA's remedies do not provide for past cleanup costs or damages.  See Meghrig v. KFC Western, Inc., 516 U.S. 479, 488 (1996) (holding that private party may not recover cost of past cleanup effort under RCRA section 6972(a)); see also Kara Holding Corp. v. Getty Petroleum Mktg, Inc., 67 F. Supp. 2d 302, 309 (S.D.N.Y. 1999) (dismissing portion of complaint that called for past costs or damages under RCRA).

The final case that Doyle offers in support of RCRA standing is similarly unhelpful to him.  See Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81 (E.D.N.Y. 2001).  There, the court addressed sua sponte the issue of the plaintiff's standing in a RCRA citizen suit.  Id. at 105.  After citing a line of cases finding aesthetic injury sufficient for a RCRA claim, the court concluded that "given the proximity of plaintiffs to the pond and creek, and their obvious interest in the environmental and health ramifications of contamination in those bodies of water, their standing is clearly

manifested." Id. at 106.  Because Doyle is no longer "proximate" to the complained-of

landfill or Property, his standing is not manifested in any degree.

Doyle's situation more closely resembles the plaintiffs' situation in Wademan v.

Concra, 13 F. Supp. 2d 295 (N.D.N.Y. 1998).  In that case, a husband and his wife's

estate sued property owners under RCRA, CERCLA, the Clean Water Act, and various

state laws.  The property had been used to store petroleum and other chemicals and

was still highly contaminated when Mrs. Wademan, the wife, worked in a building on the

premises.  She contracted acute myeloid leukemia, a disease associated with exposure

to petroleum derivatives, and died.  The court denied standing under each of the federal

statutes; regarding RCRA, it noted that, because the plaintiffs were no longer

associated with the building, "any remedial action ordered by the Court would not effect

or assist" them.  Id. at 302, 303, 305.

Though a favorable RCRA ruling might "affect" Doyle by giving him some

emotional or mental satisfaction, that satisfaction is inadequate to confer standing, no

matter how worthy the cause.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107,

109-10 (1998) (holding that environmental group did not have standing in Emergency

Planning and Community Right-to-Know Act case because, "although a suitor may

derive great comfort and joy from the fact that the United States Treasury is not

cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully

enforced, that psychic satisfaction is not an acceptable Article III remedy because it

does not redress a cognizable Article III injury") (citation omitted).[11]  Thus, like the

unfortunate defendants in Wademan and Steel Co., Doyle lacks standing on

redressability grounds under RCRA.

**IV.    CONCLUSION**

For the foregoing reasons, Litchfield's motion for summary judgment as to the

CERCLA claim is DENIED.  Its motion as to the RCRA, Connecticut General Statute

§ 22a-452, Strict Liability, and Negligence Per Se claims is GRANTED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 31st day of May, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[11]  Like Nat'l Wildlife Fed'n and Defenders of Wildlife, Steel Co. has been limited by
Friends of the Earth.  528 U.S. at 187-88.  Friends of the Earth reasoned that civil penalties are
an effective remedy where a violation is alleged to be ongoing, in contrast to the violations in
Steel Co., which had abated by the time of suit and were not alleged to be ongoing.  Id.  As
mentioned, however, any deterrent effect that civil penalties might have on Litchfield would no
longer benefit Doyle in a constitutionally cognizable manner.