UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------X
TIMOTHY P. DOYLE,                              :     Civil Number: 02-CV-656(GLG)
                                               :
    Plaintiff                                  :
                                               :
v.                                             :
                                               :
TOWN OF LITCHFIELD, CROMPTON                   :
MANUFACTURING COMPANY, INC.;                   :
UNIROYAL CHEMICAL COMPANY, INC.;               :
NAUGATUCK TREATMENT COMPANY                    :
                                               :
    Defendants.                                :     June 29, 2005
------------------------------------------------------------X

### THIRD AMENDED COMPLAINT

    Plaintiff, Timothy P. Doyle, by his attorneys, Whitman Breed Abbott & Morgan, LLC, alleges as follows:

#### Introduction

    1.    Through this action, Plaintiff seeks compensatory and punitive damages from the defendants based on their illegal, reckless, and/or intentional practice of disposing and/or allowing the disposal of hazardous sludge ash in the Town of Litchfield's landfill.

    2.    Plaintiff purchased property in Litchfield approximately one-quarter mile away from the landfill that was contaminated by leachate from the landfill. Further, as result of the defendants' illegal activities, Plaintiff has incurred response costs to address the pollution spread by the defendants, and has been made to suffer grave financial injury.

## Parties

3.  Timothy P. Doyle is an individual living at 229 Bacon Pond, #123, Woodbury, Connecticut 06798. At all relevant times herein, Doyle owned a parcel of land recorded in the Town of Litchfield, Connecticut at 521 South Plains Road, Litchfield, Connecticut 06759 (the "Property").

4.  The Town of Litchfield is a government municipality incorporated within the State of Connecticut (hereinafter the "Town"). At all relevant times hereto, the Town owned and operated the Litchfield Recycling Center located at Little Pitch Road, Litchfield, Connecticut 06759 (hereinafter the "Landfill").

5.  Crompton Manufacturing Company Inc., f/k/a Crompton Corporation ("Crompton"), is a Delaware corporation with its headquarters One American Lane, Greenwich, Connecticut. Crompton is a global marketer of specialty chemicals, polymer products and processing equipment.

6.  Uniroyal Chemical Company, Inc. ("Uniroyal") is a Delaware corporation with its principal offices at One American Lane, Greenwich, Connecticut. Uniroyal is a subsidiary of Crompton.

7.  The Naugatuck Treatment Company ("NTC") is a Connecticut corporation with its principal offices One American Lane, Greenwich, Connecticut. Upon information and belief, NTC is a wholly-own subsidiary of Crompton. Upon information and belief, NTC operated as, among other things, a waste recycling center at 50 Cherry Street, Naugatuck, Connecticut during the relevant time period hereto. Upon information and belief, and at all relevant times hereto, NTC was operated within the meaning of 42 U.S.C. § 9601 et seq. by defendants Crompton, Uniroyal

63453

2

and NTC. (Crompton, Uniroyal and NTC are hereinafter referred to collectively as "the Crompton Defendants.")

## Jurisdiction and Venue

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1332 because this action arises under the Constitution and laws of the United States.

9. The District of Connecticut is a proper venue pursuant to 28 U.S.C. Section 1391(a)(1) because all defendants reside in the judicial district of Connecticut.

## Allegations Common To All Counts

A. <u>The Doyle Property</u>

10. On March 11, 1996, the plaintiff and his fiancé purchased the Property which consists of 3.58 acres located at 521 South Plains Road, at the intersection of South Plains Road and Little Pitch Road, in the town of Litchfield. The Property contained a colonial-style farmhouse built in 1802, a small pond, and gently sloping land. Plaintiff and his fiancé planned on building and running a horse breeding operation on the Property.

11. Plaintiff soon became concerned about the condition of the water in the pond. In the spring of 1996, plaintiff saw floating dead fish and pollywogs and an orange haze or sheen on top of the pond. Plaintiff thereafter undertook an investigation wherein he tested samples of surface water from the pond, talked to neighbors, and engaged an environmental testing company. Doyle learned that the leachate from the Landfill had been the subject of previous litigation and orders from the Connecticut Department of Environmental Protection ("DEP"). As a result of his investigation, Plaintiff learned that Landfill leachate had also contaminated the Property. Plaintiff

contacted the local authorities, who in turn contacted the United States Environmental Protection Agency (the "EPA").

12. In connection with his purchase of the Property, Doyle obtained zoning and conservation permits from the Town and undertook a series of improvements on the Property to ready it for horse breeding such as removing trees, clearing land, installing a riding ring and a horse barn.

13. Plaintiff also spent significant sums of time and money responding to the problems being caused by the leachate from the Landfill. This included additional environmental testing, blasting and excavating the land, moving dirt, capping an existing well, removing old drain pipes and installing new ones to direct surface water flow on the Property to and from the pond.

14. In August 1996, Plaintiff and his fiancé married, moved onto the Property, and thereafter continued working toward their plan to raise a family and run a horse farm on the Property.

15. Plaintiff also continued to spend time and money to respond to the leachate problem and contamination on the Property.

16. Despite Plaintiff's efforts to contain, remedy or otherwise mitigate the contamination to the Property, Plaintiff was unable to correct the damage inflicted on the Property, or otherwise cease the continuing flow of leachate from the Landfill to the Property.

B. The Litchfield Landfill

17. Approximately one-quarter mile to the southeast of the Property, the former Litchfield Landfill was for fifty years the town dump for solid waste disposal. It accepted a variety of residential, commercial, and industrial waste, including hazardous substances. Upon

information and belief, the Landfill, still owned and operated by the Town of Litchfield, is now a waste recycling facility.

18. The Landfill is located in a steep valley between two bedrock ridges, and grew over the years to occupy 7.4 acres of land rising to a height of 45 feet at its center.

19. Upon information and belief, the water table in the center of the Landfill is more than 20 feet higher than the base of the refuse. Upon information and belief, the historical use of the site and its hydro-geology resulted in leachate from the Landfill entering the bedrock system underneath the Landfill and into local groundwater and surface water systems.

20. In 1982 the DEP entered a pollution abatement order against the Town and the Landfill. (See Exhibit A.) A hydrogeological study by the engineering firm of Fuss & O'Neill was thereafter conducted by the Town. The study documented the presence of leachate contamination in the fractured bedrock adjacent to the Landfill and nearby surface waters. The Fuss & O'Neill hydrogeological study also reported that the principal pathways for leachate migration from the Landfill were to the north and south along the fracture trend in the bedrock, and that leachate also flowed toward the northwest in the general direction of the Property.

21. In 1984, the Town submitted to the DEP a map depicting an area of approximately 350 acres surrounding the Landfill. The map depicted the areas where the DEP either had to preapprove well drilling or otherwise designate the area as a "No Soil Development Zone." (See Exhibit B).

22. In response to the DEP order, the Town developed, adopted and implemented a landfill closure plan. The Town installed water monitoring wells, began monitoring water quality at various private wells, and extended water mains to properties near the Landfill -- i.e. Plaintiff's

neighbors -- to abate the problems caused by the flow of leachate from the Landfill. Plaintiff was not aware of the measures taken by the Town until well after his purchase of the Property.

23.    Since leachate contamination from the Landfill was (and is) carried into the bedrock by water, part of the Town's closure plan involved placing a covering material composed of soil and ash derived from incinerated sludge on the top on the landfill to reduce the amount of rain and surface water entering the Landfill. Upon information and belief, hazardous substances are contained within this covering material.

24.    Upon information and belief, because the Landfill sits in a wetland area in a bedrock valley partially above the water table, the Landfill base remains saturated despite the closing of the Landfill and the ash sludge cap covering. As a result, the Landfill has and will continue to leach hazardous substances through ground water entering bedrock at the base and sides of the Landfill for many years.

25.    The Town has continued to collect and analyze water samples obtained from the various monitoring wells quarterly to detect the presence of leachate constituents at the various locations.

C.    The Crompton Defendants' Illegal Handling of Hazardous Waste

26.    Upon information and belief, starting in or about 1984, NTC began operating an "over the road program" in which truck tankers of waste were hauled to NTC.

27.    Upon information and belief, NTC accepted massive amounts of industrial waste despite the Crompton Defendants not having the proper permits to accept commercial and/or industrial waste, sludge or hazardous waste at NTC.

28.     Upon information and belief, the levels of hazardous substances in the waste accepted at NTC exceeded the acceptable safety levels permitted at NTC under applicable state and federal law, and constituted a danger to the environment and the community.

29.     In November 1998, the Connecticut State Attorney General's Office instituted a lawsuit against Uniroyal and NTC based on the aforementioned violations (the "AG's lawsuit").

30.     In August of 1999, Uniroyal agreed to pay $1.2 million to settle the AG's lawsuit. One million dollars of the settlement was earmarked for a special agency to restore the Naugatuck River (which was severely polluted by the Crompton Defendants' illegal activities), and $200,000.00 of the settlement payment constituted a fine that was paid to the Connecticut State Treasury.

D.     Litchfield's Acceptance of the Crompton Defendants' Sludge Ash

31.     In or about 1991, the Crompton Defendants' disposed of approximately 10,000 cubic yards of incinerated sludge ash from NTC in the Landfill. Upon information and belief, this sludge ash was used as part of the cover for the Landfill as described above. (See Exhibit C.)

32.     The DEP granted permission to Uniroyal and/or NTC to dispose of the 10,000 cubic yards of incinerated ash based on, among other things, representations from NTC and Uniroyal at the time that the sludge ash did not contain excessively high levels of hazardous substances and that the ash was otherwise appropriate for land disposal.

33.     The Town also authorized the disposal of NTC sludge ash at the Landfill based on the same representations provided by Uniroyal and/or NTC. Upon information and belief, Uniroyal and/or NTC failed to notify the Town, and/or purposefully withheld the information from

63453                                                        7

the Town, that the sludge ash was subject to certain EPA "land ban" provisions which prevented disposal of the sludge ash on land.

34. Upon information and belief, the levels of hazardous substances in the sludge ash exceeded the acceptable safety levels designated for the Landfill because, inter alia, the ash was derived from the waste incinerated at NTC that exceeded the safety levels permitted at NTC. DEP has determined that the sludge ash contains toxicity levels that are far in excess of the levels represented to the DEP at the time permission dump the ash at the Landfill was granted.

35. The presence of hazardous substances in the sludge ash and the covering created a substantial risk of probable injury, and/or had the natural tendency to create a danger and inflict injury, upon persons and/or property and rendered the sludge ash covering ultra-hazardous, unsafe and capable of producing imminent and substantial endangerment to health and/or the environment.

36. Furthermore, the excessive levels of hazardous substances in the sludge ash rendered the sludge ash covering intrinsically dangerous and unsafe for use as a covering for the Landfill.

37. Upon information and belief, the hazardous substances in the sludge ash from NTC and used to cover the Landfill leached out of the ash, percolated through the ground and/or surface water and reached the Property.

38. Upon information and belief, the sludge ash disposed at the Landfill continues to represent a danger to the public as hazardous substances continue to leach out from the Landfill.

39. The use of sludge ash with high levels of hazardous substances as a covering cap for a Landfill was unreasonable and/or unlawful in light of the fact that the Crompton Defendants and

the Town were aware that (i) the sludge ash contained hazardous substances inappropriate for land disposal, and (ii) the Landfill was susceptible to release of leachates.

40. As a result of the foregoing, Plaintiff has incurred and will continue to incur costs in responding to the release of the hazardous substances emanating from the Landfill, and in particular, the sludge ash covering.

41. As a result of the foregoing, the Property was polluted and rendered useless and without value, which in turn resulted in the destruction of plaintiff's financial investment, business plans and marriage.

### COUNT ONE
(Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") - - as to as to Town of Litchfield)

42. Doyle repeats and realleges the allegations contained in paragraphs one through 41 as if fully set forth herein.

43. The Town is a potentially responsible party as defined in 42 U.S.C. § 9607(a).

44. The Landfill is a facility as defined by 42 U.S.C. § 9601(a).

45. Hazardous substances, contaminants and pollutants were released from the sludge ash at the Landfill.

46. Plaintiff has incurred response costs as a result of the aforementioned release.

47. The Town is liable for the response costs incurred by Plaintiff pursuant to 42 U.S.C. § 9601 et seq.

### COUNT TWO
(CERCLA -- as to the Crompton Defendants)

48. Doyle repeats and realleges the allegations contained in paragraphs one through 47 as if fully set forth herein.

63453                                         9

49. The Crompton Defendants are potentially responsible parties as defined in 42 U.S.C. § 9607(a).

50. NTC is a facility as defined by 42 U.S.C. § 9601(a)

51. Hazardous substances, contaminants and pollutants were released from the sludge ash at the Landfill.

52. Plaintiff has incurred response costs as a result of the aforementioned release.

53. The response costs incurred by plaintiff conformed with the National Contingency Plan.

54. The Crompton Defendants are liable for the response costs incurred by Plaintiff pursuant to 42 U.S.C. § 9601 et seq.

### COUNT THREE
(Conn. Gen. Stat. § 22a-452 -- as to the Crompton Defendants)

55. Doyle repeats and realleges the allegations contained in paragraphs one through 54 as if fully set forth herein.

56. At all times, it was the Crompton Defendants' responsibility to make a hazardous waste determination on all wastes generated prior to the disposal at the Landfill, and to reevaluate those determinations.

57. By failing to keep the toxicity level of the sludge ash within the limits imposed by the DEP and EPA, and/or by failing to abide by EPA's "land ban" provisions, the Crompton Defendants acted purposefully, recklessly and/or negligently in causing, facilitating and/or effecting the disposal of sludge ash at the Landfill that contained excessively high levels of hazardous substances.

58. The Crompton Defendants are liable to Plaintiff for his costs incurred in containing, remedying and/or mitigating the effects of contamination to the Property from the hazardous substances in the sludge ash pursuant to Conn. Gen. Stat. § 22a-452.

## COUNT FOUR
(Nuisance -- as to the Crompton Defendants)

59. Doyle repeats and realleges the allegations contained in paragraphs one through 58 as if fully set forth herein.

60. The hazardous substances in the sludge ash used to cap the Landfill leached onto the neighboring properties, including that of Plaintiff, and have caused injury to Plaintiff.

61. The hazardous substances that leached from the sludge ash cap have interfered with the Plaintiff's use and enjoyment of the Property.

62. As a result of the foregoing, the Plaintiff has been damaged.

## COUNT FIVE
(Strict Liability -- as to the Crompton Defendants)

63. Doyle repeats and realleges the allegations contained in paragraphs one through 62 as if fully set forth herein.

64. The Crompton Defendants are strictly liable to Plaintiff based on its improper generation of, contribution to, or reckless disregard towards the disposal, handling and maintenance of the sludge ash.

## COUNT SIX
(Negligence Per Se – as to the Crompton Defendants)

65. Doyle repeats and realleges the allegations contained in paragraphs one through 64 as if fully set forth herein.

66. Plaintiff is in the class of persons intended to be protected by CERCLA and Conn. Gen Stat. § 22a-452.

67. The injuries suffered by Plaintiff are the types that CERCLA and Conn. Gen Stat. § 22a-452 are designed to prevent.

68. The Crompton Defendants' aforementioned violations of CERCLA and Conn. Gen Stat. § 22a-452 were the proximate cause of Plaintiff's damages.

WHEREFORE, the Plaintiff seeks

1. Monetary Damages;
2. Injunctive Relief;
3. Costs;
4. Punitive damages;
5. Attorneys' Fees;
6. Such further and other relief as the Court deems just and proper.

THE PLAINTIFF
TIMOTHY P. DOYLE


BY /s/ John T. Shaban
    John T. Shaban (ct14075)
    Whitman Breed Abbott & Morgan LLC
    100 Field Point Rd.
    Greenwich, CT 06830
    203-869-3800
    203-869-1951 (facsimile)
    jshaban@wbamct.com