UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------
TIMOTHY P. DOYLE,             :
                         :
        Plaintiff,       :
                         :
     v.                  :        CIVIL ACTION NO.
                         :        3:02 CV 656 (JCH)
TOWN OF LITCHFIELD,       :
                         :
        Defendant.      :        OCTOBER 21, 2005
-------------------------------------------------------

TOWN OF LITCHFIELD'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW

1.       Since 1997, plaintiff Timothy P. Doyle ("Doyle") has been prosecuting

litigation against The Town of Litchfield ("Litchfield"), originally in state court and currently

in this Court, advancing a number of claims based upon allegations of contamination from

Litchfield's former municipal landfill.

2.       In 1996, Lisa DiJon, who was at that time Doyle's fiancée, purchased property

at 521 South Plains Road in Litchfield.  The property was a former family farm, in a badly run

down condition.  The old farmhouse had structural problems and was otherwise in disrepair.

3.       Around the property were the remains or foundations of various old farm

structures that had been either abandoned or torn down.  The land was sloping and rocky and

uneven; there were old broken drains on the property which had sunk, creating gullies.  A

pond on the property had significant drainage problems.

4.       DiJon and Doyle knew that there would need to be major repairs to the

property.  They had no concerns about a water supply, however, as they knew the property was

served by public water.  Indeed, the property had been on a public water line for several decades.

5.      While neither of them had experience in horse-breeding, DiJon and Doyle were hoping to establish a commercial horse-breeding operation on the property.  Nevertheless, prior to the purchase of the property, they did not obtain any municipal guidance or professional assistance to determine whether the property would be suitable for a horse-breeding enterprise, or even to determine whether the zoning regulations would permit such a use.

6.      In fact, the Litchfield zoning regulations did *not* permit a commercial horse-breeding operation in that location.  There was never any zoning enforcement dispute, however, because DiJon and Doyle never actually established their horse-breeding operation.

7.      While DiJon and Doyle knew that they were going to have to spend a certain amount of money on site work, fencing, and putting up a barn, they substantially underestimated the expenses that they would actually incur.

8.      Most of the costs that DiJon and Doyle did not anticipate were brought on by problems with the pond.  After closing on the property, they discovered that the pond was encroaching upon the very area where they intended to put up a barn and a riding ring.  Because of that encroachment, they needed wetlands approval for the development, which meant that they had to submit a formal survey and an engineering plan for reconstruction of the pond.  Among other costs of this process, they had to pay an engineer to survey the pond.  DiJon and Doyle also learned at this time that the pond was causing flooding of a neighbor's property, which meant that the reconstructed pond needed a new outlet.

9.    Reconstruction of the pond turned out to be a fairly large job.  The unanticipated costs included extensive demolition, excavation and earth-moving.  Blasting was needed to create a sufficiently large area upon which to construct the barn and riding ring, and also to create a new outlet for the pond.  DiJon and Doyle eventually were able to put up some fencing and a leased barn, but because of the expenses they were incurring and all the other work that still needed to be done, they deferred the purchase of breeding mares.

10.    DiJon had contributed personal funds to the down payment on the property, but Doyle had not done so.  They were married a few months after the closing.  A few months after that, DiJon took out a second mortgage on the property.  She also tried to sell her previous business (a pet store), but she was unsuccessful in that effort.

11.    As their costs mounted, DiJon and Doyle became unable to manage their financial situation.  They never paid any property taxes.  They stopped paying the mortgage, and the bank commenced a foreclosure action.  By the time the state court trial started in 2000, Doyle had lost the property to foreclosure.  He subsequently moved away.

12.    Doyle spent much of their remaining money on attorney's fees, including not only fees for commencing environmental litigation but also fees for litigating a separate zoning dispute involving neighboring property.  DiJon disagreed with Doyle's focus on litigation.  They separated in 1997, with DiJon moving away and Doyle remaining at the property.

13.    During the state court litigation that preceded the current action, DiJon was a nominal co-plaintiff.  In 1997, DiJon quitclaimed to Doyle a one-half interest in the property.  As part of their eventual divorce settlement in 1999, DiJon quitclaimed her remaining interest in the property to Doyle.  She also assigned her interest in the litigation to him.  In exchange,

Doyle promised to pay DiJon funds out of any proceeds of the litigation or provide certain other financial undertakings for the benefit of DiJon.

14.     The DiJon/Doyle property was located approximately one-quarter mile from the site of the former municipal landfill in Litchfield.  The landfill had been closed in the early 1990s.  The closure plan, approved by the Connecticut Department of Environmental Protection  ("DEP"), included installation of various monitoring wells in the vicinity of the site.  Programmatic monitoring of groundwater and surface water around the landfill commenced at that time, and that monitoring continues today.

15.     Part of the DEP-approved closure plan also called for covering the top of the landfill with a material composed of a mixture of soil and ash derived from incinerated sludge, for the purpose of minimizing the infiltration of rainwater.  DEP specifically approved the use of incinerated sludge ash in that cover material.

16.     At some point in 1996, Doyle came to believe that the property DiJon had purchased was contaminated by leachate migrating from the landfill site.  He formed this belief after one of his neighbors told him about the location of the former landfill and after he noticed a "haze" and some dead fish in the pond, which Doyle later learned were normal seasonal characteristics of such a pond.

17.     During 1996, Doyle drew some surface water from the property, and he took the samples for testing by a lab.  He did not know how to take samples and had not followed any sampling protocols; the same was true of certain soil samples Doyle took at the landfill surface in 1997.  Because the test results were therefore completely unreliable, they were not used in evidence in the state court trial.  Even so, the lab analyst who had conducted all these

the tests for Doyle, Dr. Dhanwant Sethi felt that results were "minimal," "small," "low," or "insignificant."

18.     Doyle also pursued administrative complaints during 1997, contacting Connecticut DEP Commissioner Sidney Holbrook and United States Representative Nancy Johnson.  Commissioner Holbrook promised Doyle that DEP staff would investigate his concerns.  DEP staff reviewed the landfill closure permit and the ongoing monitoring reports concerning groundwater and surface water; DEP staff also came out to the property and met with Doyle on multiple occasions.  Meanwhile, Representative Johnson conveyed Doyle's concerns to the United States Environmental Protection Agency ("EPA").

19.     EPA responded to Doyle's complaints by ordering a formal site investigation, for the purpose of determining whether the former Litchfield landfill site met the criteria for a CERCLA removal action.

20.     In the summer and fall of 1997, an environmental consulting firm retained by EPA conducted the site investigation at the landfill and its surrounding area, including Doyle's property.  Doyle accompanied the EPA consultant on the site investigation and he received copies of the EPA consultant's testing.  Thereafter, EPA's consultant submitted a full report of the investigation.  A draft of the Preliminary Assessment/Site Investigation report was issued in February 1998, and the final version was issued a few months later.  Doyle received those documents.  EPA issued a Site Investigation Closure Report, and transmitted the report by letter to Representative Johnson.  The letter (provided to Doyle) stated that after considering the results of the site investigation, EPA had concluded that CERCLA action was "not appropriate."

21.     On the same day in September 1997 as the EPA site investigation and testing took place, Doyle and DiJon filed suit against Litchfield in the Connecticut Superior Court.

22.     In their original state court complaint, Doyle and DiJon alleged that leachate from the former landfill had contaminated the property at 521 South Plains Road. They claimed various damages including loss or destruction of the value of their property, loss of profits due to alleged frustration of their plans to use the property for a horse-breeding enterprise, expenditures for environmental testing and remediation, attorneys' fees, and punitive and treble damages. Plaintiffs also sought injunctive relief.

23.     In a series of amendments, the plaintiffs' complaint against Litchfield was expanded to include theories of private nuisance, public nuisance, willful and reckless conduct, negligence, negligence per se, trespass, ultrahazardous activity, environmental cost recovery, stigma damages, and constitutional taking.

24.     Meanwhile, during 1997, Doyle or his attorney arranged for an environmental consultant to take a few other surface water samples and have those samples tested. Aaron Environmental was hired for the purpose of establishing a "link" between Doyle's property and the landfill. The documentation concerning those 1997 samples was confusing and incomplete, however. Just as with the samples that had been taken by Doyle himself in 1996, these 1997 test results were not offered by the plaintiff in evidence during the state court trial.

25.     In 1998 and 1999, Doyle and DiJon filed additional suits, based upon the same claims of contamination, naming as defendants the previous owners of the property at 521 South Plains Road and also the real estate broker and agent who had been involved in DiJon's

purchase of the property.  These additional cases eventually were tried together with the plaintiffs' action against Litchfield.

26.     During 1998, Doyle or his attorneys retained a new environmental consultant for purposes of the litigation.  Doyle hired Michael Mahan of SMC Environmental to provide "litigation support" to Doyle and to help Doyle "build his case."  The new consultant took certain soil and surface water samples and had those samples tested, and those test results ultimately were admitted in evidence at the state court trial.

27.     The state court case came to trial in 2000, and was assigned to Judge Stephen Frazzini.  During a pre-trial site walk conducted by Judge Frazzini and counsel, it was discovered that Doyle, through his attorneys, had just installed groundwater monitoring wells on the property.  Doyle's counsel announced that the wells had just been sampled and that Doyle intended to offer the test results in evidence.  Litchfield moved to preclude such evidence on the ground that plaintiffs' surprise and untimely disclosure was unduly prejudicial.  After conducting an evidentiary hearing, which included expert testimony, Judge Frazzini granted the motion to preclude.

28.     The trial then took place over several weeks between May 2000 and September 2000.  There were fifteen days of evidentiary hearings, including extensive expert testimony and certain site viewings.  In January 2001, Judge Frazzini issued a 33-page decision, rendering judgment in favor of Litchfield and the other defendants.  The court found that the plaintiffs had failed to prove their allegations that the soil and the surface water at 521 South Plains Road contained elevated levels of constituents exceeding applicable environmental standards.  The court also found that the plaintiffs had failed to prove that Litchfield's former

landfill was the source of any of the constituents which plaintiffs claimed to have contaminated their property.

29.     Now acting pro se, in spring 2002, Doyle attempted unsuccessfully to appeal from the Superior Court judgment.  At the same time, also acting pro se, in April 2002, Doyle commenced the present action in federal court; he amended this complaint on or about May 22, 2002.  In this Amended Complaint, Doyle again alleged that the property at 521 South Plains Road was damaged and stigmatized by leachate contamination from Litchfield's former landfill.  Litchfield filed an Answer to the Amended Complaint in September 2002.

30.     In his May 2002 complaint, plaintiff sued also Crompton Corporation ("Crompton").  During September 2002, Crompton moved to dismiss this action on the basis that plaintiff's claims were collaterally estopped and barred by the statute of limitations and the court (Goettel, J.) granted Crompton's motion to dismiss on October 8, 2002.

31.     In July 2003, now represented by pro bono counsel, John Shaban, Doyle moved to amend his complaint to sue, along with Litchfield, Crompton and certain of Crompton's subsidiaries.  Crompton objected to the proposed amendment and Judge Goettel denied the motion to amend in October 2003.

32.     On May 28, 2004, this matter was assigned to this Court and on September 24, 2004, Doyle filed a revised five-count version of the Second Amended Complaint.  This version of the Second Amended Complaint once again repeated many of Doyle's claims from the previous state court litigation, including the central allegation that the property at 521 South Plains Road was contaminated by leachate from the landfill.

33.     Doyle alleges that Uniroyal Chemical Company ("Uniroyal") and Naugatuck Treatment Company ("NTC"), subsidiaries of Crompton, provided Litchfield with sludge ash as part of the cover material used by Litchfield for its closure of the landfill.  Doyle claims that, despite representations by Uniroyal/NTC that the ash was appropriate for landfill disposal, and despite approval of such disposal by the Connecticut DEP, the ash that was delivered by Uniroyal/NTC contained "high levels of hazardous substances."  The complaint charges that Litchfield "purposefully, recklessly and/or negligently failed to monitor and recognize" the hazardous nature of the ash used in the landfill cover material, resulting in hazardous substances leaching out of the landfill and reaching the property at 521 South Plains Road "and/or surrounding areas."  In Count One, Doyle invokes CERCLA and seeks recovery of response costs "as a result of the aforementioned release."

34.     In November 2004, Litchfield moved for summary judgment on all counts.  In a Memorandum of Decision dated May 31, 2005, Judge Hall granted Litchfield's motion as to Counts Two (Resource Conservation and Recovery Act), Three (cost recovery under Conn. Gen. Stat. § 22a-452), Four (strict liability) and Five (negligence per se).  Judge Hall denied summary judgment only as to Count One, the CERCLA cost recovery claim.

35.     Attorney Shaban filed a renewed motion to amend the complaint in June 2005, again pleading several counts against the Crompton parties.  On July 25, 2005, this Court denied the motion to amend.   The operative complaint in this matter is therefore the Second Amended Complaint dated September 24, 2004.

36.     To date Doyle has not demanded from Litchfield payment of specified amounts he claims he is owed under 42 U.S.C. § 9607(a)(4).  Indeed, in discovery requests approved by

the Court during the parties July 25, 2005 status conference, and served upon plaintiff on or about August 3, 2005, Litchfield asked Doyle to specify the response costs he seeks in this action and to provide supporting documentation.  On August 31, 2005, plaintiff requested that he be allowed additional time, through September 16, 2005, to produce this information.  On September 27, 2005, plaintiff responded to Litchfield's discovery requests, providing certain information regarding the costs he claims to have incurred.

<u>CONCLUSIONS OF LAW</u>

1.      "CERCLA [is] a detailed, comprehensive, narrow, and specific Act that applies only under limited circumstances and only when five specific elements have been procedurally and substantively satisfied."  <u>Rhodes v. County of Darlington</u>, 833 F. Supp. 1163, 1172 (D. S.C. 1992).

2.      "A prima facie cause of action under CERCLA requires a plaintiff to establish: (1) defendant fits one of the four classes of responsible parties outlined in § 9607(a); (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan set up under the Act and administered by the EPA in order to prioritize hazardous substance release sites throughout the nation."  <u>B.F. Goodrich Co. v. Murtha</u>, 958 F.2d 1192, 1198 (2d Cir. 1992); <u>see also</u> 42 U.S.C. § 9607(a).

3.      A private party plaintiff suing for recovery of costs under CERCLA bears the burden of proving that its actions were necessary and consistent with the national contingency plan.  <u>See</u> <u>United States v. Northeastern Pharm. & Chem. Co., Inc.</u>, 810 F.2d 726, 747 (8th Cir.

1986); Foster v. United States, 922 F. Supp. 642, 652 (D.C. Cir. 1996); Philadelphia v. Stepan Chem. Co., 713 F. Supp. 1484, 1486-87 (E.D. Pa. 1989); see also ABB Indus. Sys., Inc. v. Prime Tech., Inc., 32 F. Supp. 2d 38, 42 (D. Conn. 1998).

      4.      Because a claim for recovery of costs under CERCLA lies in equity, a plaintiff seeking response costs under CERCLA is not entitled to a jury trial.  See, e.g., Hatco Corp. v. W.R. Grace & Co., 59 F.3d 400, 411 (3rd Cir. 1995) (adopting Eighth Circuit Court of Appeals' holding in United States v. Northeastern Pharm. & Chem. Co., 810 F.2d 726, 749 (8th Cir. 1986), and noting that this holding had been "widely accepted," the Third Circuit held there is no right to jury trial under 42 U.S.C. § 9607 because an action for cost recovery is a claim for restitution, which lies in equity); United States v. Northeastern Pharm. & Chem. Co., 810 F.2d 726, 749 (8th Cir. 1986) (affirming district court's ruling denying plaintiff's demand for jury trial, court explained that plaintiff seeking recovery of costs under CERCLA is "in effect seeking equitable relief in the form of restitution or reimbursement of the costs it expended in order to respond to the health and environmental danger presented by hazardous substances"; held "district court correctly found appellants did not have a right to a jury trial of claims for equitable relief"); New York v. Longboat, Inc., 140 F. Supp. 2d 174, 178-79 (N.D. N.Y. 2001) ("although the Second Circuit has not directly ruled on this issue, it has noted that the *overwhelming weight* of authority holds that Congress did not intend a jury trial when the plaintiff seeks recovery of response costs"; held plaintiff was entitled to jury trial on only state law claims) (*citing* State of New York v. Lashins Arcade Co., 91 F.3d 353, 362 (2d Cir. 1996) (emphasis added)); Consolidated City Of Indianapolis v. Union Carbide Corp., No. 1:02-cv-1340-LJM-WTL, 2003 U.S. Dist. LEXIS 18180, at *4 (S.D. Ind. Oct. 8, 2003) (*citing* Lashins

Arcade Co., court observed that "overwhelming weight of authority holds that a jury trial is not available for plaintiffs bringing CERCLA claims for recovery of response costs")).

5.    Plaintiff's entitlement to recovery under CERCLA is limited.  "Congress did not intend CERCLA to make injured parties whole or to create a general vehicle for tort actions."  G. J. Leasing, Co. v. Union Elec., 854 F. Supp. 539, 561-62 (S.D. Ill. 1994), aff'd, 54 F.3d 379 (7th Cir. 1995) (where evidence showed plaintiffs had "other business reasons for undertaking site investigation and abatement actions," held costs not recoverable under CERCLA); see also Artesian Water Co. v. New Castle County, 851 F.2d 643, 650 (3d Cir. 1988) (observing that "CERCLA's scope is far more narrow than common law causes of action," held CERCLA does not provide for recovery of economic losses).

6.    Accordingly, it is settled that plaintiff may only recover "necessary costs of response" that are "consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).  CERCLA authorizes recovery for the costs of "such actions as may be *necessary* to monitor, assess, and evaluate the release or threat of release of hazardous substances."  42 U.S.C. § 9601(23) (emphasis added).

7.    To recover for response costs, "[t]here must have been a *reasonable* risk (although one that may not materialize) that the defendant's release or threatened release of hazardous substances would contaminate the plaintiff's property, and the plaintiff must have incurred the monitoring/evaluation costs in a *reasonable* manner."  Doyle v. Town of Litchfield, 372 F. Supp. 2d 288, 298 (D. Conn. 2005) (emphasis added; internal quotation marks omitted) (quoting Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1219 (3d Cir. 1993)).

8.      "CERCLA defines the term 'response' as encompassing both 'removal' efforts and 'remedial actions.'  42 U.S.C. § 9601(25).  Broadly speaking, removal includes efforts to clean up a site, prevent the threatened release of hazardous substances, and dispose of removed material.  Id. § 9601(23).  Remedial action includes more permanent efforts to store, confine, recycle, or destroy hazardous substances.  Id. § 9601(24)."  Syms v. Olin Corp., 408 F.3d 95, 101 (2d Cir. 2005) (footnotes omitted).

9.      While courts generally are lenient in their review of plaintiff's initial monitoring or testing activities, "consistent with the overwhelmingly remedial cost of the CERCLA -- which aims to provide incentives for the prompt detection and removal of environmental contaminants -- a claimant's investigatory costs *must be precipitated by a release of a* hazardous substance and *necessary to the remediation thereof*."  Foster v. United States, 926 F. Supp. 199, 203 (D.C. Cir. 1996) (emphasis added).  "In the context of investigatory costs, plaintiffs may recover only those costs that were reasonable, cost-effective, and likely to lead to a CERCLA quality clean-up."  Foster v. United States, 922 F. Supp. 642, 652 (D.C. Cir. 1996) (internal quotation marks and citations omitted).

10.     "Generally, investigative costs incurred by a private party after the EPA has initiated a remedial investigation, unless authorized by the EPA are not considered necessary because they are duplicative of the work performed by EPA."  United States v. Iron Mountain Mines, Inc., 987 F. Supp. 1263, 1272 (E.D. Cal. 1987) (internal quotation marks omitted).

11.     Similarly, when, as here, a plaintiff incurs costs without first receiving the recommendation from federal or local governmental authorities, and where objective evidence suggests that there is no need to undertake such "response" activities, any costs incurred are

unnecessary and not recoverable under CERCLA.  See, e.g., Rhodes v. County of Darlington,

833 F. Supp. 1163, 1189 (D. S.C. 1992) (where plaintiffs "incurred expenses with absolutely

no suggestion from federal, state, or local authorities to do so" and "actions were expressly not

recommended based on [government sanctioned] analyses of the site," held plaintiffs failed to

demonstrate activities were necessary under CERCLA).

      12.     "[R]ecovery of needless and expensive studies is limited by NCP requirements

and proof that the defendant was actually responsible for a release or threatened release."

Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1219 (3d Cir. 1993)

(internal quotation marks omitted); G. J. Leasing Co. v. Union Elec., 854 F. Supp. 539, 563

(S.D. Ill. 1994), aff'd,  54 F.3d 379 (7th Cir. 1995) (held PCB sampling and investigation costs

were "irrelevant" where there was "no evidence of a release of PCBs which ha[d] caused

plaintiffs to incur response costs"; "plaintiff's exhaustive search for PCBs was [therefore] not

necessary or in response to a release of a hazardous substance").

      13.     "Section 9607(a)(4) expressly requires that a release or threatened release exist

which causes the incurrence of response costs. . . .Thus, the plain language of the statute

declares that there must be a connection, a relationship, a direct and analogous event, which

links the leaching of hazardous materials to the necessary response costs expended by the

plaintiff.  The courts, while holding that CERCLA imposes strict liability, have consistently

required a plaintiff to demonstrate unequivocally causation between the alleged wrong and the

incurrence of necessary response costs.  Artesian Water Co. v. Government of New Castle

County, 659 F. Supp. 1269, 1282, n.2 (D. Del. 1987), aff'd, 851 F.2d 643 (3d Cir. 1988); New

York v. Shore Realty Corp., 759 F.2d 1032, 1044 n.17 (2d Cir. 1985); Idaho v. Bunker Hill

Corp., 635 F. Supp. 665, 674 (D. Idaho 1986)." Rhodes v. County of Darlington, 833 F. Supp. 1163, 1191 (D. S.C. 1992) (internal quotation marks omitted).

14. "Not all damages are, nor could be, necessary response costs." Rhodes v. County of Darlington, 833 F. Supp. 1163, 1172-81 (D. S.C. 1992) ("alleged diminution in the value of land, inability to secure financing, and any putative stigma of possessing allegedly contaminated property are not necessary response costs and therefore not recoverable under CERCLA"); see also Piccolini v. Simon's Wrecking, 686 F. Supp. 1063, 1068 (M.D. Pa. 1988) ("Plaintiffs' request for damages which can be construed as seeking damages for diminution in property value and lost income are not recoverable under CERCLA").

15. "To show that any response costs were necessary under the CERCLA, the plaintiff must show (1) that the costs [were] incurred in response to a threat to human health or the environment and (2) that the costs were necessary to address that threat. To the extent that [site investigations and abatement actions] were taken for purposes other than responding to an actual and real public threat, there is no CERCLA liability." Foster v. United States, 922 F. Supp. 642, 652 (D.C. Cir. 1996) (internal quotation marks and citations omitted; alterations in original).

16. In order to constitute "necessary" and recoverable costs under Section 9607, a plaintiff seeking recovery of response costs under CERCLA must establish that its "responses" resulted in the actual containment or clean-up of hazardous substances. E.g., Young v. United States, 394 F.3d 858, 864 (10th Cir. 2005). 40 C.F.R. § 300.700 (a provision of the national contingency plan), provides, in relevant part, that "a private party response action will be considered consistent with the NCP *if* the action, when evaluated as a whole, is in substantial

compliance with the applicable requirements in paragraphs (5) and (6) of this section, [which govern, among other requirements, worker safety, record keeping, and opportunity for public comment], *and results in a CERCLA-quality cleanup*[.]" 40 C.F.R. § 300.700(c)(3)(i) (emphasis added; internal quotation marks omitted); <u>see also</u> <u>Young</u>, 394 F.3d at 864 (10th Cir. 2005) (held plaintiff could not recover under Section 9607 for expenditures on "'classic examples'" of preliminary steps taken in response to the discovery of the release or threatened release of hazardous substances, such as site investigation, soil sampling . . . because the costs were neither necessary to the containment and cleanup of hazardous releases not consistent with the NCP . . . [since] the costs were not tied in *any* manner to the actual cleanup of hazardous releases.") (emphasis in original)).

17.    As the Second Circuit recently affirmed, "[e]xpenses incurred solely in preparation for litigation cannot be recovered as response costs unless they *significantly benefited* the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." <u>Syms v. Olin Corp.</u>, 408 F.3d 95, 104 (2d Cir. 2005) (<u>quoting</u> <u>Gussack Realty Co. v. Xerox Corp.</u>, 224 F.3d 85, 92 (2d Cir. 2000)) (emphasis added; <u>see also</u> <u>Durham Mfg. Co. v. Merriam Mfg. Co.</u>, 294 F. Supp. 2d 251 (D. Conn. 2003) (same; request for attorneys' fees in connection with CERCLA claim denied); <u>see also</u> <u>United States v. E. I. Du Pont de Nemours and Co.</u>, No. 02-1469-SLR, 2004 U.S. Dist. LEXIS 16366, at *23 (Aug. 5, 2004) (held litigation costs expended "in pursuit of recovering non-recoverable costs under CERCLA" are not recoverable).

18.    Moreover, even when "necessary," a plaintiff is entitled to recover for such response costs under CERCLA only if he paid for them or can show he is obligated for the

costs.  See, e.g., Syms v. Olin Corp., 408 F.3d 95, 103 (2d Cir. 2005) (held plaintiff could not

recover for costs of testing where evidence showed that attorneys paid for the testing and there

was no evidence that plaintiff was required to pay attorneys back); see also Trimble v. Asarco,

Inc., 232 F. 3d 946, 957-58 (8th Cir. 2000), *overruled in part on other grounds by,* Exxon

Mobil Corp. v.  Allapattah Servs, Inc., 162 L. Ed. 2d 502, 125 S. Ct. 2611, 2621-25 (U.S.

2005) (where plaintiffs' attorneys, rather than plaintiffs, had paid for response costs allegedly

incurred, and plaintiffs had no existing obligation to reimburse the attorneys but would be

liable for costs only if plaintiffs obtained final judgment against defendant, held plaintiff failed

as matter of law to assert private-party cost-recovery claim under CERCLA; "mere possibility,

even the certainty, that an obligation to pay will arise in the future does not establish that a cost

has been incurred, but rather establishes that a cost may be incurred, or will be incurred.").

Even assuming that Doyle could show any costs were "necessary" for the purposes of Section

9607(a)(4), to the extent that Doyle cannot establish that he actually paid for any costs or is

obligated to do so, he may not recover for these costs under CERCLA.

     19.    Nor is Doyle entitled to recover for costs expended in developing his case

against Litchfield.  E.g., Black Horse Lane Assocs. v. Dow Chemical Co., 228 F.3d 275 (3d

Cir. 2000) (cost of consultants not necessary and not recoverable under CERCLA; fees were

not incurred as part of owner's remediation or toxification of property and were therefore not

recoverable); Sealy Conn., Inc. v. Litton Indus., Inc., 93 F. Supp. 2d 177, 194 (D. Conn. 2000)

(fees paid for site investigation in connection with litigation preparation not recoverable under

Section 9607).

20.    Doyle also cannot recover from Litchfield under the guise of CERCLA for costs expended in his failed attempts to develop his property into a horse farm.  See, e.g., Syms v. Olin Corp., 408 F.3d 95, 103 (2d Cir. 2005) (routine physical maintenance, including roadway patching and snow removal, that did not relate to investigation or cleanup of contamination, not recoverable response costs under Section 107); Sealy Conn., Inc. v. Litton Indus., Inc., 93 F. Supp. 2d 177, 189 (D. Conn. 2000) (fees paid in connection with demolition of building not recoverable under Section 9607 where evidence showed plaintiff's decision to demolish building was motivated by business and other concerns unrelated to remediation efforts related to contamination); Foster v. United States, 922 F. Supp. 642, 652-53 (D.C. Cir. 1996) (costs incurred in order to identify barriers to site not recoverable costs under CERCLA); Yellow Freight Sys. v. ACF Indus., 909 F. Supp. 1290, 1299 (E.D. Mo. 1995) (where evidence showed that plaintiffs "had business reasons for undertaking the inspection, sampling and abatement actions on the Site, i.e., to place the site in a condition that was useful to it in trucking operations," held actions were not taken in response to "public threat," and therefore actions were not necessary and/or recoverable under CERCLA).

21.    Even should he be successful in his suit for cost recovery under CERCLA, Doyle is not entitled to recover attorney fees.  See Key Tronic Corp. v. United States, 511 U.S. 809, 818 (1994) (held Section 9607 does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action).

22.    Section 9607(a)(4) provides that any interest to which a plaintiff is entitled to recover will accrue either on the date that plaintiff demands in writing "payment of a specified amount," or the date the expenditure is incurred - whichever is later.  Section 9607 has been

strictly interpreted to require that plaintiff file a specific demand in order to begin the accrual

of interest.   See, e.g., Colorado v. United States, 867 F. Supp. 948, 950-51 (D. Col. 1994)

(disagreeing with the holding in In Re Bell Petroleum Servs., 3 F.3d 889, 908 (5th Cir. 1993),

that filing of a complaint suffices, court noted that Section 9607(a)(4) "clearly requires a

written demand for specified response costs.  Thus a majority of courts have concluded that the

plaintiff must present the defendant a demand in the form of a dollar amount."); see also

United States v. E.I. Du Pont de Nemours, No. 02-1429-SLR 2004, U.S. Dist. LEXIS 16366 at

*30 (D. Del. Aug. 5, 2004) ("essence of demand is that a responsible party is put on notice that

its failure to pay a specified sum will result in the accrual of interest"; held demand letter

"trigger[s] interest only for those expenditures which the demand asserts with specificity"); but

see In Re Bell Petroleum Servs., 3 F.3d 889, 908 (5th Cir. 1993) (held filing of CERCLA cost-

recovery complaint sufficient demand under Section 9607(a)(4)); Bedford Affiliates v.

Manheimer, CV 95-0116, 1997 U.S. Dist. LEXIS 23903, at *67 (E.D.N.Y. Aug. 3, 1997)

(same).  Accordingly, even if this Court concludes that Doyle has incurred any recoverable

response costs, he is not entitled to recover any interest on the amounts claimed because he did

not ever demand payment of the specified amounts as required by 42 U.S.C. § 9607(a)(4).

DEFENDANT – TOWN OF LITCHFIELD


By _____/s/  George A. Dagon_____
         George A. Dagon, Jr. - ct06599
         Theresa M. Waugh - ct23559

Murtha Cullina LLP
CityPlace I - 185 Asylum Street
Hartford, Connecticut 06103-3469
Telephone:  860-240-6000
Facsimile:  860-240-6150
Email:  gdagon@murthalaw.com
            twaugh@murthalaw.com
Its Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2005, a copy of foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system.


/s/ George A. Dagon, Jr._____
George A. Dagon