LEXSEE 1998 US DIST LEXIS 1280

**STATE OF NEW YORK, Plaintiff, v. ALMY BROTHERS, INC.; LEONARD ALMY; LOUIS A. STILLOE; and MARY A. McMAHON, in her individual capacity and as Executrix of the Estate of Robert J. McMahon, Defendants. MARY A. McMAHON, in her individual capacity and as Executrix of the Estate of Robert J. McMahon, Third-party Plaintiff, v. D/L COOPERATIVE, INC. and TRAVELERS INSURANCE COMPANY, Third-party Defendants.**

**90-CV-818**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

**1998 U.S. Dist. LEXIS 1280; 46 ERC (BNA) 1338**

**February 4, 1998, Decided**
**February 4, 1998, Filed**

**DISPOSITION:** [*1] D/L's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and its alternative request for dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure DENIED. D/L's motion for partial summary judgment limiting the amount of damages D/L liable for in this contribution action to a maximum of $ 7,588.78 GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Third-party defendant dairy sought summary judgment on the contribution claim of third-party plaintiff debtor for hazardous waste response costs. Alternatively, it sought dismissal under Fed. R. Civ. P. 12(b)(1). If its summary judgment motion were denied, third-party defendant maintained that the court should grant partial summary judgment limiting its potential liability to the amount third-party plaintiff was obligated to pay plaintiff state.

**OVERVIEW:** Plaintiff state won a judgment for $ 1,071,227 against third-party plaintiff debtor to recover its costs of responding to a release of hazardous substances at third-party plaintiff's site. The judgment was held non-dischargeable in bankruptcy, but available assets limited plaintiff's distribution to $ 7,588.78 or 0.7 percent of its claim. The bankruptcy court assigned third-party plaintiff's mortgage interest in the site to the city where it was located. Third-party plaintiff sought contribution under 42 U.S.C.S. § 9613(f) from third-party defendant dairy, which formerly operated a plant at the site for many years, contending it was a "responsible party" as defined by 42 U.S.C.S. § 9607(a). The court denied third-party defendant's summary judgment motion and motion to dismiss, holding that qualified expert witnesses' testimony raised a triable fact issue as to whether third-party defendant was liable. A portion of any obligation actually paid by third-party plaintiff was subject to contribution, and the claim was therefore justiciable. However, partial summary judgment was granted to the extent that third-party defendant's liability in any event could not exceed $ 7,588.78.

**OUTCOME:** The court denied third-party defendant dairy's motion for summary judgment and its alternative request for dismissal. However, the court granted partial summary judgment limiting the amount of damages for which it could be liable to a maximum of $ 7,588.78, the amount the bankruptcy court held that third-party plaintiff debtor was obligated to reimburse plaintiff state. The court designated the matter as a non-jury trial and set a trial date.

**CORE TERMS:** site, mortgages, hazardous, third-party, summary judgment, contamination, interrogatory, hazardous waste, disposal, waste, dairy, contaminants, chemical, plant, genuine issue of material fact, remit, responsible party, manufacturing, pesticide, L's Reply Memorandum of Law, real property located, notice, contributed, remediation, processing, disposed, compounds, proportionate share, finder of fact, non-movant

**COUNSEL:** M. SUZANNE McMAHON, ESQ., OFFICES OF M. SUZANNE McMAHON, Johnson City, New York, for Third-party Plaintiff.

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

THOMAS R. SMITH, ESQ., BOND, SCHOENECK & KING, LLP, Syracuse, New York, for D/L Cooperative, Inc., Third-party Defendant.

**JUDGES:** NEAL P. McCURN, SENIOR U.S. DISTRICT JUDGE.

**OPINIONBY:** NEAL P. McCURN

**OPINION:**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Presently before the court is Third-party Defendant D/L Cooperative, Inc.'s ("D/L") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. D/L asserts that there are no genuine issues of material fact to be tried regarding D/L's liability in contribution to Third-party Plaintiff Mary McMahon ("McMahon" or "the McMahons"). Alternatively, D/L moves to dismiss the third-party complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil [*2] Procedure on the ground that there is no justiciable case or controversy between the parties. Finally, D/L requests that if the court denies its motion for summary judgment the court grant D/L partial summary judgment limiting D/L's potential liability to $ 7,588.78, the total amount which McMahon is obligated to pay for response costs to the State of New York ("State"). McMahon opposes this motion in its entirety.

### BACKGROUND

Familiarity with the facts of this case are assumed. Therefore, the court will discuss only those facts which are relevant to the present motion.

In the underlying action, the State brought suit pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") against, among others, the McMahons. The State sought recovery for response costs which it would incur in responding to a release of hazardous substances at a site in the City of Binghamton, New York. This court found the McMahons jointly and severally liable for these response costs and granted judgment against the McMahons in the amount of $ 1,071,227. The McMahons then filed a third-party complaint against D/L seeking contribution pursuant to CERCLA § 9613(f) on [*3] the ground that D/L was also a "responsible party" as that term is defined by § 9607(a).

In her third-party complaint, McMahon alleges that D/L owned the site prior to its sale to the McMahons in early 1981 and that D/L leased a portion of the site from the McMahons for some time after the McMahons ac-

quired ownership of the same. The third-party complaint also alleges that at the time the McMahons acquired the site in 1981, the site "was strewn with drums or barrels containing unidentified chemicals" and that "said barrels contained, among other things, pesticides of various kinds, volatile chemicals and solvents, and other hazardous substances." Specifically, the third-party complaint claims that DDT was found on the site, that DDT was banned in 1972, that DDT was used in milk processing facilities such as D/L's, and that D/L used DDT on the site for many years resulting in the contamination of the site. Finally, the third-party complaint asserts that D/L applied herbicides and rodenticides on the site for a number of years and that D/L improperly disposed of "gasoline, diesel fuel, motor oil, paints, solvents, and other hazardous or potentially hazardous substances," contributing [*4] to the contamination of the site.

In July 1993, Robert and Mary McMahon filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. On September 9, 1994, the McMahons' Chapter 11 case was converted to a Chapter 7 proceeding. On November 12, 1993, the State filed proof of claim against the bankruptcy estate in the amount of $ 890,555.55, later amended to the amount of $ 1,071,227, after this court granted judgment against the McMahons in that amount.

The State commenced an adversary proceeding in the Bankruptcy Court seeking a determination that the debt which the McMahons owed to the State was non-dischargeable. In this proceeding, the State argued that Robert McMahon's conviction for a violation of Environmental Conservation Law § 71-2711(3) established that the debt was the result of a willful and malicious injury. On July 16, 1996, the Bankruptcy Court issued a decision holding the debt non-dischargeable as to Robert McMahon but dischargeable as to Mary McMahon.

On February 6, 1997, the Bankruptcy Court issued an order assigning certain mortgages pertaining to the site to the City of Binghamton. This order also provides that the McMahons have no further [*5] interest in either the mortgages or the real property to which they attach. n1 Finally, on September 8, 1997, the Trustee in Bankruptcy filed a Notice of Distribution. As set forth in that Notice, due to the limited assets of the bankruptcy estate, there was a total of $ 7,765.53 available for distribution to general unsecured creditors, including the State. According to the Notice, the State will receive a distribution of $ 7,588.78, representing .007 (0.7%) of the State's claim.

n1 This order provides, in pertinent part, that

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

**WHEREAS**, the Chapter 7 trustee has moved to abandon property of the debtors' estate which consist of two mortgages on real property located at 6-10 Jackson Street in the City of Binghamton; and

**WHEREAS**, the State of New York has objected to the abandonment of such property; and

**WHEREAS**, the State and the trustee have stipulated and agreed that the mortgages held by the debtors' estate and any causes of action arising therefrom should be assigned to the City of Binghamton; and

**WHEREAS**, the City has agreed to accept the assignment of the mortgages;

**IT IS HEREBY ORDERED:**

1. The Chapter 7 trustee hereby assigns to the City of Binghamton the mortgages held by the debtors' estate on real property located at 6-10 Jackson Street in the City of Binghamton, which mortgages are attached hereto and incorporated herein and which are due and owing to the debtors by mortgagees Leonard Almy, Richard Shenk and Louis Stilloe.

2. The trustee also hereby assigns to the City of Binghamton all rights, title, and interest in said mortgages, and any causes of action that the estate may have against any person arising from such mortgages.

3. The debtors, Robert J. and Mary A. McMahon shall have no further interest in such mortgages or in the real property located at 6-10 Jackson Street in the City of Binghamton.

4. The State hereby provides the Chapter 7 trustee with a full and complete release from liability for any contamination at the 6-10 Jackson Street property and with contribution protection for the estate of the debtors under Section 113 of the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9613, but only to the extent of the State's future recovery of response costs as a result of the assignment of the foregoing mortgages and the sale of the properties by the City of Binghamton.

5. The Court's determination of non-dischargeability of the State's claim against Robert J. McMahon shall be unaffected by the terms of this order.

See Bankruptcy Court Order dated February 6, 1997, attached as Exhibit H to Bernstein's Affidavit.

[*6]

With this background in mind, the court will address D/L's motion for summary judgment or, in the alternative, for dismissal of the third-party complaint.

**DISCUSSION**

**I. Summary Judgment Standard**

Since 1986, the standards that govern this court's analysis of a summary judgment motion have been well-established. n2 As a drastic remedy, summary judgment is only available when it is clear that no genuine issue of material fact exists which needs to be resolved at trial, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The mere existence of some alleged factual dispute, however, will not defeat such a motion. Anderson, 477 U.S. 242 at 247-48, 106 S. Ct. 2505 at 2510, 91 L. Ed. 2d 202 at    . Rather, Rule 56 requires that there be no **genuine** issue of **material** fact. Id. at 248, 106 S. Ct. at 2510, 91 L. Ed. 2d at    (emphasis in original).

n2 In 1986, the Supreme Court decided a trilogy of cases in which it set forth these now-familiar standards. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Ra-

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

dio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

[*7]

The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of any genuine issue of material fact. 477 U.S. at 247, 106 S. Ct. at 2510, 91 L. Ed. 2d at   .

Once the moving party has met this burden, the burden shifts to the non-movant to demonstrate that there is a genuine issue of material fact. In this regard, the non-movant must do more "than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356, 89 L. Ed. 2d at   "Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor." Greenblatt v. Prescription Plan Servs. Corp., 783 F. Supp. 814, 819-20 (S.D.N.Y. 1992) (citing Anderson, 477 U.S. at 248 (interpreting the "genuineness" requirement)).

Moreover, as a preliminary matter, the non-movant [*8]  must "make a showing sufficient to establish the existence of [the] element[s] essential to [its] case, and on which [it] will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552, 91 L. Ed. 2d at . If the non-movant fails to satisfy this initial burden, there can be no genuine issue as to any material fact because "[a] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323, 106 S. Ct. at 2552, 91 L. Ed. 2d at    . Under such circumstances, the moving party is entitled to judgment as a matter of law. Id.

As the foregoing discussion makes clear, the court's task at the summary judgment stage is to determine "whether there is the need for trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511, 91 L. Ed. 2d at . It is with these guidelines in mind, that the court will address the issues raised by D/L's motion for summary judgment.

[*9]  **II. CERCLA Contribution Action**

Pursuant to  42 U.S.C. §  9613(f), "any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. . . ." 42 U.S.C. §  9613(f). To bring a contribution action, "[a] plaintiff must show that (1) the defendant is a liable party under CERCLA 107(a) [§  9607(a)]; (2) the site in question is a facility, as defined in CERCLA §  101(9); (3) there was a release or a threatened release of a hazardous substance; and (4) the release or threatened release caused plaintiff to incur response costs consistent with the NCP." Boeing Co. v. Cascade Corp., 920 F. Supp. 1121, 1132 (D. Or. 1996) (citations omitted).

The only element at issue on this motion is whether "the defendant is a liable party under CERCLA 107(a) [§  9607(a)]." Id. In the underlying cost recovery action which the State brought against the McMahons and others, this court already has determined that the site was a facility; that there was a release of a hazardous substance and that the release caused the State [*10]  to incur response costs for which this court found the McMahons jointly and severally liable.

Section 9607(a) provides, in pertinent part, that

> notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section -- . . .
>
>> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . . shall be liable for --
>>
>> (A) all costs of removal or remedial action incurred by . . . a State . . .

42 U.S.C. §  9607(a).

For purposes of this section, 42 U.S.C. §  9601(29) defines the term "disposal" to have the meaning provided in section 1004 of the Solid Waste Disposal Act,  42 U.S.C. §  6903, which, in turn, defines "disposal" to mean

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

In support of its motion [*11] for summary judgment, D/L argues, in essence, that there is no evidence to support a finding that D/L owned or operated the site at the time any hazardous substances were disposed of. In this regard, D/L notes that in response to a formal request for information made by the New York State Department of Environmental Conservation ("DEC") for information relating to the site D/L stated that it had no documents in its possession or control "reflecting a description of the waste generating and disposal activities at the Binghamton location." See D/L's "Response to Demand for Information Pursuant to Environmental Conservation Law §§ 27-1307, 27-1309," attached as Exhibit A to Lesser's Affidavit, at 4. D/L also stated in response to the same demand that "there are no documents reflecting the yearly use of chemicals purchased for use and/or storage at the Binghamton location," that "to the best of D/L's knowledge, pesticides were not used at the Binghamton location," and that "D/L has no information relating to the use of solvents at the Binghamton location." Id at 8.

In addition, D/L responded similarly to McMahon's first set of interrogatories in this action. In those answers, [*12] D/L stated that "other than the spill which occurred in April 1989 which is the subject of this litigation, D/L is unaware of any spill of a hazardous chemical, substance, or waste that occurred on the Site." See "D/L Cooperative's Answers to Third-Party Plaintiff's First Set of Interrogatories," attached as Exhibit F to Smith's Affidavit, at P 33. In addition, D/L responded to this same set of interrogatories by stating that it lacked knowledge of the procedures for disposal or treatment of any wastes generated at the site and that it lacked knowledge of the application of any pesticide at the site. See id. at PP 13; 14.

Since D/L had no knowledge of the disposal of any hazardous substances while it owned or operated the site, D/L served interrogatories upon McMahon to elicit any information she might have about such disposal. In her response to D/L's interrogatory # 18, McMahon stated that she had "no knowledge of any spill occurring at this site other than the spill which occurred on April 19, 1989." See "Third Party Plaintiff's Response to Third-Party Defendant's First Set of Interrogatories," attached as Exhibit A to Smith's Affidavit, at P 18. Furthermore, in response [*13] to interrogatory # 32 which requested that she provide specific information concerning any

disposal of hazardous chemicals by D/L at the site, she stated that she had no knowledge of the dates of any disposal and that she could not identify any substances disposed of. See id. at P 32. However, she stated that she was "aware that D/L used the services of exterminating companies, pest control operators, etc. . . . over the many years that D/L owned the property." See id. She also stated that "upon information and belief . . . chemicals were both sprayed and distributed on the site, both indoors and outdoors, for the control of pests, rodents, and weed and brush." See id. Finally, in response to this same interrogatory seeking "any and all documents concerning the disposal of hazardous chemicals, substances, or waste at the Site by D/L," she identified only a "letter of Thomas Miles and Mark O'Malley dated 11-14-89." See id.

In response to interrogatory # 34, which called for information about each release or threat of release of hazardous substances at the site, McMahon stated that she had "no specific information regarding this request at this time," but alleged again [*14] "upon information and belief," that "under contract with DL, McMahon Brothers, Inc., sprayed and distributed chemicals onto the site, both indoors and outdoors." See id. at P 34.

In response to interrogatory # 35, which requested the basis for the allegation that D/L used DDT at the site, McMahon produced no evidence that D/L had, in fact, used DDT but alleged that

> since use of DDT was banned several years prior to McMahons purchase of the site and since DL operated a Milk and Food manufacturing business on this site for over 50 years, it is only logical to assume that if there is DDT on the site that DL put it there. . . . Since D/L operated a large food processing and Manufacturing plant at the site for approximately 50 years and since D/L or one of its prior companies was in exclusive possession of the property during the 1940's, 50's, and 60's when DDT was widely used, [McMahon] alleges that D/L is responsible for DDT contamination of the site. DDT was commonly used during this period for the purpose of fly control a major problem at milk manufacturing plants. Therefore, the only logical presumption that can be made is that D/L contaminated the site with DDT.

[*15]

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

See id. at P 35.

Similarly, in response to interrogatory # 39 which requested the basis for the allegation that D/L disposed of gasoline, diesel fuel, motor fuel, paint, solvent, and other hazardous or potentially hazardous substances, McMahon responded that "simple logic is the basis of this allegation." See id. at P 39.

D/L also deposed McMahon on April 10, 1997. During that deposition, she testified that she had no personal knowledge that McMahon Brothers or anyone else provided pest control or weed and brush services to D/L, nor could she provide the name of anyone else who had such information. See Transcript of McMahon's Deposition, attached as Exhibit B to Smith's Affidavit, at 60-61. She also testified that she had no knowledge of McMahon Brothers supplying pesticides to D/L, nor did she know who any of the customers of McMahon Brothers were. See id. at 14-15, 47-48. Finally, McMahon stated that she did not recall seeing any drums or barrels on the site in 1981. See id. at 40, 46. Moreover, she stated that the only time she recalled seeing drums on the property was sometime after Mr. McMahon was arrested in April 1989. See id. at 42.

In response [*16] to the present motion, McMahon concedes that she cannot identify any witnesses "who can testify to specific episodes of D/L releases of hazardous substances on the Site." See McMahon's Memorandum of Law at 1. However, she asserts that this is of no moment because she can provide the court with circumstantial evidence which would permit a finder of fact to conclude that there was a discharge of hazardous substances on the site during the time that D/L owned or operated the site. See id. at 2-3. To support this contention, McMahon has submitted the affidavits of two experts who state that it is their opinion that D/L contributed to the contamination of the site and, thus, is a potentially responsible party under CERCLA § 9607(a).

The first of these affidavits is that of Christopher E. Wernicke, a geologist who owns and operates his own geological and environmental consulting firm, Earth Safe, in Whittier, California. See Wernicke Affidavit at P 1. He frames the issue upon which his expertise is sought as "whether at this juncture there is sufficient evidence to support a reasonable inference that Third-party Defendant D/L Cooperative, Inc. ("D/L") contributed to the contamination [*17] of the Site." See id. at P 6. To answer this question, Mr. Wernicke states that he has

> reviewed, inter alia, the following documents: the original CERCLA complaint(s) brought by the State of New York ("State") in this action; the State's motion

papers for summary judgment on CERCLA liability and response costs (including the numerous affidavits and administrative/technical reports attached thereto as exhibits); this Court's 10/24/94 Memorandum-Decision and Order on CERCLA liability; the Third-party Plaintiff's impleader motion and complaint against D/L; D/L's answer to the third-party complaint; and the motion papers (with numerous exhibits) that D/L has submitted in the instant proceeding.

See id. at P 7.

Mr. Wernicke begins his analysis with a review of the State's findings concerning the identity and quantity of contaminants that were found and treated/remediated at the site which are set forth in its Remedial Investigation Report, Feasibility Study Report, and Record of Decision. See id. at P 11. In this regard, Mr. Wernicke states that the State found that "in addition to pesticides and herbicides, the Site was very heavily contaminated by semivolatile [*18] organic compounds (oil), metals such as cadmium and chromium, and various petrocarbon compounds." See id. at P 12. Mr. Wernicke asserts that the presence of these substances "is a typical indicator that a plant or facility was engaged (over a substantial period) in high-volume manufacturing or industrial processes (of almost any kind), and that the plant or facility incorporated e.g. a very active truck dock, garage/vehicle-repair station, and fueling station." See id. at P 14. In addition, based upon his review of these documents, Mr. Wernicke states that it is his opinion that "Robert J. McMahon's activities on the Site could not possibly explain or account for the large quantity of semivolatile organic compounds, metals, and petrocarbons that were found on the Site." See id. at P 14.

Mr. Wernicke goes on to assert that "from the standpoint of any qualified expert in hazardous waste causation, and likewise from the standpoint of sound common sense, D/L's long (and perhaps very long) tenancy of the Site is by itself grounds enough for raising at least a reasonable suspicion that some part of the Site contamination must be attributed [*19] to D/L." See id. at P 19. Moreover, in addition to the length of D/L's ownership and operation of the site, Mr. Wernicke states that D/L's potentially responsible party status is supported by the nature and magnitude of D/L's activities on the site. See id. at P 20. Mr. Wernicke explains that

> from at least 1956 until 1980 or 1981, D/L was engaged in fluid milk processing and

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

ice cream production on the Site. The Site was a major industrial facility in the area and apparently processed millions of gallons of dairy products. In conjunction with its primary production operations, D/L either directly or indirectly engaged in complex subsidiary or support operations, including maintenance, repair, replacement, expansion, etc. of its processing machinery and equipment and the physical plant and premises in general. Additionally, D/L maintained substantial facilities for receiving supplies at and shipping products from the Site. Furthermore, D/L maintained service and storage garages for its vehicles as well as an on-site fueling station. Even in the period between 1981 and 1988, when D/L had ceased manufacturing operations on the Site and purportedly used it only as a depot, [*20] D/L was engaged in significant trucking operations, which apparently also involved maintenance of a service garage and fueling station.

See id. at P 20.

According to Mr. Wernicke, "D/L's operations on the Site are exactly the kind of operations that can, and typically do (i.e., at other known hazardous waste sites), explain the presence of large quantities of hazardous semivolatile [sic] organic compounds, metals, and petrocarbons." See id. at P 21.

In particular, with respect to the chromium contamination, Mr. Wernicke contends that "dairy processing plants typically have on-site chromium-dipping apparatuses (since many dairy vessels are traditionally chrome-plated), and there is a very high probability that D/L had such facilities on the Site and generated the said chromium contamination." See id. at P 22. Finally, Mr. Wernicke asserts that

> it is critical to note that the above-named hazardous wastes (in particular, cadmium and chromium) have a small or low horizontal migratory potential in most conditions and soil types. This means that, if these materials are found at a site, there is a very high probability (almost approaching certainty) that [*21] these materials were initially released at that site. With respect to the subject Site, this means that

we can and should infer that these hazardous wastes were released by D/L.

See id. at 23.

In summary, Mr. Wernicke opines that

> the Site was contaminated with (among other things) semivolatile organic compounds, metals, and petrocarbons; McMahon could not have produced that contamination; D/L easily could have (and no casual passerby could have); the said contaminants must have been released at the Site; by process of elimination, D/L, as the only other owner/operator of the Site, within a causally relevant time-frame, must have released the contaminants during the course of its operations on the Site.

See id. at P 24.

The other expert affidavit upon which McMahon relies is that of Robert B. Poitras. Mr. Poitras owns BBC Environmental, Inc. and BMR Environmental in Atlanta, Georgia, and holds a General Engineering license Class A with Hazardous Substance Certification. See Poitras Affidavit at P 2. Mr. Poitras states that he has worked, in one form or another, on 78 hazardous waste job sites since 1990. See id. In the course of this work, Mr. [*22] Poitras asserts that he has "developed substantial familiarity with the CERCLA statute and [is] familiar with the general criteria for attributing CERCLA liability to disposers of hazardous wastes." See id. He also states that he has "contracted as a hazardous waste remediation company duly licensed and qualified to perform remedial work at [several] dairy operations." See id. at P 3.

Based upon the work that he has done, Mr. Poitras asserts that it is his experience "(a) that dairy plants are invariably heavy users of pesticides, petrochemicals and fuels and (b) that such said use, if at all protracted, invariably results in serious contamination." See id. at P 5. He also states that

> the contaminants found at the Jackson Street, Binghamton, New York CERCLA Site . . . are either the same or consistent with the contaminants that were generated by dairies in other hazardous waste sites that I have seen. Since D/L has owned/operated major dairy processing

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

facilities at the Site at least throughout the period 1956-1980, it is my opinion that a finder of fact could reasonably infer that D/L is a CERCLA PRP in this matter. Moreover, on the basis of the documents that [*23] I have reviewed, it is my opinion that there is every reason to conclude that D/L is a PRP in this matter and no reason to find otherwise. In fact, on the given facts, it appears that D/L is probably causally responsible for the preponderance of the contamination at the Site.

See id. n3

n3 Mr. Poitras reviewed the same documents as Mr. Wernicke. See Poitras' Affidavit at P 6.

D/L argues that these affidavits are inadmissible for the following reasons:

(a) the witnesses and their expected testimony were not disclosed in response to a proper discovery request by D/L; (b)the witnesses are not qualified to offer expert opinion on the issues for which the affidavits are offered, as required by Rule 702 of the Federal Rules of Evidence; (c) the opinions offered are not based upon an adequate factual foundation, and therefore do not qualify as relevant evidence and are inadmissible under Rules 402 and 702 of the Federal Rules of Evidence; (d) the inadequacy of the factual foundation and lack [*24] of valid methodology renders the opinions unreliable and inadmissible under Rules 702, 703, and/or 403 of the Federal Rules of Evidence; and (e) they impermissibly offer legal conclusions.

See D/L's Reply Memorandum of Law at 2-3.

The court will address each of D/L's concerns *seriatim*.

A. Non-Disclosure of Expert Witnesses

D/L asserts, in conclusory fashion, that because McMahon failed to identify either Mr. Wernicke or Mr. Poitras as an expert or the substance of their testimony in response to D/L's interrogatory # 40, "the introduction of these expert witness affidavits in response to the motion for summary judgment represents unfair surprise, is

prejudicial to D/L, and the affidavits should therefore be rejected." See D/L's Reply Memorandum of Law at 3.

This argument need not detain the court for long. In response to D/L's interrogatory # 40 McMahon stated, *inter alia*, that "no such witnesses have been specifically identified at this time." See "Third Party Plaintiff's Response to Third-Party Defendant's First Set of Interrogatories," attached as Exhibit A to Smith's Affidavit, at P 40. In addition, in response to this motion, McMahon asserts [*25] that she recognizes that "the ongoing Discovery demand rule compelled [her] to give D/L notice of her intent to produce an expert witness at trial as soon as she reasonably [could] give such notice." See McMahon's Surreply Letter at 2. In this regard, she contends that "through counsel, [she] retained these experts on December 1, 1997 and notice was given to D/L on December 8, 1997. In fact, there was no communication or contact of any nature with either of these experts by Mary A. McMahon or her counsel prior to November 27, 1997." See id.

Although D/L does not so state, the court assumes that D/L is relying upon Rule 37(c)(1) of the Federal Rules of Civil Procedure to support its argument. This rule provides that "(1) a party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). As the Advisory Committee's note explains, this rule "provides a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need [*26] for a motion . . ." Fed. R. Civ. P. 37(c)(1) advisory committee's note.

Despite this rule's seemingly harsh mandate, courts have held that "imposition of sanctions under Rule 37 is a drastic remedy and should only be applied in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." Hinton v. Patnaude, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (citing Sterling v. Interlake Industries, Inc., 154 F.R.D. 579 (E.D.N.Y. 1994); Burks v. Eagan Real Estate Inc., 742 F. Supp. 49 (N.D.N.Y. 1990) (discussing drastic remedy of default under Rule 37)). Such decisions conform to the Advisory Committee's note which explains that "limiting the automatic sanction to violations 'without substantial justification,' coupled with the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties in a variety of situations: . . ." Fed. R. Civ. P. 37(c)(1) advisory committee's note.

In the present case, there is no evidence of either "flagrant bad faith" or a "callous disregard of the Federal Rules of Civil Procedure." To the contrary, quite the opposite appears to be true. In keeping with the [*27] rule

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

requiring continuing disclosure, McMahon updated her response to interrogatory # 40 by notifying D/L within a week of retaining these experts. Accordingly, the court concludes that there is no procedural impediment to the admission of the expert affidavits of Mr. Wernicke and Mr. Poitras.

B. Qualification of Experts

D/L asserts that Mr. Poitras and Mr. Wernicke are not qualified to offer expert opinions on the issues for which their affidavits are offered because "there is no showing that either has any experience or knowledge regarding dairy operations generally or the operations carried on by Dairylea." See D/L's Reply Memorandum at 9.

Federal Rule of Evidence 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. Although a district court has broad discretion in determining the admission and qualification of experts pursuant to Federal Rule of Evidence 702, Stagl v. Delta Air Lines, Inc., [*28] 117 F.3d 76, 81 (2d Cir. 1997), this rule requires that in reaching its decision the court make two determinations.

> First, the court must decide whether expert testimony could assist the trier of fact in understanding the evidence or determining a fact. Michael H. Graham, *Federal Practice and Procedure*, § 6641, at 242-43 (1992 Interim Edition). Second, the court must decide whether the witness called is properly qualified to give the testimony sought.

Lappe v. American Honda Motor Co., Inc., 857 F. Supp. 222, 226 (N.D.N.Y. 1994).

With respect to the first determination "'"doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility."'" Id. (quoting Larabee v. M M & L Int'l Corp., 896 F.2d 1112, 1116 n. 6 (8th Cir. 1990) (quoting in turn J. Weinstein & M. Berger, *Weinstein's Evidence* P 702[02], at 702-30 (1988))). With respect to the second determination, "liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." 857 F. Supp. at 227 (footnote omitted). "An expert must, however, [*29] stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." Id. (citing Wheeler v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir. 1991)).

Having reviewed the affidavits of Mr. Poitras and Mr. Wernicke, the court concludes that their testimony could assist the court, as the trier of fact, in ultimately determining whether D/L contributed to the contamination of the site and, therefore, is a responsible party within the meaning of § 9607(a). Secondly, the court concludes that based upon their knowledge of and experience in hazardous waste remediation, both Mr. Poitras and Mr. Wernicke are qualified to testify with respect to the facts which would aid the court in determining the issue of D/L's potential liability for the recovery costs incurred at the site. This is so even though they have not personally visited the site. See B.F. Goodrich v. Betkoski, 99 F.3d 505, 524 (2d Cir. 1996) (experts are not required to personally visit the site at issue). Moreover, as the court noted in Lappe, "Fed. R. Evid. 702 only requires that an expert have 'scientific, technical, or other specialized knowledge' [*30] gained through 'knowledge, skill, experience, training or education.'" Lappe, 857 F. Supp. at 226 (quoting Fed. R. Evid. 702). Both Mr. Poitras and Mr. Wernicke have such knowledge and, thus, meet this criteria.

Moreover, the fact that Mr. Poitras and Mr. Wernicke may have limited experience or knowledge regarding dairy operations is of no moment. Their affidavits demonstrate that they do have experience with hazardous waste remediation and causation. Also, particularly in Mr. Poitras' case, some of that experience has been gained through his involvement in remediations involving dairy operations. In addition, Mr. Wernicke has experience and knowledge relating to general manufacturing operations and the contaminants which often result from such operations which could assist the court in its understanding of the evidence in this case. Accordingly, given the experience and knowledge of these experts, together with the documents which they are competent to review, the court concludes that both Mr. Poitras and Mr. Wernicke are qualified within the meaning of Federal Rule of Evidence 702.

C. Foundation for Opinions

D/L asserts that there is a "complete absence of any reliable [*31] data to support the expert opinions . . . " of Mr. Poitras and Mr. Wernicke. See D/L's Reply Memorandum of Law at 10. The court disagrees. Both Mr. Poitras and Mr. Wernicke relied upon many of the papers previously filed in this matter, including, most importantly, the State's findings of fact with respect to the identity and quantity of contaminants that were found and treated/remediated at the site. See Wernicke's Affi-

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

davit at P 11; Poitras' Affidavit at P 6. To the court, this data appears to be the type of information "reasonably relied upon by experts in [the field of hazardous waste remediation and causation] in forming opinions or inferences upon the subject . . ." Fed. R. Evid. 703. Moreover, the court finds that based upon their experience and knowledge, as well as the reports they reviewed, these experts acted reasonably in making assumptions of fact upon which they based their conclusions. See Lappe, 857 F. Supp. at 227.

If D/L believes that this scientific evidence is weak, it will have the opportunity to vigorously cross-examine these experts at trial and to present contrary evidence to refute these findings and conclusions. See Betkoski, 99 F.3d at [*32] 526. "This is the traditional and appropriate means of attacking admissible evidence with which one disagrees." Id. (citation omitted).

### D. Prejudicial Effect of Testimony

D/L asserts that "even if the court were to find the affidavits admissible under Rules 702 and 703, they should be excluded under Rule 403, because the prejudicial effect clearly outweighs any probative value that they may have." See D/L's Reply Memorandum of Law at 10-11. D/L does not explain what the prejudicial effect of these affidavits would be. In fact, other than this one conclusory sentence, D/L makes no effort to explain how this argument relates to the issues of this case. Based upon the court's review of these expert affidavits, the court finds no prejudice which would outweigh the probative value of the statements contained therein.

### E. Legal Conclusions

D/L contends that Mr. Poitras' statement that in his opinion it reasonably may be inferred "that D/L is a CERCLA PRP" and Mr. Wernicke's statements regarding the role of circumstantial evidence and that the evidence is sufficient "for a finder of fact reasonably to infer that D/L is a PRP" are impermissible legal conclusions which are [*33] not within the witnesses' areas of competence and are for the court to determine. See D/L's Reply Memorandum of Law at 11.

Arguably, the statements that D/L cites constitute impermissible legal conclusions. This does not mean, however, that the affidavits in their entirety must be disregarded. Although Mr. Wernicke and Mr. Poitras may not testify that "D/L is a CERCLA PRP," they certainly are competent to testify that in their opinion D/L contributed to the contamination of the site. Whether or not these opinions together with the other evidence McMahon may present at trial will be sufficient to establish that D/L is a "CERCLA PRP" is a determination which this court must make. Before it does so, however, D/L will have the opportunity to produce evidence that during the

time of its ownership and operation of the site no hazardous substances were discharged. Accordingly, although the court will consider these expert affidavits, it will disregard those statements which impermissibly state legal conclusions.

Having found that McMahon's expert witness affidavits are admissible, the court concludes that based upon the facts contained therein, McMahon has created a genuine issue of [*34] material fact concerning whether D/L contributed to the contamination of the site and, thus, is a potentially responsible party within the meaning of § 9607(a). Therefore, the court denies D/L's motion for summary judgment.

Before leaving this issue, the court notes that D/L cannot rely upon its lack of recall to dodge liability. As the Second Circuit noted in Betkoski,

> people and companies often dispose of waste without knowing its contents. In future lawsuits, once hazardous substances were discovered in a given facility the generators would only need say that they could not recall what was in their waste. Because plaintiffs usually lack direct evidence that a defendant dumped hazardous substances, the potentially responsible parties would only be found liable in those rare instances in which a so-called 'smoking gun' is discovered, . . ., and the broad, remedial purpose of the Act would thereby be defeated.

Betkoski, 99 F.3d at 526 (citations omitted).

### III. Justiciable Controversy

In the alternative, D/L argues that the court should dismiss the third-party complaint because "the 'controversy' is not sufficiently real and immediate to justify [*35] the federal court's determination, because there is no reasonable prospect that any relief granted by the court to [McMahon] would have any practical effect." See D/L's Memorandum of Law at 19-20. In support of this motion, D/L asserts that "as a result of the bankruptcy and the death of Robert McMahon, there is no likelihood that [McMahon] will ever pay more than 0.7% of the amount of the State's judgment." See id. at 20. Therefore, according to D/L, "before [McMahon] could recover even a dime from D/L, the Court would first have to make a finding that, in an equitable allocation between [McMahon] and D/L, D/L is more than 99.3% responsible for the response costs incurred by the State, i.e., the Court would have to find that McMahons' re-

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

sponsibility is actually less than 0.7% of the total liability." See id. McMahon does not address this issue in her opposition papers.

This argument need not detain the court for long. D/L's conclusion that in order for this case to constitute a live controversy, the court would have to determine that D/L was 99.3% responsible for the response costs which the State incurred defies logic. The Trustee's Notice of Distribution concluded [*36] that because of the limited assets available in the bankrupt estate the State would only receive .7% of the judgment that it obtained against the McMahons. This is not the same as finding that the McMahons are only .7% responsible for these response costs. Nor does the fact that the McMahons are required to remit to the State only .7% of the total judgment because of their bankrupt status alter the fact that they may seek contribution from other potentially responsible parties for a percentage, over and above their proportionate share, of the $ 7,588.78 which they actually pay to the State.

Klinger v. Dudley, 41 N.Y.2d 362, 393 N.Y.S.2d 323, 361 N.E.2d 974 (1977), upon which D/L relies, does not dictate a different result. In Klinger, after noting that a claim for contribution "does not entitle a main defendant to contribution until Payment by such defendant to plaintiff of an amount in excess of his proportionate share of the judgment . . .," the court goes on to carve out the following exception to this general rule: "unless such defendant's payment to plaintiff, though not in excess of his proportionate share, is in full satisfaction of the judgment . . ." Id. at 369, [*37] 393 N.Y.S.2d at 328-29 (citations omitted). Although Klinger addressed the situation in which after a judgment has been entered the defendant settles with the plaintiff for an amount less than the judgment awarded, its logic is, nonetheless, applicable to the situation presented by this case.

In the instant case, although the Bankruptcy Court found the State's judgment for CERCLA recovery costs non-dischargeable as to Mr. McMahon, he is now deceased. Therefore, as D/L points out, he will be unable to accumulate any further assets from which the State could recover any further response costs. Thus, the $ 7,588.78 which McMahon is required to remit to the State pursuant to the Trustee's Notice of Distribution is, for all practical purposes, in full satisfaction of the State's judgment.

Therefore, if McMahon is able to prove that D/L is a responsible party under CERCLA § 9607(a), and as such must share in the response costs, she will be able to recover that portion of the $ 7,588.78 she actually remits to the State which exceeds her proportionate share. In other words, if the court were to find that D/L was 60% responsible for the discharge of hazardous substances at the site, [*38] then, once McMahon remits $ 7,588.78

to the State, she would be able to recover $ 4,553.27 from D/L. n4 This being the case, this matter continues to constitute a live controversy over which this court retains jurisdiction. Accordingly, the court denies D/L's motion to dismiss the third-party complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

n4 It is interesting to note that McMahon's bankruptcy may result in D/L receiving a potential "windfall" of sorts. Had the McMahons been required to pay the State its full judgment of approximately $ 1 million and then this court were to find D/L 60% responsible for the contamination of the site, McMahon would have been able to recover approximately $ 600,000 from D/L.

## IV. Possible Liability of D/L

D/L requests that if the court denies its motion for summary judgment or, alternatively, for dismissal, the court grant D/L partial summary judgment limiting its liability to the $ 7,588.87 that McMahon actually must remit to the State. [*39] McMahon opposes this request, arguing that she already has paid considerably more than this amount in the form of the mortgages on the site which she assigned to the State as partial payment for the response costs.

The record in this case does not support McMahon's contention. By order dated February 6, 1997, the Bankruptcy Court ordered that "the Chapter 7 trustee hereby assigns **to the City of Binghamton** the mortgages held by the debtors' estate on real property located at 6-10 Jackson Street in the City of Binghamton . . ." See Order of Bankruptcy Court dated February 6, 1997, attached as Exhibit H to Bernstein's Affidavit, at P 1. This order also stated that "the debtors, Robert J. and Mary A. McMahon shall have no further interest in such mortgages or in the real property located at 6-10 Jackson Street in the City of Binghamton." Id. at P 3.

McMahon attempts to circumvent the unambiguous language of the Bankruptcy Court's February 6, 1997, order by relying upon the history of the bankruptcy proceeding which culminated in this order. In this regard, she states that after the Bankruptcy Court approved the Trustee's abandonment of the subject mortgages on May 15, 1996, [*40] the State filed a motion on May 21, 1996, asking the Bankruptcy Court to reconsider its order and to undo the abandonment. McMahon asserts that for purposes of the present motion it is critical to note that in its motion papers submitted to the Bankruptcy Court the State perceived that the mortgages were valuable assets

1998 U.S. Dist. LEXIS 1280, *; 46 ERC (BNA) 1338

and that the State demanded that the mortgages be given to the State to partially satisfy the McMahons' CERCLA debt. See S. McMahon's Affidavit at P 24. According to McMahon, not only did the McMahons not oppose the State's motion but in the summer of 1996 they agreed to cede the mortgages to the State or to the Trustee for assignment to the States. See id. at P 25.

Based upon these facts, McMahon argues that it is unclear to her why the ultimate destination of the mortgages negates the reality that the mortgages were initially and in good faith assigned to the State. See id. at P 26. Moreover, McMahon asserts that the Bankruptcy Court's Order dated February 6, 1997, did not formally vacate the May 15, 1996 order and did not contain a complete recitation of the procedural events that preceded it. See id. at P 28. In addition, she contends that the State [*41] apparently drafted the February 6, 1997, for the Bankruptcy Court's signature and deliberately crafted it to bury the previous history of the mortgages. See id. McMahon concludes that the effect of the May 15, 1996 order was to vest the mortgages in the possession of McMahon. See id. at P 29. Finally, she asserts that the February 6, 1997, order did not grant the State's motion to negate the Trustee's abandonment of the mortgages nor did it vacate the May 15, 1996, Order. See id. Instead, according to McMahon she literally gave the mortgages to the State and the February 6, 1997 order recognized this fait accompli. See id.

McMahon's interpretation of the events which preceded the Bankruptcy Court's February 6, 1997 order, notwithstanding, the fact remains that this order unambiguously provides for the Trustee to assign the mortgages to the City and provides that the McMahons would have no further interest in either the mortgages or the real property to which these mortgages attach. McMahon has come forward with no evidence to suggest that this order is invalid or any basis upon which the court could rely, if it were so inclined, to ignore the unambiguous language of [*42] this order. Under these circumstances, the court concludes that McMahon has failed to demonstrate that there is a genuine issue of material fact concerning the Bankruptcy Court's February 6, 1997 order or the Trustee's Notice of Distribution which limited the amount McMahon is required to remit to the State for the recov-ery costs the State incurred at the site. Thus, no matter what the outcome of the trial on McMahon's third-party contribution action, D/L's liability would never exceed $ 7,588.78. Accordingly, the court grants D/L's motion for partial summary judgment limiting the amount of damages D/L could be liable for to a maximum of $ 7,588.78.

**CONCLUSION**

For the reasons stated above, the court **DENIES** D/L's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and its alternative request for dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. However, the court **GRANTS** D/L's motion for partial summary judgment limiting the amount of damages D/L is liable for in this contribution action to a maximum of $ 7,588.78

In light of this decision, the court hereby designates this matter as non-jury trial # 2 [*43] to commence on **March 17, 1998**, immediately upon the completion or disposition of the trial of 91-CV-685. n5 The court will issue a final pre-trial order under separate cover.

n5 Although the Second Circuit has not addressed the issue of whether the parties to a contribution action brought pursuant to § 9613(f) are entitled to a jury trial, the Third Circuit, in a well-reasoned opinion, recently answered this question in the negative, relying primarily upon the equitable nature of the relief available. This court concurs in that decision. See Hatco Corp. v. W. R. Grace & Co.-Conn., 59 F.3d 400, 412-14 (3d Cir. 1995).

**IT IS SO ORDERED.**

DATED: February 4, 1998

Syracuse, New York

NEAL P. McCURN

SENIOR U.S. DISTRICT JUDGE